# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

REGINALD G. MOORE *et al.*,          )
)
        Plaintiffs - Respondents,          )
)          No. _____
        v.          )
)
JANET NAPOLITANO, Secretary of the          )
U.S. Department of Homeland Security,          )
)
        Defendant - Petitioner.          )

---

## PETITION OF SECRETARY NAPOLITANO
## FOR PERMISSION TO TAKE AN
## INTERLOCUTORY APPEAL UNDER FED. R. CIV. P. 23(f)

STUART F. DELERY,
Acting Assistant Attorney General.

CHARLES W. SCARBOROUGH,
Appellate Staff.

RONALD C. MACHEN JR.,
United States Attorney.

R. CRAIG LAWRENCE,
Assistant United States Attorney.

MARINA UTGOFF BRASWELL,
BENTON G. PETERSON,
Assistant United States Attorneys.

C.A. 00-953

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### Parties

Petitioner is Janet Napolitano, Secretary of the U.S. Department of Homeland Security, who is the defendant below. The Respondents, a subset of the plaintiffs below, are Reginald G. Moore, John E. Turner, C. Yvette Summerour, Leroy Hendrix, Cheryl L. Tyler, Luther K. Ivery, Andrew E. Harris, Jr., and Kenneth Rooks, on behalf of themselves and a class of African American Special Agents at the Secret Service who sought promotion to the GS-14 or GS-15 level or both between 1995 and 2005, and who were not promoted on the first bid list on which they bid and who had not served as an Assistant Director, a Deputy Director, or the Director of the Secret Service at any time during the class period. There is no *amicus curiae*.

### Ruling For Which Review Is Being Requested

The Secretary seeks discretionary review of the February 25, 2013 Memorandum Opinion and Order granting the plaintiffs' fourth motion for class certification.

### Related Cases

This case was before the Court previously in Nos. 04-5364 and 10-5220, in which the Court dismissed plaintiffs' petitions for mandamus. There are no pending, related cases.

Pursuant to Fed. R. Civ. P. 23(f) and Fed. R. App. P. 5, Defendant Janet Napolitano, Secretary of the U.S. Department of Homeland Security, respectfully requests permission to appeal an interlocutory order of the District Court (entered on February 25, 2013) granting plaintiffs' fourth motion for class certification.[1]

## PRELIMINARY STATEMENT

The District Court has certified a class of African-American Special Agents ("SAs") at the Secret Service who allege disparate treatment and disparate impact under Title VII with respect to numerous promotions to vacant positions at the GS-14 and GS-15 level between 1995 and 2005, involving different applicant pools for each position, different portions of the decision-making process, different ratings panels, and different decision-makers. The Order is contrary to the Supreme Court's recent decision in *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541 (2011), which clarified the standard for aggregating individual employment discrimination claims in a class action. In certifying a class action in this case, the District Court not only failed to conduct the "rigorous analysis" of Rule 23's requirements mandated by *Wal-Mart* but also committed at least three independent but overlapping legal errors.

*First*, the District Court manifestly erred by holding that plaintiffs had established commonality under Rule 23(a)(2) where each class member was

---

[1] The Memorandum Opinion and Order entered February 25, 2013 ("Order") are at Appendix 1 ("Appx."). Other referenced material is in the Appendix.

allegedly subjected to discrimination with respect to different GS-14 and GS-15 positions, that became vacant at different times from 1995 to 2005, involving different ratings and selecting officials (including some members of the putative class), and different parts of the promotion process. Plaintiffs failed to identify any common policy or other "thread" unifying their disparate claims except the broad allegation that they each suffered discrimination under Title VII, which is plainly inadequate under *Wal-Mart*. *See* 131 S. Ct. at 2551. Nor did plaintiffs support their broad class definition with correspondingly broad statistical evidence demonstrating disparities in the overall promotion rates of African-American SAs during the entire class period – indeed, their expert witness conceded he could reach no such conclusion. There was thus no proper evidentiary basis for concluding that plaintiffs suffered a "common injury" or that they had identified any common issue "capable of class-wide resolution" in a way that "will resolve an issue that is central to the validity of the[ir] claims in one stroke." *Id.*

*Second*, the District Court manifestly erred in its analysis of why plaintiffs could adequately represent a class in which both a class representative and some absent class members who participated in the very decision-making process now alleged to be part of a "common policy" of discrimination. Although the District Court concluded that only *direct* allegations of discrimination made by one SA against another could create insurmountable conflicts for purposes of Rule

2

23(a)(4), this Court and others have found disabling conflicts where class members participated in allegedly discriminatory decisions concerning other class members. *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011). *See also Wagner v. Taylor*, 836 F.2d 578, 595 (D.C. Cir. 1987) (reversing class certification).

*Finally*, the District Court manifestly erred in holding that plaintiffs the satisfied the predominance and superiority requirements of Rule 23(b)(3). The District Court acknowledged the need to resolve numerous individual issues to determine whether any class member was unlawfully denied a promotion, and even more individual issues to determine if he or she were entitled to back pay or compensatory damages. But the District Court effectively assumed away the predominance requirement by merely observing that these individual issues could be resolved in later proceedings. That approach is flatly contrary to *Amchem. Products, Inc. v. Windsor*, 521 U.S. 591 (1997), which held that plaintiffs alleging injuries from exposure to asbestos could not proceed under Rule 23(b)(3) because individual issues related to liability and damages dwarfed any class-wide, common issues and rejected arguments that resolving individual issues could be postponed.

## FACTS RELATING TO THE PETITION

### A. The Secret Service's Merit Promotion Plan.

The Secret Service has numerous policies prohibiting race discrimination. The agency is deeply committed to merit selection principles, and evaluates SAs

3

seeking promotion to the GS-14 and GS-15 level in an elaborate, multi-tiered process known as the Merit Promotion Plan ("MPP"). Appx 61-66. The MPP is not a monolithic "policy," but instead is the generic name for a multi-step process, involving hundreds of different agency personnel spread across the country, comprised of three distinct phases: (1) the assignment of scores needed to bid for promotion to vacant GS-14 or GS-15 positions, (2) the bidding on vacant positions and the construction of a Best Qualified List ("BQL") for each vacant position, and (3) the selection of individuals for vacant positions. Appx. 61.

The first phase of the MPP, which assigned scores needed to bid for promotion to the GS 14 or GS-15 levels, consisted of three separate steps. Appx. 61-63. In the initial step, known as the First-Level Evaluation, the SA's immediate supervisor evaluated the SA's performance in consultation with any other supervisors who had significant contact with the SA for significant periods of time.[2] In the second step, the Peer Panel Evaluation, approximately seven SAs chosen annually from offices across the Secret Service, rated all the candidates. In the third step, known as a Second-Level Panel Evaluation, a seven-member panel composed of a representative from each Assistant Director's office, used objective benchmarks to evaluate the quality of the SA's experience, supervisory ability,

---

[2] During the class period, there were well over 1,100 such supervisors dispersed through 44 states, 18 foreign countries, and D.C. Appx. 79-80. The Peer Panels changed each year. Eighty (80) different SAs served on at least one Peer Panel during the class period. Appx. 80.

leadership skills, and judgment. This three-tiered process produced a composite score ("MPP score") with a maximum of 100 points. Appx. 61.[3]

The second distinct phase of the MPP involved voluntary bidding by SAs for vacant positions and the construction of BQLs for each vacancy. Upon the announcement of a vacancy, all SAs who received a final MPP score the prior year were eligible to bid for promotion to the next higher grade level, and the Secret Service placed no limit on the number of bids any SA could submit at any time. After the bidding period ended, a computer program then ranked the bidders for each vacancy by their MPP scores and calculated a cut-off score for the BQLs for the available vacancies, using a previously established formula. The BQL for each vacancy generally consisted of the names of the 30 bidders with the top MPP scores, or the top 25% of bidders. If fewer SAs than the calculated number submitted bids, then all bidders were placed on the BQL. As a result, the cut-off scores could vary dramatically for different positions, and for the same position at different times, depending upon the number of other SAs competing for a given position. *See* Appx. 73 (cut-off score for position of ATSAIC on the Vice Presidential Protective Division ranged from 72.68 to 93.22 from 1995 to 2004). Thus, due to the relative strength of other bidders, a relatively high MPP score might not have been placed on certain BQLs, whereas a comparatively lower MPP

---

[3] The scoring process for promotion to the GS-15 level changed over time but was essentially the same as that described above for the GS-14 positions. Appx. 63.

5

score might have made the BQL for each vacancy bid on. *See* Appx. 75-76.

The third distinct phase of the MPP was the selection of SAs from the BQLs for vacant positions. In this phase, the Secret Service's Personnel Division referred the eligible candidates for recommendation for possible selection to the Advisory Board, comprised of the Deputy Director, the Chief of Staff, all ADs, and the Chief of the Uniformed Division and varied from year to year. In turn, the Advisory Board submitted recommendations to the Director, who made the final selection decision. Appx. 64-65, 81 (four Directors during the class period).

### B.    Proceedings In This Case.

Plaintiffs filed suit in 2000, alleging discrimination in virtually every aspect of the Secret Service's employment decisions. After conducting extensive discovery, plaintiffs did not make any attempt to litigate their individual claims of discrimination, but repeatedly sought class certification. Appx. 7. On February 25, 2013, the District Court granted plaintiffs' fourth motion for class certification, finding that plaintiffs had satisfied both Rule 23(a) and Rule 23(b)(3) for:

> all current and former African-American Special Agents who bid for promotion to a GS-14 position from 1995 to 2004 and were not promoted to GS-14 on the first bid list on which they bid; and all current and former African-American Special Agents who bid for promotion to a GS-15 position from 1995 to 2005 and were not promoted to GS-15 on the first bid list on which they bid; but excluding Special Agents who served as an Assistant Director, a Deputy Director, or the Directive of the Secret Service during the class period.

Appx. 53. This petition focuses on three significant legal errors.

6

*First*, with respect to Rule 23(a)(2)'s commonality requirement, the District Court concluded that "plaintiffs' statistical and anecdotal evidence raises an inference of discrimination that is manifested through the MPP" and that plaintiffs had therefore "carried their burden of establishing commonality." Appx. 41. The District Court reached this conclusion despite the fact that plaintiffs' statistical analysis did not show that the MPP as a whole led to disparate rates of promotions for African-American SA bidders. To the contrary, plaintiffs' statistical showing was limited to showing "an adverse impact at individual levels of the MPP process." Appx. 17. Even the statistical evidence of an adverse impact at these individual levels was limited. While plaintiffs' expert found a disparity in the rates at which African-Americans qualified for BQLs, he also found that there was no disparity in the rate at which African-Americans were actually selected from the BQL for promotion for the majority of the class period. *See* Appx. 39-40. Ultimately, plaintiffs' expert was able to identify a disparity in actual selections from the BQL for the years 1998-2000 for promotions to GS-14 and the years 2002-2005 for promotions to GS-15. *Id.* Despite the very limited nature of this showing, the District Court certified a class spanning eleven years.

*Second*, the District Court concluded that plaintiffs had demonstrated that they would fairly and adequately represent the interests of the class, as required by Rule 23(a)(4). The District Court acknowledged that prior decisions by this Court

make clear that "it does pose a serious problem where class plaintiffs have accused other class members of the same type of discrimination from which they seek relief." Appx. 44 (citing *Wagner*, 836 F.2d at 595). The District Court also recognized that "the record demonstrates that several potential class members were directly involved in the Peer Panel or Second Level evaluation process." Appx. 46. Nevertheless, the District Court concluded that, "[b]ecause the record does not show specific allegations of discrimination by class members against other class members, the representation proposed is adequate." *Id.*

*Third*, the District Court held that the class satisfied the predominance and superiority requirements of Rule 23(b)(3). While acknowledging that plaintiffs' claims raised a host of "non-common factual issues," such as "whether there were legitimate, non-discriminatory reasons not to promote a specific SA," the District Court concluded that "whether the MPP promotions process discriminates against African-American SAs and whether the Secret Service has a pattern and practice of race discrimination" was a common issue (to be proved statistically) that predominated over any individual issue even though the case would eventually require a consideration of whether there were legitimate, nondiscriminatory reasons not to promote a specific SA." Appx. 48-49. The reasoning for this conclusion was limited to an observation that in certain enforcement actions brought by the United States – a distinct context with no predominance

8

requirement as in Rule 23(b)(3) – individual issues are deferred to a later phase.

## QUESTIONS PRESENTED

Whether the District Court manifestly erred by certifying a class for disparate treatment and disparate treatment claims when commonality and predominance are lacking under Rule 23 and *Wal-Mart*, and the class has internal conflicts because, *inter alia*, the class representatives include at least one person who rated others for promotion and could have an incentive to manipulate the description of the peer rankings in a particular way.

## REASONS FOR GRANTING THE PETITION

### A. This Court Should Grant the Petition.

This Court has ample discretion to permit interlocutory appeals under Rule 23(f), and it has exercised that discretion to review class certification decisions in similar circumstances. *See, e.g.*, *Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006). Here, immediate appellate review is warranted because the District Court's class certification decision presents "unsettled and fundamental issue[s] of law relating to class actions" that may well evade end-of-case review and it is also "manifestly erroneous." *In re Veneman*, 309 F.3d 789, 794 (D.C. Cir. 2002); *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 105-06 (D.C. Cir. 2002).

This Court has not yet had occasion to apply *Wal-Mart* to an employment discrimination class action, and this case raises novel issues whose resolution

9

would clarify the legal standards in this important area. As discussed below, the District Court manifestly erred in apply Rule 23(a) because (1) no common issue – or "glue," to use the terminology from *Wal-Mart*, see 131 S. Ct. 2252 – unifies all of the plaintiffs' individual claims, and (2) there is inherent conflict within the class because both a class representative and some absent class members participated on scoring panels that were part of the decision-making process plaintiffs allege was unlawfully tainted by discrimination. Moreover, the District Court manifestly erred in applying Rule 23(b)(3) by failing to meaningfully analyze whether individual issues predominate over common issues suitable for resolution on a class-wide basis (if any such exist), by instead concluding that such individual issues were irrelevant to class certification because they could be resolved in later proceedings.

## B.  The District Court Manifestly Erred in Certifying a Class.

Federal Rule of Civil Procedure 23(a) provides that a class may be certified only if the class is numerous, there are common questions of law or fact, the claims or defenses of the parties are typical of the class, and the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The Supreme Court has stated that "actual, not presumed, conformance with Rule 23(a) remains . . . indispensable[,]" and because a class action is a departure, the Court should undertake a  "rigorous analysis" to ensure that a class action is appropriate

under Rule 23. *General Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982); *Wal-Mart*, 131 S. Ct. at 2551.

Furthermore, a class action may be certified only if it satisfies the requirements of at least one of the subdivisions of Rule 23(b). Rule 23(b)(3), the subdivision at issue here, provides that certification is appropriate only if the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The Supreme Court has emphasized that Rule 23(b)'s requirements are "far more demanding" than the commonality requirement of Rule 23(a), and individual issues requiring resolution may preclude a finding that commonality predominates. *Amchem Products*, 521 U.S. at 623-24.

### 1. No "Common Injury" Or Answer Unifies Plaintiffs' Claims.

Plaintiffs allege that the Secret Service unlawfully denied promotions to African-American SAs with respect to numerous vacant positions at the GS-14 and GS-15 level, spanning a period from 1995 to 2005, involving different applicant pools for each position, different decision-makers (including some class members who participated on peer review panels), and disqualifications at different stages in the multi-tiered promotion process. Plaintiffs' proposed class includes SAs who missed every BQL they applied for, who made every BQL they applied for, who

received high scores that placed them near the top of most BQLs, who received low scores that placed them near the bottom of most BQLs, who made BQLs and were not promoted, and who were promoted in the same year that they missed many BQLs. Despite the wide diversity among plaintiffs' claims, the District Court concluded that they could be aggregated in a class action because there were at least some general questions that could potentially be litigated on a class-wide basis. Whatever validity that approach may once have had, the Supreme Court emphatically rejected it in *Wal-Mart*.

In *Wal-Mart*, the Supreme Court held that a putative class of female employees alleging gender discrimination under Title VII could not establish commonality under Rule 23(a) simply by alleging that Wal-Mart engaged in a "pattern and practice" of discrimination that affected all class members. The Court explained that it was not enough for the named plaintiffs to recite general questions such as "Do all of us plaintiffs indeed work at Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get?" *Wal-Mart*, 131 S. Ct. at 2551. Instead, plaintiffs had to "demonstrate that the class members 'have suffered the same injury.'" *Id.* (quoting *Falcon*, 102 S. Ct. 2364). Moreover, the Court warned, plaintiffs cannot satisfy this requirement merely by showing that class members "have all suffered a violation of the same provision of law" because "the mere claim by employees of

12

the same company that they have suffered a Title VII injury or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once." *Id.* Thus, the Court summarized, plaintiffs' claims "must depend upon a common contention," and that contention "must be of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Plaintiffs' Title VII claims in this case lack commonality, the same flaw that precluded class certification in *Wal-Mart.* Commonality is unsatisfied here (a) because plaintiffs failed to specifically challenge the particular components of the MPP Process that caused a disparate impact, and (b) because not all class members were adversely impacted by both of the disparity-producing parts of the process. Plaintiffs seek to aggregate widely-divergent claims alleging discrimination with respect to various parts of the MPP promotion process, made by different agency officials (including members of the class), with respect to a host of different positions at both the GS-14 and GS-15 level, which became vacant during the period from 1995 to 2005. There is no common thread unifying these disparate claims of discrimination except the broad allegation that each putative class member suffered an injury cognizable under Title VII when he or she was not promoted. As the Supreme Court made clear in *Wal-Mart,* however, this is not

13

sufficient to establish that class members suffered a common injury. Absent the identification of some common policy, practice or other "thread" unifying plaintiffs' individual discrimination claims, there is simply no issue that "can productively be litigated at once." *Wal-Mart*, 131 S. Ct. at 2551.

Rather than identifying a specific policy or practice that allegedly caused a common injury to all class members, the District Court purported to find a common thread linking plaintiffs' claims in the broad allegation that the Secret Service "operated under a general policy of discrimination and that the discrimination manifested itself in the defendant's challenged policies and procedures." Appx. 37-41. But the Supreme Court made clear in *Wal-Mart* that plaintiffs seeking to establish commonality in this way must offer "significant proof that an employer operated under a general policy of discrimination." *Wal-Mart*, 131 S. Ct. at 2553. As in *Wal-Mart*, plaintiffs' evidence does not satisfy this stringent standard.

The Secret Service has general policies prohibiting race discrimination and that many African-American SAs were promoted to GS-14 and GS-15 positions – often over other putative class members. Appx. 55-56; 83 (Harris selected over Moore). Moreover, the statistical analysis of plaintiff's expert, Dr. Mann, fails to show any overall disparity in the rate that African-American SAs were selected for promotion under the MPP. At most, Dr. Mann's analysis shows statistically

14

significant disparities at certain steps of the MPP only in certain time periods.[4]
Whatever the viability of narrow classes drawn in light of plaintiffs' narrow
evidence – something plaintiffs never proposed – that narrow evidence does not
support a generalization to a broad class encompassing nearly every African-
American denied any promotion to GS-14 or GS-15 during the class period.

Indeed, the patchwork nature of Dr. Mann's analysis tends to undermine
rather than support the conclusion that class members suffered a common injury
within the meaning of *Wal-Mart*. For example, those class members who always
made BQLs, such as lead plaintiff Reginald Moore, were plainly *never* affected by
disparity rates in the selection to BQLs. While evidence showing disparities in the
inclusion on BQLs might be relevant to a claim made by a class member who
failed to make some BQLs, such as John Turner, it is irrelevant for class members
like Mr. Moore. Such evidence is also irrelevant for Mr. Turner (and all other
class members) with respect to those positions where he made the BQL.
Moreover, for over half of the 1590 vacancies that occurred within the class period,
*all* SAs made the BQLs (Appx. 72-73), and thus Dr. Mann's statistical analysis
about the construction of BQLs ignores and is completely irrelevant for more than
half the positions at issue.

_____

[4] As the District Court explained, Dr. Mann found disparities for the entire class
period in the creation of BQLs, but for selection from BQLs (*i.e.,* selection for
promotion), he only found disparities from 1998 to 2000 for GS-14 positions and
from 2002 to 2005 for GS-15 positions. Appx. 39-40.

Likewise, some, but not all, class members might be affected by disparities identified in certain years with respect to selections from the BQL for promotions. But a class member who never scored high enough to be included on a BQL would never have been subjected to disparities in selections from the BQL, and *no* class member suffered from disparate impact or disparate treatment for the many years in which no disparity at all was found with respect to selections off the BQL. In this way, no class-wide determination regarding the validity of Dr. Mann's statistical findings will "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2251.

But the problem is not merely that the statistical evidence plaintiffs offered to establish commonality is *inadequate* to establish a class-wide "pattern and practice" of discrimination; that evidence tends to *refute* any such global finding. Most notably, the limited time frames for which plaintiffs' expert found disparities suggest that the same officials who were allegedly part of a "pattern and practice" of discrimination with respect to GS-14 promotions (*i.e.*, from 1998 to 2000) were *not* discriminating with respect to GS-15 promotions during that same period, and vice versa during the period (2002 to 2005) for which Dr. Mann found disparities with respect to GS-15 promotions. In short, the insurmountable obstacle to any finding of commonality here is not just a *lack* of statistical evidence to support plaintiffs' claim that the Secret Service "operated under a general policy of

discrimination," but the fact that plaintiffs' evidence actually refutes that claim.

Because plaintiffs' statistical evidence does not "demonstrate that the class members 'have suffered the same injury," *Wal-Mart*, 131 S. Ct. at 2551, the District Court manifestly erred in finding commonality in this case.

## 2.  The Undisputed Participation of Class Members In The Allegedly Discriminatory Decision-Making Process Creates Conflicts That Undermine The Adequacy of Named Plaintiffs As Class Representatives

The District Court also manifestly erred in concluding that plaintiffs' revised class definition cured the "conflict of interest" problem that had previously caused it to deny class certification. *See Moore*, 269 F.R.D. at 33-35.  Even under the revised class definition, the court recognized that "several potential class members were directly involved in the Peer Panel or Second Level evaluation process," and that the class thus still posed the problem of class members effectively accusing other class members of discrimination to the extent they participated in a decision-making process that plaintiffs alleged was part of a "pattern and practice" of discrimination.   Appx. 46.  Nevertheless, the court held that, "[b]ecause the record does not show specific allegations of discrimination by class members against other class members, the representation is adequate." *Id.*

The District Court cited no case to support its extraordinary conclusion that only *direct* accusations of discrimination create a conflict of interest rendering class members inadequate representatives.   Nor are we aware of any such

precedent. On the contrary, both this Court and the Seventh Circuit have held that putative class representatives have disabling conflicts of interest where they are in positions to make the very sorts of employment decisions being challenged. *Randall*, 637 F.3d at 824. As this Court explained in reversing the certification of a class of African-American employees alleging race discrimination under Title VII, the inclusion of class members who "have been responsible for evaluating the performances of other members of the class" fatally undermines adequacy of representation. *Wagner*, 836 F.2d at 595.[5]

### 3.   The District Court Fundamentally Misconceived The Predominance And Superiority Requirements of Rule 23(b)(3).

Even assuming the class in this case satisfied the requirements of Rule 23(a), it does not satisfy the "far more demanding" predominance and superiority requirements of Rule 23(b)(3). *Amchem*, 521 U.S. at 623-24. The District Court only analyzed these requirements perfunctorily, and in this way, violated *Wal-Mart*'s mandate of a "rigorous analysis" of all the Rule 23 requirements. The sum total was a declaration that "[a]ll members of the class will rely on the same

---

[5] The District Court relied solely on *McReynolds v. Sodexho Marriott Servs.*, 208 F.R.D. 428, 447 (D.D.C. 2002), for the proposition that "the presence of both supervisors and non-supervisors in a class does not undermine adequacy where there were no direct accusations of discrimination within the class." Appx. 46-47. Such a reading of *McReynolds* is in tension with this Court's decision in *Wagner*. But *McReynolds* is also distinguishable, including, unlike here, plaintiffs in that case did not allege "discriminatory treatment by other potential class members with respect to promotions." 208 F.R.D. at 447.

statistical evidence to make the same claim: that the MPP process discriminates against African-American SAs seeking promotions," and a conclusion that individual issues – such as "whether there were legitimate, nondiscriminatory reasons not to promote a specific SA" – "are not germane to the liability stage of a pattern and practice claim, are not relevant to the plaintiffs' disparate impact claim, and thus do not destroy predominance." Appx. 48-49.

The District Court's assessment of predominance is flawed in numerous ways. As an initial matter, it erred in viewing the "MPP process" as a monolithic policy susceptible to a class-wide determination that it "discriminates against African-American SAs seeking promotions to the GS-14 and GS-15 positions." *Id.* As explained above, the "MPP process" is a label for a multi-stage process resulting in the many individual promotion decisions made. A global indictment of the MPP process as a whole will not meaningfully advance any class member's Title VII claim any more than a global finding that the MPP process was "not discriminatory" would preclude any class member from attempting to prove that that he or she was unlawfully denied specific promotions on account of race.

Further, the District Court also erred by concluding that the many individual issues that must be resolved in secondary stages of a "pattern and practice" case (*e.g.*, phase II *Teamsters* hearings to determine individual relief) are irrelevant to the predominance inquiry under Rule 23(b)(3). To the contrary, that is the heart of

19

the predominance inquiry, which necessarily entails a comparison of common and individual issues.[6] The District Court cited no precedent for its novel approach, and we know of no decision parsing the predominance inquiry in this manner. On the contrary, in holding that plaintiffs' seeking relief based on injuries from their common exposure to asbestos could not proceed as a class action under Rule 23(b)(3), the Supreme Court in *Amchem* did not treat individual issues requiring resolution at later stages as irrelevant to the predominance analysis, but instead took those issues into account and found that they dwarfed any common issue. *See Amchem* 521 U.S. at 624; *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 421-22 (5th Cir. 1998) (courts assessing predominance under Rule 23(b)(3) must consider the claim "as a whole" and rejecting an attempt to "manufacture predominance").

In sum, the District Court fundamentally erred by ignoring the myriad individual issues that plaintiffs would need to prove later in making its threshold assessment of predominance under Rule 23(b)(3).

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, this Court should allow an immediate appeal from the District Court's order certifying a class and vacate the February 25, 2013 order.

---

[6] The District Court erred in assuming that plaintiffs "will rely on the same statistical evidence to make the same claim." Appx. 48. It summarized three distinct categories of individual claims: (1) applicant-to-BQL; (2) use of MPP scores on the BQL; and (3) BQL-to-selected, Appx. 10-12; 47-51, and that shows that the reasons for a class member's non-selection may vary by position.

STUART F. DELERY
Acting Assistant Attorney General

CHARLES W. SCARBOROUGH
U.S. Department of Justice, Civil Division
Appellate Staff

RONALD C. MACHEN JR.
United States Attorney

R. CRAIG LAWRENCE
Assistant United States Attorney


MARINA UTGOFF BRASWELL
BENTON G. PETERSON
Assistant United States Attorneys

21

# APPENDIX

# TABLE OF CONTENTS

Page

February 25, 2013 Memorandum Opinion and Order ..............................................1

Miscellaneous Standards - (U.S. Secret Service) ...................................................55

Supplemental Declaration of Nilda Walker (excerpt) ...........................................60

Declaration of Ruth A. O'Donnell (excerpt) ........................................................71

Declaration of Karen Waring (excerpt) ................................................................77

SA Promotion Certificate for Vacancy No. 99169 ................................................83

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
————————————————————————          )
REGINALD MOORE, et al.,           )
                                  )
      Plaintiffs,                 )
                                  )
      v.                          )  Civil Action No. 00-953 (RWR/DAR)
                                  )
JANET NAPOLITANO,                 )
                                  )
      Defendant.                  )
————————————————————————          )
```

## MEMORANDUM OPINION AND ORDER

Plaintiffs, African-American current and former Special
Agents ("SAs") of the United States Secret Service, bring this
employment discrimination action individually and as a putative
class action on behalf of African-American SAs against the
Secretary of the United States Department of Homeland Security
alleging that the Secret Service engaged in a pattern and
practice of racial discrimination in promoting African-American
SAs to GS-14 and GS-15 positions and that the Secret Service's
promotion process has an adverse impact upon African-American SAs
in violation of Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000e et seq., and the Civil Rights Act of 1991, 42
U.S.C. § 1981a.  The plaintiffs move to certify a class of
African-American current and former SAs who have allegedly been
denied promotions due to racial discrimination under Federal Rule
of Civil Procedure 23.  The defendant moves to exclude the
testimony of plaintiffs' expert, Dr. Charles Mann, offered in

**Appx. 1**

-3-

## I.    PROMOTION EVALUATION PROCESS

The plaintiffs' discrimination claims center around the Secret Service evaluation system known as the Secret Service Special Agent Merit Promotion Program ("MPP"). The MPP is used annually to evaluate SAs for promotion. An MPP score on a scale up to 100 points is used by an agent seeking promotion to bid on available or vacant positions throughout an upcoming bid cycle. (Pls.' Mem. of P. & A. in Supp. of Pls.' Mot. for Class Cert. ("Pls.' Mem.") at 15.) A participating GS-13 Agent receives a total MPP score that consists of three distinct parts: a (1) First Level evaluation; (2) Peer Panel evaluation; and (3) Second Level evaluation. A participating GS-14 Agent receives an MPP score that consists of two parts: a (1) First Level evaluation and (2) Second Level evaluation. (Id. at 15-16.) The first level evaluation to which both GS-13 and GS-14 participating agents are subject is completed by the candidate's immediate supervisor and is signed by a Special Agent in Charge. (Id. at 16.) The supervisor rates each candidate using a scale of one to five on ten specific elements such as writing ability, problem solving, oral communication, knowledge of Secret Service rules and regulations, leadership and management ability, and negotiation skill. (Id.; see also Moore v. Summers [(Moore I)], 113 F. Supp. 2d 5, 8 (D.D.C. 2000).)

The Peer Review Panel applies to candidates seeking promotion to the GS-14 level. The Panel evaluates candidates on their "protection" and "investigation" experience. (Pls.' Mem. at 16.) Peer Panel members include agents at the GS-14 level or above, who are given oral instructions on conducting the panel. Notes are not taken during the Peer Panel evaluation. (Id. at 17.)

A Second Level Panel evaluates candidates for GS-14 or GS-15 promotions. GS-14 Agents are rated on six separate competencies, including written or oral communication, ability to lead or direct others, and ability to analyze problems and recommend solutions. (Id.) The Second Level Panel members include representatives from each of the seven Assistant Director ("AD") offices, and the members are instructed not to take notes and may review and adjust the ratings at their discretion. (Id. at 17-18.)

Once an agent is given an MPP score, she may use her score to bid on vacant positions. In some cases, a

-5-

Service in 2004, but asserts that "he would have reached the GS-15 . . . level before retirement" had he not experienced the Secret Service's discriminatory practices. (Id.)

    C.   John Turner

John Turner is an African-American former SA who bid for more than 80 GS-14 positions for which he was not selected. (Id. at 40.) Originally his MPP score was not high enough to place him on the BQL, but once it was, he was "nevertheless denied dozens of GS-14 positions on which he bid." (Id.) Turner alleges that he was promoted "six years after he first became eligible" and only after filing an EEO complaint and a lawsuit. (Id. at 41.)

    D.   Cheryl Tyler

Cheryl Tyler is a former SA who was employed by the Secret Service from 1984 to 1999. (Id.) Tyler alleges that she became eligible to bid for a GS-14 promotion in 1993, but deferred bidding until 1996 because her MPP scores were not competitive enough. (Id. at 42-43.) Tyler was the only African-American female SA in the Atlanta Field Office and that, "[a]t the time she resigned, and . . . the filing of this lawsuit, there were no African-American female Agents in a GS-14 position." (Id. at 41-42.) Another agent was "troubled . . . by . . . Tyler's experience in the Secret Service's Office of Training" because Tyler had "worked in every possible assignment and/or position within the Office, yet she was continually passed over for promotion." (Id. at 43 (quoting 7/28/00 Webb Decl. ¶ 36).) Tyler asserts that she resigned in 1999 "because she could not reach the GS-14 level as a result of discrimination" and that the Agency told her that it "was not ready for an African-American female supervisor." (Id. at 44 (citing C. Tyler Decl. ¶¶ 36, 34).)

    E.   Yvette Summerour

Yvette Summerour claims that she experienced discrimination by the Secret Service even before it hired her because it delayed her hiring by five years and that, after being hired, from 1998 through 2001, she "applied for and was denied promotion to almost 70 GS-14 positions." (Id. at 44-45.) In the "calendar year before this lawsuit was filed . . . , [she] applied for and was denied promotion to twelve GS-14

- 7 -

    14 positions prior to finally being promoted, even
    though he was qualified for each and every position."
    (Id. at 52 (citing Ex. 87).)   Hendrix, an African-
    American, further alleges that he was not selected for
    a position "when his score was ten points higher than
    the selectee's score."   (Id. at 53 (citing Ex. 88 at
    455).)   Hendrix "bid on and was not selected for over
    forty GS-15 positions" and claims that, although he was
    "the most qualified choice" for a Special Services
    Division/White House Mail position, he was not selected
    and was "forced to vacate his office to make room for
    the white selectee, and . . . train that Agent."   (Id.
    at 53-54.)   Hendrix states that he "was finally
    promoted to a GS-15 Assistant Special Agent in Charge
    position in the Los Angeles Field Office" but that "he
    was required to accept a cross-country move to be
    promoted[.]"   (Id. at 54.)

Moore III, 269 F.R.D. at 24-27.

    The plaintiffs have moved for class certification three

times before.   The plaintiffs' third motion for class

certification was considered in Moore III.   There, the plaintiffs

moved to certify a class

    on behalf of all current and former African-American
    Agents who were employed as Criminal Investigators
    (GS/GM-1811) and who had the required time-in-grade to
    seek promotion to competitive positions at the GS-14
    level at any time during the years 1995 to 2004, and/or
    who had the required time-in-grade to seek promotion to
    competitive positions at the GS-15 level at any time
    during the years 1995 to 2005.

Id. at 27 (internal quotation marks and citation omitted).

Although the plaintiffs' proposed class satisfied the numerosity

and commonality prongs, the plaintiffs' motion for class

certification was denied without prejudice because the class

representatives' claims were not typical of the class members'

-9-

<u>DISCUSSION</u>

I.   MOTION TO EXCLUDE EXPERT TESTIMONY[2]

Rule 702 provides:

A witness who is qualified as an expert by knowledge,
skill, experience, training, or education may testify
in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other
specialized knowledge will help the trier of fact to
understand the evidence or to determine a fact in
issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles
and methods; and
(d) the expert has reliably applied the principles and
methods to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, district courts are

gatekeepers of expert evidence.  <u>See</u> <u>Daubert</u>, 509 U.S. at 589.  A

court must determine as an initial matter whether the proffered

_____

[2] In <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2553-54
(2011), the Supreme Court suggested that a court should probably
determine whether expert testimony is admissible under Rule 702
and <u>Daubert</u> at the class certification stage.  <u>See</u> <u>Wal-Mart</u>, 131
S. Ct. at 2553-54 ("The District Court concluded that <u>Daubert</u> did
not apply to expert testimony at the certification stage of class
action proceedings.  We doubt that is so[.]") (citation omitted).
The D.C. Circuit has not spoken about whether district judges
must conduct a full <u>Daubert</u> analysis at the class certification
stage, and courts in other circuits disagree as to what is
required of a district judge deciding a motion for class
certification.  <u>See</u> <u>In re Rail Freight Fuel Surcharge Antitrust
Litig.</u>, 286 F.R.D. 88, 92 (D.D.C. 2012) (discussing circuit
split).  Nevertheless, "dicta of the United States Supreme Court
should be very persuasive."  <u>Gabbs Exploration Co. v. Udall</u>, 315
F.2d 37, 39 (D.C. Cir. 1963) (internal quotation marks omitted);
<u>see also</u> <u>Bangor Hydro-Electric Co. v. FERC</u>, 78 F.3d 659, 662
(D.C. Cir. 1996) (stating that "Supreme Court dicta tend[] to
have somewhat greater force" than dicta from other courts).
Accordingly, the defendant's motion to exclude Dr. Mann's expert
testimony will be considered before turning to the plaintiffs'
motion for class certification.

-11-

reliable." <u>Groobert v. President & Dirs. of Georgetown Coll.</u>,
219 F. Supp. 2d 1, 6 (D.D.C. 2002) (quoting <u>Daubert</u>, 509 U.S. at
590).

"In general, Rule 702 has been interpreted to favor
admissibility." <u>Khairkhwa v. Obama</u>, 793 F. Supp. 2d 1, 10
(D.D.C. 2011) (citing <u>Daubert</u>, 509 U.S. at 587; Fed. R. Evid. 702
Advisory Committee's note ("A review of the caselaw after <u>Daubert</u>
shows that the rejection of expert testimony is the exception
rather than the rule.")). Nonetheless, the proponent of the
expert witness -- here, the plaintiffs -- bears the burden to
prove that the expert testimony is reliable by a preponderance of
the evidence. <u>Meister</u>, 267 F.3d at 1127 n.9.

The plaintiffs offer Dr. Mann's report to show that the MPP
promotion process had a statistically significant adverse impact
on African-American SAs in support of both the plaintiffs'
disparate treatment pattern and practice claim and their
disparate impact claim. Specifically, Dr. Mann would offer three
opinions. First, relying on his "applicant to best qualified
list" analysis,[3] Dr. Mann would testify that "[t]he use of MPP
scores to create a cut-off for inclusion on the best qualified

_____

[3] The "applicant to best qualified list" analysis compares the
number of African-American SAs expected to make a best qualified
list for a position based on the number who applied for the
position with the actual number of African-American SAs who made
the best qualified list. <u>See</u> Pls.' Opp'n to Mot. to Exclude Mann
Test., Ex. 2 (Fourth Supp. Decl. of Charles R. Mann, Ph.D. ("Mann
Decl.")) ¶¶ 35-43.

-13-

based on his "best qualified to selected" analysis,[6] Dr. Mann

concludes that "[f]ewer African-American Special Agents are

promoted from the best qualified list than would be expected in

the absence of discrimination[.]"  Pls.' Opp'n to Mot. to Exclude

Mann Test. at 5; see also Mann Decl. ¶¶ 45-48.  Dr. Mann found

statistically significant racial disparities in GS-13 to GS-14

level promotions that occurred from 1998 to 2000, and in GS-14 to

GS-15 level promotions that occurred in 2002 to 2005.  Pls.'

Opp'n to Mot. to Exclude Mann Test. at 5; see also Mann Decl.

¶¶ 45-48.

     There is no dispute that Dr. Mann is qualified to offer

statistical expert testimony.[7]  Instead, the Secret Service

---

[6] The "best qualified to selected" analysis "compares the number
of African American promotions 'expected' based on the number of
African Americans who made the best qualified list to the number
of African-Americans actually promoted."  Pls.' Opp'n to Mot. to
Exclude Mann Test. at 41.

[7] The defendant's motion does not dispute that Dr. Mann is
qualified to offer expert opinions based on statistical analyses.
See also Pls.' Opp'n to Mot. to Exclude Mann Test., Ex. 1
(Charles Mann Dep. at 7:15-20).  Dr. Mann has a Bachelor of
Science in Applied Mathematics, a Master of Science in
Mathematical Statistics, and a doctorate in Statistics.  Mann
Decl., Attach. A (Mann Resume at 1).  Dr. Mann is the President
of a "consulting firm which provides statistical, econometric and
data processing services."  Id.  In this capacity, Dr. Mann
"provides expert witness services and statistical guidance in
connection with a wide range of litigation."  Id.  Dr. Mann has
also testified in numerous state and federal court proceedings.
See Mann Decl., Attach. A. (Mann Test. List).  Based on his
extensive education and experience, Dr. Mann is qualified to
testify as an expert in statistics.

-15-

<u>Watson v. Fort Worth Bank & Trust</u>, 487 U.S. 977, 985-86 (1988).

In a disparate treatment case, "the plaintiff is required to

prove that the defendant had a discriminatory intent or motive."

<u>Id.</u> at 986.  One method of proving disparate treatment is to show

that an employer engaged in a pattern and practice of

discrimination.  Where a plaintiff alleges such systemic

discrimination, "[t]he ultimate factual issues are . . . simply

whether there was a pattern or practice of such disparate

treatment and, if so, whether the differences were 'racially

premised.'"  <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S.

324, 335 (1977).  In a pattern and practice case, a plaintiff has

to "establish by a preponderance of the evidence that racial

discrimination was the company's standard operating procedure[,]

the regular rather than the unusual practice."  <u>Id.</u> at 336.  The

plaintiff may meet his burden by offering circumstantial evidence

that is "entirely statistical in nature."  <u>Palmer v. Shultz</u>, 815

F.2d 84, 90 (D.C. Cir. 1987); <u>see also</u> <u>Segar</u>, 738 F.2d at 1267.

> Statistics showing racial or ethnic imbalance are
> probative in a [pattern and practice case] only because
> such imbalance is often a telltale sign of purposeful
> discrimination; absent explanation, it is ordinarily to
> be expected that nondiscriminatory hiring practices
> will in time result in a work force more or less
> representative of the racial and ethnic composition of
> the population in the community from which employees
> are hired.  Evidence of longlasting and gross disparity
> between the composition of a work force and that of the
> general population thus may be significant[.]

-17-

between pattern and practice disparate treatment claims and

disparate impact claims, "an important point of convergence" is

that both "are attacks on the systemic results of employment

practices." Segar, 738 F.2d at 1267.

> The pattern or practice claim amounts to an allegation
> that an observed disparity is the systemic result of an
> employer's intentionally discriminatory practices.  The
> disparate impact claim amounts to an allegation that an
> observed disparity is the systemic result of a specific
> employment practice that cannot be justified as
> necessary to the employer's business.  Consequently the
> proof of each claim will involve a showing of disparity
> between the minority and majority groups in an
> employer's workforce.

Id.  Because both the disparate treatment and disparate impact

claims can be proven using the same statistical showing, the

relevance of Dr. Mann's testimony can be considered for both of

the claims at the same time.

      2.   Relevance of statistical evidence showing an
            adverse impact at individual stages of a multiple
            step employment decision process

Dr. Mann's statistical evidence shows an adverse impact at

the individual levels of the MPP process.  While the defendant

does not dispute that statistical evidence showing an adverse

impact at an individual stage is relevant to the plaintiffs'

disparate impact claim, the defendant argues that Dr. Mann's

testimony is not relevant to the plaintiffs' disparate treatment

pattern and practice claim because none of Dr. Mann's conclusions

are based on the "relevant statistic" -- "a comparison of the

promotion rates of qualified (or eligible) African-American and

-19-

Although the "bottom line" defense is not applicable in a

disparate impact case, the Court in <u>Teal</u> noted that

> a nondiscriminatory "bottom line" and an employer's
> good-faith efforts to achieve a nondiscriminatory work
> force, might in some cases assist an employer in
> rebutting the inference that particular action had been
> *intentionally discriminatory*:  "Proof that [a] work
> force was racially balanced or that it contained a
> disproportionately high percentage of minority
> employees is not wholly irrelevant on the issue of
> intent when that issue is yet to be decided."

<u>Id.</u> (emphasis added) (quoting <u>Furnco Constr. Corp. v. Waters</u>, 438

U.S. 567, 580 (1978)) (citing <u>Teamsters</u>, 431 U.S. at 339 n.20).

Although statistics showing "a nondiscriminatory bottom line" can

be used to rebut the inference of discrimination, "[a] racially

balanced work force cannot immunize an employer from liability

for specific acts of discrimination." <u>Furnco</u>, 438 U.S. at 579.

Therefore, statistical evidence showing an adverse impact at a

component level may be offered in support of a pattern and

practice claim.  <u>See</u> <u>United States v. City of New York</u>, 683 F.

Supp. 2d 225, 249 (E.D.N.Y. 2010) (finding that statistical

evidence showing statistically significant disparities at

individual levels of the employer's hiring process was sufficient

to establish a prima facie case that the employer had a pattern

and practice of discriminating against African-American

applicants).[8]

--------

[8] Contrary to the defendant's argument, allowing statistical
evidence at the component level to create an inference of
discrimination to support the plaintiffs' pattern and practice
claim is consistent with <u>Moore I</u>.  In <u>Moore I</u>, the plaintiffs'

-21-

is relevant to the plaintiffs' disparate treatment and disparate impact claims.[9]

Dr. Mann's testimony based on his mean rank and effective pass rate analyses is also relevant to the plaintiffs' claims. The plaintiffs provide evidence that the members of the promotion Advisory Board testified that they considered a SA's rank on the best qualified list when making promotion recommendations. See id., Ex. 5 (Examples from Def.'s Resp. to Pls.' Interrogs. 4(c)); see also Pls.' Opp'n to Mot. to Exclude Mann Test. at 37. If a SA's rank on a best qualified list affects whether that SA will be promoted, Dr. Mann's mean rank analyses will help the trier of fact determine whether the MPP process is discriminatory. The plaintiffs also provide evidence that some "members of the promotion Advisory Board . . . [felt] that some Special Agents who made the best qualified list had scores that were simply too

---

[9] That Dr. Mann did not directly compare the MPP scores received by African-American and non-African-American SAs does not compel a different conclusion regarding the relevancy of Dr. Mann's applicant to best qualified list analysis as the defendant argues. The defendant asserts that the "fact in issue" is "whether African-American SAs receive lower MPP scores than non-African-American SAs." Def.'s Mem. to Exclude Mann Test. at 33. The plaintiffs establish, however, that Dr. Mann's applicant to best qualified list analysis is relevant because it "measure[s] the adverse impact of how MPP scores are actually used," Pls.' Opp'n to Mot. to Exclude Mann Test. at 33, and "models the real-world effect on African-American Agents of the MPP's first use of scores by measuring the impact by race on failure to make the best qualified list," id. at 34. The applicant to best qualified list analysis is based on the MPP scores and is relevant as a proxy for the scores. Because this analysis showing an adverse impact on African-American SAs is probative of whether the MPP process is discriminatory, it is relevant.

**Appx. 21**

-23-

271, 276 (D.C. Cir. 1998) (Sentelle, J., concurring).  In a non-promotion case, the statistician proceeds from the assumption that "absent discriminatory promotion practices, the proportion of the protected group in each of the job classifications and grade levels would approximate the proportion of the protected group with the minimum necessary qualifications for promotion in the employer's labor force as a whole." Davis v. Califano, 613 F.2d 957, 964 (D.C. Cir. 1979) (citing Teamsters, 431 U.S. at 339 n.20).

Dr. Mann described the application of his methodology. First, he used information he received from the Secret Service to define his pools, and considered pools composed of eligible bidders "for whom selection would be a promotion (increase in grade) and who ha[d] not already been selected for another promotion from the bid list" who bid on any vacancy announcement during a period of time.  Mann Decl. ¶ 16.  In his applicant to selected analysis, Dr. Mann included only "informative" pools. According to Dr. Mann, "informative" pools are diverse (i.e., "pools that have at least one African-American eligible and at least one non-African-American eligible") and competitive (i.e., pools that "have at least one successful eligible and at least one not successful eligible").  Id. ¶ 77.  Then, Dr. Mann conducted the following analyses: (1) applicant to best qualified list, (2) best qualified list to selected, (3) mean rank on the

-25-

expert, Dr. Paul White, also used pools analyses for some of his
analyses. Pls.' Opp'n to Mot. to Exclude Mann Test. at 29 &
n.25; see also Def.'s Mem. to Exclude Mann Test., Ex. 4, White
Report at 7. Dr. Mann's decision to exclude non-competitive best
qualified lists "where fewer Agents bid for the position than the
number used to create the cut-off score[,]" Pls.' Opp'n to Mot.
to Exclude Mann Test. at 30, does not make Dr. Mann's testimony
unreliable as the defendant argues, Def.'s Mem. to Exclude Mann
Test. at 34-36. Even if the non-competitive lists are among the
data relevant to Dr. Mann's analyses, there is "no authority
rigidly requiring that an expert review all relevant information
in a case in order to have his or her testimony admitted into
evidence." SEC v. Johnson, 525 F. Supp. 2d 70, 75 (D.D.C. 2007).
"Indeed, Federal Rule of Evidence 705 specifically 'eliminates
the prior practice of requiring an expert to set out,
specifically, the facts and data underlying an opinion before
allowing the expert to testify.'" Id. at 75-76 (citing Ambrosini
v. Labarraque, 101 F.3d 129, 132 (D.C. Cir. 1996)). Thus,
Dr. Mann's failure to review lists he considered to be non-
informative is not a ground for excluding his testimony; instead,
"it provides subject matter for cross-examination." Id. at 76.[11]
Similarly, the defendant's argument that Dr. Mann did not report

---

[11] An expert who fails to review relevant data, and can offer no
good reason for it or does not understand the omitted relevant
data, has not reliably applied a scientific methodology. See
Fed. R. Evid. 702(d). That, of course, did not occur here.

**Appx. 25**

-27-

tests[.]"  Palmer, 815 F.2d at 95.  Dr. Mann used one-tailed
tests and concluded that stages of the MPP process have an
adverse impact on African-American SAs where his analyses showed
results that were statistically significant at a 2.5% probability
of randomness.  Although two-tailed tests are favored in Title
VII cases, Dr. Mann reliably applied the one-tailed tests and his
conclusions followed from his analyses.

Dr. Mann aggregated data across periods of time, a method
the defendant criticizes as unreliable because the results are
not based upon individual years.  See Def.'s Mem. to Exclude Mann
Test. at 21-23.  In his deposition, Dr. Mann explained that he
did not report year-by-year data because he believed that there
was "no real significance to the years."  Pls.' Opp'n to Mot. to
Exclude Mann Test., Ex. 1, Mann Dep. at 260:21-261:6.  He also
stated that unlike aggregated data, disaggregated annual data may
have only yielded "small numbers and tests not powerful enough to
detect [a disparity]."  Id.  "Where, as here, 'policies have
remained unchanged over a period of time and there have been no
substantial changes in the [promotion process], it would be
unreasonable to require a plaintiff to break his or her data into
year by year subgroups.'"  Eldredge v. Carpenters 46 N. Cal.
Cntys. Joint Apprenticeship & Training Comm., 833 F.2d 1334, 1339
n.7 (9th Cir. 1987) (quoting D. Baldus & J. Cole, Statistical
Proof of Discrimination § 7.1 (1986 Supp.)); see also Lilly v.

-29-

756 F.2d 524, 541 (7th Cir. 1985)).  Dr. Mann's methodology finds

support in precedent involving aggregating data in similar

situations and is reliable.

Finally, the defendant argues that Dr. Mann's testimony

based on his best qualified to selected analysis is unreliable

because Dr. Mann should have expected that his multiple analyses

would yield some "significant" results as random error.  The

defendant further argues that Dr. Mann should have conducted

additional tests to "determine the likelihood that his results

are consistent with . . . pure statistical chance[.]"  Def.'s

Mem. to Exclude Mann Test. at 29-30.  The defendant's argument is

supported only by the declaration of defendant's proffered

expert, Dr. Laura Malowane, "an expert statistician retained by

the Secret Service for purposes of this Daubert motion."  Id. at

30 n.9.  Because the defendant's disclosure of Dr. Malowane as an

expert was untimely, Dr. Malowane's declaration should not be

considered.[12]  However, even if the defendant's arguments based

_____

[12] The plaintiffs argue that Dr. Malowane's declaration should be
stricken under Federal Rule of Civil Procedure 37(c) as having
been disclosed untimely in violation of Rule 26(a)(2), or
alternatively, 26(a)(1).  Rule 26(a)(2) requires that a party
"disclose to the other parties the identity of any [expert]
witness it may use at trial[.]"  Fed. R. Civ. P. 26(a)(2)(A)
(emphasis added).  Rule 26(a)(1) requires that a party disclose
the name and address "of each individual likely to have
discoverable information . . . that the disclosing party may use
to support its claims or defenses[.]"  Fed. R. Civ. P.
26(a)(1)(A).  "If a party fails to provide information or
identify a witness as required by Rule 26(a) or (e), the party is
not allowed to use that information or witness to supply evidence
on a motion . . . unless the failure was substantially justified

**Appx. 29**

-31-

on Dr. Malowane's untimely declaration were considered, they

would not be grounds to find that Dr. Mann's testimony is

inadmissible because Dr. Malowane erroneously assumes that

Dr. Mann conducted several, individual tests within each

---

purposes of Rule 26 are to "avoid surprise and the possible
miscarriage of justice [and] to disclose fully the nature and
scope of the controversy[.]"  See Wright, Miller, & Kane, 8
Federal Practice and Procedure 22-23 (3d ed. 2010); see also
Pierce v. Pierce, 5 F.R.D. 125, 125 (D.D.C. 1946).

"Rule 37(c)(1) is a self-executing sanction[.]"  Norden v.
Samper, 544 F. Supp. 2d 43, 49 (D.D.C. 2008) (internal quotation
marks omitted).  "[T]he overwhelming weight of authority is that
preclusion is required and mandatory absent some unusual or
extenuating circumstances -- that is, a 'substantial
justification.'"  Elion v. Jackson, Civil Action No. 05-0992
(PLF), 2006 WL 2583694, at *1 (D.D.C. Sept. 8, 2006) (quoting
Klonoski v. Mahlab, 156 F.3d 255, 269, 271 (1st Cir. 1998)).  The
proponent of the evidence bears the burden of showing that the
failure to disclose the evidence "was substantially justified or
is harmless," Fed. R. Civ. P. 37(c).  See Norden, 544 F. Supp. 2d
at 50.

Here, Dr. Mann's declaration that Dr. Malowane attacks was
disclosed on September 28, 2007.  The defendant had until
November 27, 2007 to disclose its expert reports.  The report the
defendant submitted on November 27, 2007 from its expert,
Dr. White, acknowledged Dr. Mann's declaration but did not
disclose the new detailed critique contained in Dr. Malowane's
declaration that was not disclosed until 2012, well beyond the
2008 close of discovery.  The defendant asserts that its non-
disclosure was harmless because the plaintiffs should have asked
to depose Dr. Malowane before filing their opposition brief.
Reply in Support of Def.'s Mot to Exclude Test. of Charles R.
Mann at 24 n.6.  Whether the disclosure this late in the case
newly attacking an issue raised years ago did or did not violate
Rule 26, it certainly was not in keeping with fair opportunities
to depose an opponent's expert during the discovery period.
Moreover, discovery after the deadline hinders the ability "to
move the case expeditiously forward from the end of discovery,
through dispositive motions, to pre-trial and trial."  Coles v.
Perry, 217 F.R.D. 1, 5 (D.D.C. 2003).  The defendant has not
shown that its failure to disclose Dr. Malowane was substantially
justified or harmless, and Dr. Malowane's declaration should not
be considered in support of the defendant's Daubert motion.

-33-

    (3) the claims or defenses of the representative
parties are typical of the claims or defenses of the
class [("typicality")]; and
    (4) the representative parties will fairly and
adequately protect the interests of the class
[("adequacy of representation")].

Fed. R. Civ. P. 23(a); see also Wal-Mart Stores, Inc. v. Dukes,

131 S. Ct. 2451, 2548 (2011). "Failure to adequately demonstrate

any of the four is fatal to class certification." Garcia v.

Johanns, 444 F.3d 625, 631 (D.C. Cir. 2006).

    "[A] Title VII class action, like any other class action,

may only be certified if the trial court is satisfied, after a

rigorous analysis, that the prerequisites of Rule 23(a) have been

satisfied." Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147,

161 (1982). "Frequently, that 'rigorous analysis' will entail

some overlap with the merits of the plaintiff's underlying

claim." Wal-Mart, 131 S. Ct. at 2551. However, "the question is

not whether the plaintiff or plaintiffs have stated a cause of

action or will prevail on the merits, but rather whether the

requirements of Rule 23 are met." Eisen v. Carlisle & Jacquelin,

417 U.S. 156, 178 (1974). In considering a motion for class

certification, a court presumes the allegations in the complaint

to be true. Stephens v. US Airways Group, Inc., Civil Action No.

07-1264 (RMC), 2012 WL 6086930, at *3 (D.D.C. Dec. 7, 2012).

**Appx. 33**

-35-

would contain 120 members who are geographically dispersed.  <u>See</u>
Mem. of P. & A. in Supp. of Pls.' Mot. for Class Cert. ("Pls.'
Mem. for Class Cert.") at 45-46; Pls.' Reply in Support of Mot.
for Class Cert. at 5.[14]  As <u>Moore III</u> found, a proposed class of
120 members satisfies the numerosity requirement.

The defendant advances several arguments against the
plaintiffs' estimate.  The defendant claims that the plaintiffs
fail to prove numerosity because the plaintiffs' statistical
expert, Dr. Mann, found that a statistically significant number
of under-promotions occurred only from 1998 to 2000 for GS-14
positions and from 2002 to 2005 for GS-15 positions.  Def.'s
Opp'n to Pls.' 4th Mot. for Class Cert. ("Def.'s Opp'n to Mot.
for Class Cert.") at 44-45.  The defendant asserts that given the
dearth of statistical evidence showing under-promotions for the
remainder of the class period, the "plaintiffs' class must be
limited to those who bid for the appropriate promotion in those
times periods, shrinking the class to 42."  <u>Id.</u> at 45.  The
defendant also contends that the proposed class must exclude
those who have conflicts of interest (i.e., any class member who

_____

[14] The plaintiffs derive this number from the "'bid database'
produced by Defendant in discovery[.]"  Pls.' Mem. for Class
Cert. at 45.  According to the plaintiffs, the database shows
that "127 different African-American Special Agents actually bid
on GS-14 or GS-15 positions during the class period."  <u>Id.</u>  After
excluding "those who were selected for promotion on their first
bid and those who served as the Director, the Deputy Director, or
an Assistant Director during the class period," the proposed
class includes 120 members.  <u>Id.</u> at 45-46.

-37-

variations among the class members will not defeat the
commonality requirement, so long as a single aspect or feature of
the claim is common to all proposed class members.'" Encinas,
265 F.R.D. at 8 (quoting Bynum v. District of Columbia, 217
F.R.D. 43, 46 (D.D.C. 2003)).  To satisfy this requirement, a
plaintiff must "demonstrate that the class members 'have suffered
the same injury[.]'" Wal-Mart, 131 S. Ct. at 2551 (quoting
Falcon, 457 U.S. at 157).  That is to say, "[t]heir claims must
depend upon a common contention[.]"  Id.  The "common contention"
must be "capable of classwide resolution -- which means that
determination of its truth or falsity will resolve an issue that
is central to the validity of each one of the claims in one
stroke."  Id.  A plaintiff's burden is to "bridge the gap"
between her individual claim and "the existence of a class of
persons who have suffered the same injury as that individual[.]"
Falcon, 457 U.S. at 157.

   In cases where the plaintiffs allege systemic disparate
treatment, plaintiffs may demonstrate commonality by providing
"'significant proof that an employer operated under a general
policy of discrimination . . . if the discrimination manifested
itself in . . . promotion practices in the same general
fashion[.]'"  Wal-Mart, 131 S. Ct. at 2553 (quoting Falcon, 457
U.S. at 159 n.15); see also Love v. Johanns, 439 F.3d 723, 728
(D.C. Cir. 2006) (explaining that in cases where plaintiffs

-39-

members[.]"  Pls.' Mem. for Class Cert. at 49.  As is discussed
above, Dr. Mann found that for the class period and the four-year
background period, the difference between African-American SAs
expected to reach a best qualified list in the absence of
discrimination and the actual number of African-American SAs who
reached a best qualified list, for both GS-14 and GS-15
promotions, was statistically significant.  See Pls.' Opp'n to
Mot. to Exclude Mann Test. at 5; see also Mann Decl. ¶¶ 36-43.
Dr. Mann also found that for the class period and the four-year
background period, the consideration of rank by MPP score on the
best qualified list disproportionately disadvantaged African-
Americans, for both GS-14 and GS-15 promotions; the disparity in
African-American SAs mean rank on best qualified lists and
African-American SAs on best qualified lists with an MPP score
above the effective pass rate are statistically significant.
Dr. Mann further found that for the years 1998 to 2000, the
difference between expected African-American promotions in the
absence of discrimination, taking as a given the presence of
African-Americans on the best qualified list, and actual African-
American promotion to GS-14 positions was statistically
significant.  See Pls.' Opp'n to Mot. to Exclude Mann Test. at 5;
see also Mann Decl. ¶¶ 49-75.  For the years 2002 to 2005, the
difference between expected African-American promotions in the
absence of discrimination, taking as a given the presence of

-41-

b.   *Anecdotal evidence*

The plaintiffs also offer anecdotal evidence in the form of

declarations of named plaintiffs and putative class members

alleging that they were discriminated against by the Secret

Service.   In their declarations, SAs assert that the Peer Panel

and Second Level Panel "discriminatorily diminished and

discounted" their "demonstrated skills and qualifications"

causing them to receive lower MPP scores than non-African-

American SAs, Pls.' Mem. for Class Cert. at 50, that they were

denied promotions as a result of their low MPP scores, id. at 51,

and that the MPP process "empower[ed] the Advisory Board and

Director to discriminate against African-American Agents by

selectively employing criteria to recommend white Agents for

promotion over qualified African-American candidates," id. at 52;

see also id. at 52-56.   The anecdotal evidence, which is

summarized in Moore III, 269 F.R.D. at 31-32, brings "the cold

numbers" of Dr. Mann's statistical evidence "convincingly to

life." Teamsters, 431 U.S. at 339.   The plaintiffs' statistical

and anecdotal evidence raises an inference of discrimination that

is manifested through the MPP process.   Thus, the plaintiffs have

carried their burden of establishing commonality.

3.   Typicality

"Typicality requires that the claims of the representative

be typical of those of the class." Taylor, 241 F.R.D. at 44

-43-

and promoted on their first bid.  There is no dispute that these

changes cured the typicality defects identified in Moore III.

Def.'s Opp'n to Mot. for Class Cert. at 46 n.38.  Thus, the

plaintiffs' proposed class satisfies the typicality requirement

of Rule 23(a).

        4.    Adequacy of representation

     The fourth prerequisite for class certification requires the

court to determine whether the proposed representatives will

fairly and adequately represent the interests of the class.

Taylor, 241 F.R.D. at 45.  "'Two criteria for determining the

adequacy of representation are generally recognized: 1) the named

representative must not have antagonistic or conflicting

interests with the unnamed members of the class, and 2) the

representative must appear able to vigorously prosecute the

interests of the class through qualified counsel.'"  Twelve John

Does v. District of Columbia, 117 F.3d 571, 575-76 (D.C. Cir.

1997) (quoting Nat'l Ass'n of Reg'l Med. Programs, Inc., 551 F.2d

340, 345 (D.C. Cir. 1976)).

     When there is a dispute as to the existence of a conflict of

interest between class members, a court must bear in mind that

"[c]lass members whose interests are antagonistic in fact to, or

even 'potentially conflicting' with, the interests of the

ostensibly representative parties cannot be bound, consistent

with the requirements of due process to an adjudication taken in

**Appx. 43**

-45-

Here, there is no dispute that counsel are competent to represent the class's interest. However, there is again a dispute regarding a potential conflict of interest among class plaintiffs and class members. The plaintiffs argue that the class meets the final requirement of Rule 23(a) because "[p]laintiffs and the class members . . . have the same interests": "to prove the existence of a pattern or practice of discrimination with respect to the Secret Service's promotions policy and establish that its promotions policy and practices have a disparate impact on class members." Pls.' Mem. for Class Cert. at 63. The plaintiffs further contend that their revised class definition is free from conflicts and excludes all of the class members identified in Moore III as having been directly accused of discrimination. Id. at 65-67. Because there are no direct accusations of discrimination within the class, the plaintiffs assert that "the inclusion within the class of supervisors or class members who participated on panels evaluating other class members cannot defeat adequacy of representation." Id. at 70. The defendant counters that the plaintiffs cannot satisfy the adequacy of representation requirement because the proposed class contains "supervisors who actively participated in an allegedly discriminatory promotions process against [other putative class members] who were seeking promotions." Def.'s Opp'n to Mot. for Class Cert. at 66. To

-47-

class does not undermine adequacy of representation where there
were no direct accusations of discrimination within the class).

    B.    <u>Rule 23(b) requirement</u>

The plaintiffs claim that the class satisfies the
requirements of Rule 23(b)(3), which provides that a class action
may be maintained if "the court finds that the questions of law
or fact common to class members predominate over any questions
affecting only individual members, and that a class action is
superior to other available methods for fairly and efficiently
adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In
determining whether a proposed class meets the Rule 23(b)(3)
requirements, a court should consider:

> (A) the class members' interests in individually controlling
> the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the
> controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the
> litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

>     1.    Whether common questions of law or fact
> predominate over questions affecting only
> individual members

To establish Rule 23(b)(3)'s predominance requirement, the
plaintiffs must show that the issues identified as common in the
Rule 23(a) commonality inquiry predominate over non-common issues
for both their pattern and practice claim and their disparate
impact claim.  <u>See</u> <u>In re Vitamins Antitrust Litig.</u>, 209 F.R.D.

-49-

were legitimate, nondiscriminatory reasons not to promote a
specific SA.  See Def.'s Opp'n to Mot. for Class Cert. at 81-82.
These issues, however, are not germane to the liability stage of
a pattern and practice claim,[16] are not relevant to the
plaintiffs' disparate impact claim, and thus do not destroy
predominance.

>           2.    Whether class action is superior method of
>                 adjudication

"'Rule 23(b)(3) favors class actions where common questions
of law or fact permit the court to consolidate otherwise
identical actions into a single efficient unit.'"  Encinas, 265
F.R.D. at 10 (quoting Bynum I, 214 F.R.D. at 40); see also In re
Nifedipine Antitrust Litig., 246 F.R.D. 365, 371 (D.D.C. 2007)
("[C]ertification is appropriate in cases in which a class action

---

[16] In Teamsters, the Supreme Court adopted a bifurcated approach
for pattern and practice class actions.  In the first stage,
regarding liability, the plaintiffs have the burden to
"demonstrate that unlawful discrimination has been a regular
procedure or policy followed by an employer or group of
employers."  Teamsters, 431 U.S. at 360.  "If the plaintiffs
succeed in establishing liability in the first phase, the court
may order class-wide injunctive and declaratory relief."  Taylor,
205 F.R.D. at 46 (citing Teamsters, 431 U.S. at 336).  "If the
plaintiffs also seek individual monetary relief, they proceed to
the second phase, called a 'Teamsters hearing.'"  Id. (citing
Hartman, 88 F.3d at 1235 n.2).  At the "Teamsters hearing," the
plaintiffs are entitled to the presumption that "individual
[employment] decisions were made in pursuit of the discriminatory
policy[,]" Teamsters, 431 U.S. at 359, and the burden is on the
defendant to show that there was a legitimate, non-discriminatory
reason for the adverse employment decision such that the employee
is not entitled to additional, individualized relief.  See
Hartman, 88 F.3d at 1235 n.2.

-51-

(1997) (quoting <u>Mace v. Van Ru Credit Corp.</u>, 109 F.3d 338, 344

(7th Cir. 1997)). However, "the text of Rule 23(b)(3) does not

exclude from certification cases in which individual damages run

high[.]" <u>Id.</u> Moreover, the defendants cite no evidence for

their assertion that the plaintiffs may potentially recover large

damage awards. At any rate, the interests of efficiency and

uniformity support a finding that a class action is a superior

method of adjudicating the plaintiffs' claims. Thus, the class

will be certified under Rule 23(b)(3).

     C.   <u>Notice</u>

If a court certifies a class under Rule 23(b)(3),

> the court must direct to class members the best notice
> that is practicable under the circumstances, including
> individual notice to all members who can be identified
> through reasonable effort. The notice must clearly and
> concisely state in plain, easily understood language:
> > (i) the nature of the action;
> > (ii) the definition of the class certified;
> > (iii) the class claims, issues, or defenses;
> > (iv) that a class member may enter an appearance
> > through an attorney if the member so desires;
> > (v) that the court will exclude from the class any
> > member who requests exclusion;
> > (vi) the time and manner for requesting exclusion;
> > and
> > (vii) the binding effect of a class judgment on
> > members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). The plaintiffs have not submitted a

proposed notice that satisfies all requirements of Rule 23(c)(2).

Accordingly, the plaintiffs will be ordered to file a proposed

order.

**Appx. 51**

-53-

Rule 23(b)(3)'s requirements for class certification.
Accordingly, it is hereby

        ORDERED that the defendant's motion [703] to exclude the
testimony of Dr. Charles Mann be, and hereby is, DENIED.  It is
further

        ORDERED that the plaintiffs' motion [677] for class
certification under Rule 23(b)(3) be, and hereby is, GRANTED.
The class consists of all current and former African-American
Special Agents who bid for promotion to a GS-14 position from
1995 to 2004 and were not promoted to GS-14 on the first bid list
on which they bid; and all current and former African-American
Special Agents who bid for promotion to a GS-15 position from
1995 to 2005 and were not promoted to GS-15 on the first bid list
on which they bid; but excluding Special Agents who served as an
Assistant Director, a Deputy Director, or the Director of the
Secret Service during the class period.  The class is certified
to adjudicate whether the Secret Service has a pattern and
practice of engaging in race discrimination in making promotions
decisions to GS-14 Special Agent positions from 1995 to 2004 and
GS-15 Special Agent positions from 1995 to 2005, and whether the
Secret Service's Merit Promotion Plan had an adverse impact on
African-American Special Agents seeking promotion to GS-14
positions from 1995 to 2004 and GS-15 positions from 1995 to
2005.  The following will be appointed as class counsel:  John P.

<table>
<tr><td></td><td colspan="2" align="center">United States Secret Service<br>Directives System</td><td></td></tr>
</table>

| Manual : Human Resources and Training | Section : PER-05(05) |
|---|---|
| RO : PER | Date : 03/27/2001 |

# MISCELLANEOUS STANDARDS - (U.S. SECRET SERVICE)

## Coverage

This section includes standards of conduct which are not lengthy enough to require separate sections, but which are nonetheless important and applicable to all concerned. Most of these standards are not specifically described under the Standards of Ethical Conduct for Employees of the Executive Branch or the Department of the Treasury Employee Rules of Conduct.

## Employment, Supervision, and Promotion of Relatives

By law, a public official may not appoint, employ, promote, advance, or advocate (recommend orally or in writing) for appointment, employment, promotion, or advancement, in or to a civilian position in the agency in which he or she is serving or over which he/she exercises jurisdiction or control, any individual who is a relative of the public official. Secret Service "public officials" include: (1) all managers and supervisors, regardless of grade or rank; (2) all employees in GS/GM-13 or above positions; and (3) all nonclerical employees in the Personnel Division, Special Agent and Office of Investigations Branch or the Uniformed Division and Administrative Support Branch. See PER-04, Employment, for a detailed discussion of restrictions on employment, supervision, and promotion of relatives.

## Prohibited Activities Regarding Treatment of Minorities and Women

### General

It is the policy of the U.S. Secret Service to continually affirm a program for equal opportunity in employment and personnel operations based upon merit without regard to race, color, religion, age, sex, sexual orientation, national origin or disability. This policy applies to appointments, assignments, career development, training, promotion, and to any other action or situation affecting employment status in this Service.

This policy states that deliberate sexual, racial, religious, or ethnic harassment or discrimination, including verbal comments, actions, and/or physical contact of a sexual nature, directed toward anyone whether or not they are employees will not be tolerated.

1

010276



GOVERNMENT
EXHIBIT
50

Appx. 55

| Manual : Human Resources and Training | Section : PER-05(05) |
|---|---|
| RQ    :  PER | Date   : 03/27/2001 |

Within the U.S. Secret Service, a supervisor who uses implicit, or explicit coercive sexual behavior to control, influence, or affect the career, salary, or job of an employee is engaging in sexual harassment. Similarly, an employee of the Service who behaves in this manner in the process of conducting agency business is engaging in sexual harassment. Finally, any employee who participates in deliberate or repeated unsolicited verbal comments, gestures, or physical contact of a sexual nature which are unwelcome and/or interfere in work productivity is also engaging in sexual harassment.

The Secretary of the Treasury has reaffirmed the Department's commitment to providing a work environment that is professional and free of sexual harassment. The Secretary wants to ensure that all bureaus neither tolerate nor condone sexual harassment of any kind and, when such instances are brought to the attention of bureau personnel, that reprisal does not occur and immediate action is taken.

In response to the Secretary's mandate, the following process has been instituted:

1. A toll free 800 hotline is being established for employees to report instances of sexual harassment. Callers who use this line will be given the option of having their allegations brought to the Director of the Secret Service or to the attention of the Inspector General. This should not preclude employees from first advising their supervisors of instances of sexual harassment. The local Washington, D.C. area number is (202) 406-5840.

2. The Service's EEO counselors have been instructed to provide employees who contact them the option of bringing their allegations to the Director of the Secret Service or to the attention of the Inspector General.

If an employee believes that he or she has been discriminated against sexually and that this discrimination adversely affected a subsequent personnel action (promotion, reassignment, etc.), the employee should contact the Equal Employment Opportunity Officer in the Office of AD-Administration. Any complaints involving sexual harassment not known to have affected personnel actions should be referred to the Personnel Division, Employee Relations Branch.

The Service will not tolerate any form of discrimination, to include sexual discrimination. Supervisors are responsible for being knowledgeable of the environment in their offices and are required to take appropriate action when instances of sexual harassment are brought to their attention. Anyone who violates the Service's policy will be subject to swift discipline.

New Secret Service employees will be provided a copy of this policy during their initial orientation for certification. Subsequent certifications will be completed on the occasion of an employee's annual mid-year performance review.

## Courtesy

Courtesy, or daily behavior that is polite and considerate of others, is required of Secret Service and other Treasury employees in all of their dealings with the general public, Members of Congress, and other Federal employees. Courteous behavior is expected even if others are being discourteous, although employees are obviously obliged to refuse to violate law or regulations or to give special advantage not called for by law.

010278

Appx. 57

Manual : Human Resources and Training            Section : PER-05(05)
RO     : PER                                     Date    : 03/27/2001

Any incident in which any employee of this Service is involved and which may be the cause of publicity or inquiry from others, must be immediately reported to the employee's supervisor. The range of incidents which might occur is so great that it is not possible to enumerate them. Each employee must judge when, in his/her opinion, the matter may or could be given publicity in the newspapers or other media, or may be the subject of inquiry. Of special importance is any situation involving any Secret Service employee and any other unit of Government (Federal, State or local). It is in the best interest of the employee and the Secret Service that supervisors be informed by the employee of the circumstances of any incident. The supervisor must immediately report any such matter to his/her Assistant Director, who will report to the Assistant Director - Government Liaison and Public Affairs, and any other concerned Assistant Director.

## Testimonials

Employees may not give testimonials or letters of recommendation to present or former Secret Service employees or to subjects who have been investigated by this Service, without prior approval by the appropriate Assistant Director or Chief Counsel.

## Using Position for Unofficial Purposes

No employee of the Secret Service shall use his/her association with the Service to obtain information from other agencies, firms, or individuals unless such action is officially ordered or directly related to the employee's official business.

## Non-Fraternization with the Criminal Element

Employees of the Service shall not fraternize with persons charged with or suspected of committing a crime except when such association is required in the line of official duty. When such association is necessary, the employee should advise his/her supervisor, prior to the contact, if practicable.

## Negligence in Performance of Official Duties

All employees are expected to perform their official duties in a highly satisfactory manner. Some indications of undesirable performance, for which appropriate discipline is in order, are habitual tardiness; sleeping on duty; insubordination to authority; leaving a post of duty without proper relief; unauthorized use of firearms; mistreatment of person on public contacts or of individuals taken into custody; failure to carry required identification or loss of same; any reprehensible conduct which tends to bring the Service into disrepute. Any necessary disciplinary action will be taken in accordance with prescribed procedures.

010280

**Appx. 59**

### The Merit Promotion Process

5. At all times relevant to this litigation, 1995-2005, the special agent merit promotion process ("MPP") comprised three parts: (1) the assignment of an annual MPP score; (2) individualized special agent bidding and the construction of Best Qualified Lists ("BQL"); and (3) the recommendation and selection of special agents for vacant positions.

6. The MPP itself was periodically revised. During the times relevant to this litigation, major revisions were issued in 1992, 1997, 2002, and 2003. These versions are included as Attachments A-D, respectively.

7. In 2008, the MPP was again revised. This revision, which was first used for the 2009 scoring year/2010 selection year, is the version currently in use, and instituted a largely revised promotion process for special agents.

Assignment of Annual MPP Scores

8. During the relevant time periods, the assignment of annual MPP scores began each year when qualified special agents seeking promotion to the GS-14 or GS-15 levels chose to be evaluated for an MPP score.

9. The process to assign annual MPP scores was different for promotions to GS-14 than it was for promotions to GS-15 grade level.

10. The annual MPP score for promotion to GS-14 was made up of three components: (1) a maximum of 50 points assigned through a First-Level Promotion Evaluation score issued by the Special Agent in Charge or equivalent, Resident Agent in Charge, or higher level supervisor; (2) a maximum of 20 points assigned through a Peer Panel; and (3) a maximum of 30 points, assigned by a Second-Level Panel. The end result was a composite evaluation score out of a possible 100.

11. Each component of the score reflected a rating for different aspects of the candidate's experience. For example, the First-Level Promotion Evaluation score was based on the employee's current performance. In contrast, the panel evaluation scores represented a broader assessment of the candidate's overall experience in particular disciplines and management competencies necessary to succeed as a supervisor.

12. Special agents generally received very high scores from their immediate supervisors on their First-Level Promotion Evaluations. The overwhelming majority of First-Level Promotion Evaluation scores fell at or above 47 out of 50 possible points.

13. The Peer Panels were a panel of special agents who volunteered to serve and were then chosen by the Deputy Director each year. From 1995 to 1996, the Peer Panel (which was then known as the Qualification Review Panel) had 7 members, all of whom rated the

**Appx. 61**

First-Level Promotion Evaluation score, but may not have the breadth of experience to achieve high panel scores.

20. The annual score for promotion to GS-15 was made up of two components: (1) a First-Level Promotion Evaluation with a maximum of 50 points issued by the Special Agent in Charge or equivalent, or higher-level supervisor; and (2) a Second-Level Panel Evaluation with a maximum of 50 points. Unlike candidates for promotion to GS-14 positions, candidates for promotion to GS-15 positions did not undergo a peer panel evaluation. Prior to 1997, however, a Peer Panel was a part of the GS-15 promotion process.

21. As with scores for promotion to the GS-14 level, there could be substantial differences in ratings for the different components of the score for GS-15 promotion candidates. For example, in 2002, 188 GS-14s obtained an MPP score for use in bidding for promotion to the GS-15 level. Of those, 108 received a perfect 50 on their First-Level Promotion Evaluations.

   • Of those receiving a perfect First-Level Promotion Evaluation score, the average Second-Level Panel Evaluation score was 39.94 for African-Americans and 39.99 for Caucasians;
   • Of those receiving a perfect First-Level Promotion Evaluation score, the Second-Level Panel Evaluation scores ranged from 34.52-44.38 for African-Americans and 30.11-47.96 for Caucasians;
   • Of those receiving a perfect First-Level Promotion Evaluation score, 7 individuals scored lower on their Second-Level Panel Evaluations than Andrew Harris, who had a Second-Level Panel Evaluation score of 34.52. Three of these individuals were Caucasian and two were Hispanic.

22. Special agents could grieve any part of their MPP score through the Agency's formal grievance process. Once the grievance was resolved, the agent's score for that rating year was finalized and used in the bid and selection phases for the year following assignment of the score (i.e., the promotion year). For example, agents would bid on vacancies in 1995 using the MPP score that they obtained in 1994 ("the 1994/1995 bid cycle").

23. Special agents develop more varied experiences in protection and investigations over their careers. As they develop and have more varied experiences, they perform more complex work, which generally results in higher MPP scores. Therefore, a special agent's relative standing on the promotion list is likely to be higher with more experience.

<u>Special Agent Bidding and BQL Construction</u>

24. Pursuant to the Special Agent MPP, the Personnel Division would announce vacancies periodically during each calendar year for GS-14 and GS-15 positions.[1] Special agents

---

[1] Prior to 1999, promotion to the GS-13 was also done through a competitive process.

4

- The highest-scoring 30 individuals who obtained an MPP score (plus any ties for the 30th position) or the top 25% (plus any ties),[3] whichever is greater, for the appropriate grade level (referred to as the "Merit Promotion Register").

31. The Advisory Board consisted of the Deputy Director, the Chief of Staff (when that position was occupied), the ADs, and the Chief of the Uniformed Division. The Chief Counsel was also a member of the Advisory Board and served in an advisory role but did not vote on promotions or reassignments. The Chief of the Personnel Division also attended Advisory Board meetings as an advisor and recorder of the proceedings.

32. For each vacant position, the relevant AD who oversaw the vacancy made a recommendation to the other members of the Advisory Board regarding who should fill the vacancy.

33. There were three groups of eligible candidates from which the Advisory Board could choose to make a selection recommendation when seeking to fill a vacancy with a promotion candidate.

34. First, the Board could fill a position with an individual who bid for promotion to the specific position and whose name appeared on the BQL for that position. Based on a review of data compiled by the Personnel Division, I have determined that, for the relevant periods, the vast majority of promotion selections were made by choosing from among the bidders whose name appeared on the BQL for the specific vacancy.

35. Second, in addition to considering those agents who bid and whose name appeared on the BQL, the Advisory Board also could choose to recommend a non-bidder based on their position on the overall Merit Promotion Register for that bid cycle. Such selections are referred to as "Vacancy Filled by Non-Bidder" (VFNB).

36. Third, for unannounced positions that needed to be filled during a given bid cycle, the Advisory Board would make its recommendation from the Merit Promotion Register for that bid cycle. Such selections are referred to as "in addition to" (IAT).

37. Based on the recommendation of the particular AD with oversight over the vacancy, the Advisory Board would make a recommendation to the Deputy Director. The Deputy Director, in turn, would convey the recommendation to the Director of the Secret Service, who made the final decision on each candidate to be selected for a position.

Obtained an MPP Score but Chose Not to Bid

38. To be considered for a competitive promotion to the GS-14 or GS-15 level, a special agent elected to participate in the MPP for the rating period by indicating their choice on the election form, SSF 4028.

---

[3] From 1995-1997, a BQL generally would consist of the top 15 highest-scoring employees (plus any ties for the 15th position).

**Appx. 65**

*position from 1995-2005 and were not promoted to GS-15 on the first bid list on which they bid; but excluding Special Agents who served as an Assistant Director, Deputy Director, or the Director of the Secret Service during the class period.*

49. I have reviewed Agency data regarding special agents who bid for promotion to the GS-14 during 1995 to 2004, and who bid for promotion to the GS-15 level during 1995 to 2005.

50. In total, 128 African-American special agents bid for promotion to the GS-14 and/or GS-15 during the relevant time periods.

51. Of these 128 African-American special agent, 118 bid on available GS-14 positions during the GS-14 class period.

52. Of the 118 African-American special agents who bid for GS-14 positions during the class period, 78 bid only on GS-14 positions. The other 40 individuals were promoted to the GS-14 level and went on to bid for GS-15 positions during the class period.

53. Of those same 128 African-American special agents who bid for promotion during the class period, 50 bid on GS-15 positions between 1995 and 2005.

54. Of the 50 African-American special agents who bid for GS-15 positions during the class period, 10 bid on only GS-15 positions during the class period. The other 40 individuals had previously bid on a GS-14 promotion during the class period.

55. Eight (8) of the African-Americans special agents who bid for promotion to the GS-14 level during the class period were selected for promotion the first time they bid (i.e., in their first bid cycle). The italics indicate those who only bid on GS-14 positions during the relevant time frame.

- *Christopher Johnson*
  - Faron Paramore
  - Edna Perry
  - Joseph Ravenell
- Paula Reid
  - *Cornelius Southall*
  - *Allen Taylor*
  - *Stuart Tryon*

56. Because 4 of these individuals bid only on GS-14 positions during the relevant time frame and were selected for promotion the first time they bid, they are not putative class members under plaintiffs' proposed class definition.

57. Likewise, 6 of the African-American special agents who bid for a GS-15 promotion between 1995 and 2005 were selected for promotion the first time they bid (i.e., in their first bid cycle). The italics indicate those who only bid on GS-15 positions during the relevant time frame.

**Appx. 67**

as a Secret Service special agent. However, in that same period, one individual - an African-American special agent named Allen Taylor - was promoted to the GS-14 with less than 10 years of experience as a Secret Service special agent.

68. Forty-seven (47) putative class members bid for promotion to the GS-15 level from 1995-2005. As of the most recent promotion list, dated April 4, 2011, thirty-three (33) of these individuals were selected for promotion. Ten (10) of these promotion selections occurred after 2005.

69. Thus, out of the 47 putative class members who bid for promotion to the GS-15 level, only 14 individuals have not been selected for promotion. Nine (9) of these individuals have left the Agency, but the other 5 are current GS-14s who may still be promoted in the future. One (1) of the current GS-14s submitted his first GS-15 bid in 2005 - the final year of plaintiffs' proposed GS-15 class period.

70. Eight (8) of the putative class members promoted to the GS-15 level were selected for promotion in the first year that they began bidding.

71. Out of the 121 putative class members, 21 became candidates for the Senior Executive Service (SES). 17 of those individuals were subsequently promoted into SES positions.

72. Out of the 121 putative class members, the following 6 left the agency before September 11, 1999.

- Robert Boswell
- Lafayette Collins
- George Davis
- Walton Sheppard
- Alonzo Webb
- Levester Youman

### Declarants Who Left the Agency

73. I have been asked to check our records regarding the departure from the Agency of the 61 named individuals on the list attached hereto as Attachment E.

74. The following 22 African-American special agents left the Agency before September 11, 1999. The 9 italicized names are those individuals who left the Agency prior to 1992.

- Kenneth Banner
- Hubert Bell
- Robert Boswell
- *Nathaniel Bryant*
- *Bobby F. Coates*
- *Dejustice Coleman, Sr.*
- Horace L. Coleman, Jr.
- *Robert Faison*
- *Zandra L. Flemister*
- Larry Hague
- Henry Hooper II
- *Charles C. Maddox*
- William J. Montgomery
- Robert J. Moore
- Myron K. Smith
- *Phillip Strother*
- Eddie Thompson
- *Donald W. Tucker*

**Appx. 69**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REGINALD G. MOORE, et al.,                )
                                          )
        Plaintiffs,                       )
                                          )      Civ. Action No. 00-953 (RWR/DAR)
v.                                        )
                                          )
JANET NAPOLITANO, Secretary,              )
Department of Homeland Security,          )
                                          )
        Defendant.                        )

---

## DECLARATION OF RUTH A. O'DONNELL
## HUMAN RESOURCES SPECIALIST
## UNITED STATES SECRET SERVICE

I, Ruth O'Donnell, hereby make the following declaration:

1. I am employed by the United States Secret Service (Secret Service or Agency) as
   a Human Resources (HR) Specialist. I have been employed by the Secret Service
   since June 2002.

2. In my position as an HR Specialist, I am responsible for the development and
   execution of HR policy initiatives, programs, and procedures for the Secret
   Service. I also advise the Assistant Director and the Office of Human Resources
   and Training on all matters relating to the planning, developing, and integrating of
   HR policies, programs and systems to promote the effective management of the
   total agency-wide workforce. I also am responsible for interpreting data and
   information derived from various sources, and analyzing policy that applies to the
   entire spectrum of mission requirements for DHS and the Secret Service.

3. I have knowledge of the Agency's employment policies and procedures, including
   those governing Special Agent (SA) promotions. I also have access to Agency
   employment records, including special agent personnel files, merit promotion
   files, position histories, and bid histories.

4. I was asked to review data from the Secret Service Merit Promotion Plan (MPP)
   to ascertain certain information regarding which African-American Special
   Agents bid for promotion to the GS-14 and/or GS-15 level during the years 1995-

1



GOVERNMENT
EXHIBIT
6
App. 71

| Year | No. Vacancies Announced | Cut-Off Scores | Vacancies w/ no cut-off |
|------|------------------------|----------------|-------------------------|
| 2004 | 64 | 69.61 to 75.89 | 61 |
| 2005 | 56 | No cut-offs | 56 |

9. Cut-off scores for the same position varied during the different bid cycles over the years. For example, the cut-off scores for the GS-14 position of ATSAIC on the Vice Presidential Protective Division (VPD) ranged from 72.68 to 93.22 between 1995 and 2004. The cut-off scores for the GS-15 position of ASAIC in the Washington Field Office, in turn, ranged from 75.06 to 92.21; there was no cut-off score for that position in some years. Additional examples of positions that almost always had a cut-off score are listed on Attachment A.

10. Many positions never had cut-off scores or rarely had them. Where there was no cut-off score, the SAs who bid on these positions always made the BQL as a result. For example, during the class period, the vacancies of GS-14 position of ATSAIC in the Newark Field Office had a cut-off score only once out of the eight times it was announced. The GS-15 position of ASAIC in the Chicago Field Office was announced approximately nine times from 1995 to 2003 and never had a cut-off score associated with the vacancy. Additional examples of positions that never or rarely had a cut-off score are listed on Attachment B.

**African-American Special Agents Who Bid for Promotion**

11. In order to determine which African-American SAs bid for promotion, I reviewed electronic Agency data regarding the race code by which SAs self-identified and electronic data from the Bids Mainframe System that indicated bids for vacancies at the GS-14 and GS-15 levels from 1995-2005.

12. My review indicated that 78 African-American SAs bid only on GS-14 vacancies from 1995 to 2004. Ten (10) African-American SAs bid only on GS-15 vacancies from 1995 to 2005. Forty (40) African-American SAs bid on both GS-14 and GS-15 vacancies during the relevant time period. In total, from 1995 to 2005, 128 African-American SAs bid on GS-14 and/or GS-15 vacancies.

13. The data that I reviewed from the Mainframe Bids System also included SAs who bid for each announced vacancy, what their MPP scores were, and the cut-off score for each vacancy.

14. Using this data, I determined how many bids each African-American SA placed during each year of the relevant time period and how many BQLs each SA made. This information is reflected in Attachment C.

3

**Appx. 73**

▓▓▓▓▓▓ placed 4 bids and made 3 BQLs. In 2000, ▓▓▓▓▓▓ placed 3 bids and made 2 BQLs. In 2004, ▓▓▓▓▓▓▓▓ placed 37 bids and made 36 BQLs.

23. Named plaintiff ▓▓▓▓▓▓▓ placed 69 bids and made 67 BQLs. SA ▓▓▓▓ missed 1 BQL (out of 17 bids) in 2002 and 1 BQL (out of 21 bids) in 2003. In 2004, he made the BQL for each of the 30 positions on which he bid.

24. Only 3 of the 50 African-American SAs who bid on GS-15 vacancies failed to make the BQLs for more than five vacancies. One of those individuals, ▓▓▓▓▓ ▓▓▓▓▓, was promoted to the GS-15 level in the same year that he failed to make multiple BQLs.

25. In conclusion, for every bid African-American SAs placed for GS-15 vacancies, they made the BQL 91.83% of the time.

GS-13 Special Agents Bidding on GS-14 Vacancies

26. One hundred and eighteen (118) African-American SAs bid for GS-14 vacancies during the relevant time period. The number of those SAs who bid in each year of the relevant time frame is indicated below:

| Year | No. AA SAs Bidding |
|------|--------------------|
| 1995 | 14 |
| 1996 | 18 |
| 1997 | 16 |
| 1998 | 10 |
| 1999 | 16 |
| 2000 | 16 |
| 2001 | 29 |
| 2002 | 26 |
| 2003 | 46 |
| 2004 | 40 |

27. Of the 118 who bid, 28 made the BQL for every position on which he or she bid. The number of bids they placed ranged from a single bid on one specific vacancy to bidding on over 212 vacancies. See Attachment F.

28. Of those who missed one or more BQLs, 33 individuals were promoted to the GS-14 level in the same year in which they missed one or more BQLs.

**Additional Information Regarding BQLs**

29. Whether an SA made BQLs was the result of his/her bid choices, his/her MPP score, and the bid choices and MPP scores of every other SA bidding on the

5

**Appx. 75**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Reginald G. Moore, et al.,    )
                             )
Plaintiffs,                  )
                             )
v.                           )    Civ. Action No. 00-953 (RWR/DAR)
                             )
Janet Napolitano, Secretary, )
Department of Homeland Security, )
                             )
Defendant.                   )
                             )

### DECLARATION OF KAREN WARING
### HUMAN RESOURCES SPECIALIST
### SPECIAL AGENT AND UNIFORMED DIVISION SUPPORT BRANCH
### UNITED STATES SECRET SERVICE

I, Karen Waring, hereby make the following declaration:

1. I am employed by the United States Secret Service (Secret Service or Agency) as a Human Resources Specialist in the Special Agent and Uniformed Division Support Branch in the Office of Human Resources and Training. In this capacity, I am responsible for processing promotion and reassignment actions for the special agents and the Uniformed Division. I have been employed by the Secret Service since October 1984.

2. I have knowledge of the Agency's employment policies and procedures, including those governing special agent promotions and promotion evaluations. I also have access to the Agency's paper and electronic employment records, including merit promotion files, bid books, panel evaluation documents, and first line supervisory evaluations.

3. This declaration is a presentation of information as set forth in the official business records of the Secret Service, my personal review of the relevant records, and my personal knowledge of Secret Service procedures.

4. I have been informed that the plaintiffs have proposed the following class definition:

   *All current and former African-American Special Agents who bid for promotion to a GS-14 position from 1995-2004 and were not promoted to GS-14 on the first bid list on which they bid; and all current and former*

1



**Appx. 77**

12. At my direction, Agency records identifying those GS-14 and higher supervisors who participated in providing scores used in the MPP and those who were involved in recommending and selecting individuals for promotion to the GS-14 and/or GS-15 levels from 1994[1] to 2005 were reviewed. The purpose of this review was twofold: first, to determine the number of individuals who participated as raters in the MPP during the proposed class period, and second, to identify those instances where putative class members rated other putative class members.

## SPECIAL AGENTS WHO DIRECTLY PARTICIPATED
## IN THE RATING PHASE OF THE MPP

### First-Level Promotion Evaluations

13. First Level Promotion Evaluations, the first component of the MPP score, were generally conducted by a special agent's SAIC, RAIC, or next higher official, who rated each candidate on various competencies.

14. During the 12-year scoring period discussed here, the Secret Service had approximately 42 Field Offices headed by SAICs, and 78 Resident Offices headed by RAICs, distributed across 44 states and 18 foreign countries, which were divided into four geographic regions. Six protective divisions located in California, Texas, New York, and Georgia, were also headed by SAICs. Additionally, there were approximately 33 offices or divisions located in the Washington, D.C. area that were supervised by SAICs.

15. Based upon available Agency records and what I have been advised regarding First Level Promotion Evaluations, between 1994 and 2005, at least 313 SAICs and 213 RAICs participated in the MPP by providing First Level Promotion Evaluation scores.

16. The MPP also required that the SAIC or RAIC responsible for preparing the First-Level Promotion Evaluation consult with lower-level supervisors whenever he or she was not the immediate supervisor of the special agent being evaluated. Such lower-level supervisors, known as "Contributing Raters," had to attest to his or her participation in the First-Level Promotion Evaluation score. Contributing Raters were other special agent supervisors, such as Deputy Special Agents in Charge (DSAICs), Assistant Special Agents in Charge (ASAICs), or Assistants to the Special Agent in Charge (ATSAICs).

17. The MPP, furthermore, encouraged the SAIC/RAIC preparing the First-Level Promotion Evaluation to consider the comments of any others who had supervised the special agent being rated for significant periods of time.

18. Based on the available records that I reviewed, between 1995 and 2005, approximately 1,152 special agents held the positions of ASAIC, ATSAIC, or DSAIC. To the extent that SAICs and RAICs consulted others who supervised the special agent being rated, as

---

[1] Records from 1994 were reviewed because special agents bidding for promotion in 1995 (the start of the class period identified by plaintiffs) would have received their MPP score in 1994.

**Appx. 79**

26. Agency records indicate that at least 36 special agents participated at one time or another as Advisory Board members between 1995 and 2005 as either an AD, Chief of Staff, or the Deputy Director. *See* Exhibit C.

27. During the 11-year class period, Agency records indicate that there have been at least four different Directors of the Secret Service. *See* Exhibit C.

### PUTATIVE CLASS MEMEBERS WHO RATED OTHER PUTATIVE CLASS MEMBERS

#### Putative Class Members

28. I have been informed that there are 121 putative class members. *See* Exhibit D (list of potential class members).

#### First-Level Promotion Evaluation Conflicts

29. Between 1994 and 2005, approximately twenty-three putative class members held SAIC and/or RAIC positions; at least two of these individuals provided First Level Promotion Evaluation scores to other putative class members. *See* Exhibit E.

30. Additionally, my review indicates that at least fourteen putative class members also served as Contributing Raters for other putative class members between 1994 and 2005. *See* Exhibit E.

#### First and Second Level Panel Conflicts

31. Available Agency records indicate that, for those individuals who received scores between 1994 and 2005, at least 22 African-American special agent supervisors participated as Peer Panel or Second-Level Panel members rating all special agents for promotion to GS-14 and GS-15 positions.

32. Of the 22 African-American special agent supervisors mentioned in paragraph 31, 14 are putative class members. The 14 putative class member supervisors rated a total of 112 other putative class members. *See* Exhibit F.

33. For example, putative class member Andrew Harris rated at least 33 individual potential class members; putative class member James Dunlap rated at least 64 individual potential class members; putative class member James Carter rated at least 30 individual potential class members; and putative class member Michael Lee rated at least 19 individual potential class members.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

5

U. S. SECRET SERVICE PERSONNEL DIVISION
SPECIAL AGENT PROMOTION CERTIFICATE

VACANCY NO: 99169
   ATSAIC, SPECIAL INV. & SECURITY DIVISION                GRADE: 14
                   FOR  1 POSITION(S)

| NAME | SCORE | LOCATION |
| --- | --- | --- |
| MOONEY MICHAEL G | 97.69 | BALTIMORE FIELD OFFICE |
| MCFARLAND CHRISTOPHER A | 97.35 | JAMES J. ROWLEY TRAINING CENTER |
| MOORE REGINALD G | 97.03 | DALLAS FIELD OFFICE |
| GREEN WILLIAM  JR | 95.96 | CHARLOTTE FIELD OFFICE |
| TURNER JOHN E | 95.64 | WASHINGTON FIELD OFFICE |
| GALLAGHER SEAN Q | 95.35 | BALTIMORE FIELD OFFICE |
| RIVERA RODOLFO  JR | 94.47 | BALTIMORE FIELD OFFICE |
| GALLIGAN THOMAS A | 94.02 | INFORMATION RESOURCES MANAGEMENT |
| SMITH GLENN F | 93.98 | CLEVELAND FIELD OFFICE |
| EMMETT DANNY J | 93.78 | JAMES J. ROWLEY TRAINING CENTER |
| MARTINEZ ANTHONY R | 93.75 | MCALLEN RESID. AGENCY (SAN ANTONIO) |
| ONEILL VINCENT P | 93.45 | NEWARK FIELD OFFICE |
| PARKINSON JONATHAN K | 93.42 | ATLANTA FIELD OFFICE |
| JENSEN PAUL A | 93.22 | SPECIAL SERVICES DIVISION |
| WALSH SUSAN A | 93.06 | SPECIAL INVESTIGATIONS + SECURITY DIV. |
| SVEUM EUGENE L JR | 93.02 | WASHINGTON FIELD OFFICE |
| KNOLL WILLIAM F | 92.74 | WASHINGTON FIELD OFFICE |
| WAGONER JAMES R | 91.84 | HOUSTON FIELD OFFICE |
| DIAZ CHARLES A | 91.08 | JAMES J. ROWLEY TRAINING CENTER |
| BOUR JAMES P | 90.84 | WASHINGTON FIELD OFFICE |
| SYKES LARRY J JR | 90.84 | JAMES J. ROWLEY TRAINING CENTER |
| MCNALLY JOHN G | 90.60 | WASHINGTON FIELD OFFICE |
| HARRIS ANDREW E JR | 90.31 | SPECIAL INVESTIGATIONS + SECURITY DIV. |
| SCHEUER GERALD M | 90.01 | JAMES J. ROWLEY TRAINING CENTER |
| COUSINS WILLIAM J | 89.70 | TOLEDO RESID. AGENCY (CLEVELAND) |
| QUIGLEY FRANK L | 89.66 | SACRAMENTO RESID. OFFICE (SAN FRANCISCO) |
| LEMISKA PETER D | 89.49 | INVESTIGATIVE SUPPORT DIVISION |
| HARRINGTON RICHARD C JR | 89.32 | SPECIAL INVESTIGATIONS + SECURITY DIV. |
| DOUEL ROBERT W | 89.04 | TREASURY PROTECTIVE DIV. |
| KELLY THOMAS A | 88.79 | JAMES J. ROWLEY TRAINING CENTER |
| MONTGOMERY CHERYL L | 88.28 | MAJOR EVENTS DIVISION |
| MITCHELL GEORGE A III | 88.00 | RENO RESID. AGENCY (SACRAMENTO) |
| NICKLYN STANLEY J JR | 87.55 | JAMES J. ROWLEY TRAINING CENTER |
| TERRY DEANE J | 87.12 | PROTECTIVE RESEARCH A.D. |
| LYNCH BRIAN J | 86.97 | BALTIMORE FIELD OFFICE |
| WEARE PAUL T | 86.89 | PROVIDENCE RESIDENT OFFICE (BOSTON) |
| KIRKES BRYAN B | 86.67 | MINNEAPOLIS FIELD OFFICE |
| CHRISTIAN FRANK J | 86.61 | SAN FRANCISCO FIELD OFFICE |
| GOODWIN BRUCE D | 86.14 | JAMES J. ROWLEY TRAINING CENTER |
| CERVONI JOSE L | 85.76 | JAMES J. ROWLEY TRAINING CENTER |
| BAILEY CHARLES E | 85.73 | NEW YORK FIELD OFFICE |
| GAST TRACY A | 85.14 | PRESIDENTIAL PROTECTIVE DIV. |
| DOBSON JAMES P | 85.03 | FINANCIAL CRIMES DIVISION |
| WILLIAMS DENNIS J | 84.26 | LIAISON DIVISION |

GOVERNMENT
EXHIBIT

Appx. 83

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of March, 2013, a copy of the foregoing

was served on counsel for Plaintiffs-Respondents by overnight delivery service

(Federal Express) marked for delivery to:

    Erica Kneivel Songer, Esq.
    Thomas John Widor, Esq.
    E. Desmond Hogan, Esq.
    HOGAN LOVELL US LLP
    555 13th Street, N.W.
    Washington, D.C.  20004

    Jennifer I. Klar, Esq.
    John Peter Relman, Esq.
    Megan Cacace, Esq.
    RELMAN, DANE & COLFAX, PLLC
    1225 19th Street, N.W.
    Suite 600
    Washington, D.C.  20036

            /s/ Jane M. Lyons
            JANE M. LYONS
            Assistant United States Attorney