No. 13-8002

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

REGINALD G. MOORE, *et al*.,

Plaintiffs-Respondents,

v.

JANET NAPOLITANO, Secretary of the U.S. Department of Homeland Security,

Defendant-Petitioner.

On Petition for Rule 23(f) Review from
the United States District Court for the District of Columbia

**PLAINTIFFS-RESPONDENTS' OPPOSITION TO PETITION OF
SECRETARY NAPOLITANO FOR PERMISSION TO TAKE AN
INTERLOCUTORY APPEAL UNDER FED. R. CIV. P. 23(f)**

CATHERINE E. STETSON
E. DESMOND HOGAN
ERICA KNIEVEL SONGER
HOGAN LOVELLS US LLP
555 Thirteenth St., N.W.
Washington, D.C. 20009
(202) 637-5491
cate.stetson@hoganlovells.com

JENNIFER I. KLAR
JOHN P. RELMAN
MEGAN CACACE
RELMAN, DANE & COLFAX PLLC
1225 Nineteenth St., N.W.
Suite 600
Washington, D.C. 20036
(202) 728-1888
jklar@relmanlaw.com

*Counsel for Plaintiffs-Respondents and the Class*

March 25, 2013

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel certifies as follows:

**A.     Parties and Amici.**  Petitioner is Janet Napolitano, Secretary of the U.S. Department of Homeland Security, who is the Defendant in the District Court.  The Respondents are Reginald G. Moore, John E. Turner, C. Yvette Summerour, Leroy Hendrix, Cheryl L. Tyler, Luther K. Ivery, Andrew E. Harris, Jr., and Kenneth Rooks, class representatives below on behalf of themselves, and a class of all African-American current and former Secret Service Special Agents who bid for promotion to a GS-14 position from 1995 to 2004 and were not promoted to GS-14 on the first bid list on which they bid; and all current and former African-American Special Agents who bid for promotion to a GS-15 position from 1995 to 2005 and were not promoted to GS-15 on the first bid list on which they bid; but excluding Special Agents who served as an Assistant Director, a Deputy Director, or the Director of the Secret Service during the class period.  Other parties who have previously appeared in this case are prior Defendants (Michael Chertoff, Paul H. O'Neill, Tom Ridge, and Lawrence H. Summers), prior Plaintiffs (Arthur Derek Evans, Robert J. Moore, Donald W. Tucker, and Jenell G. Walker-Clark), and Plaintiffs who are not class representatives (Lisa Robertson and Camilla Simms). There are no amici.

**B.     Rulings Under Review.** Petitioner seeks discretionary review of the Honorable Richard W. Roberts's February 25, 2013 Memorandum Opinion and Order granting Plaintiffs' motion for class certification. The Memorandum Opinion and Order is included in Petitioner's Appendix at 1-54, the pagination of which corresponds to the Mem. cites used herein.

**C.     Related Cases.** This case was previously before the Court in Nos. 04-5364 and 10-5220, in connection with Plaintiffs' petitions for mandamus. There are no pending related cases.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

STANDARD OF REVIEW .....................................................................1

FACTUAL BACKGROUND ...................................................................2

I.    THE SECRET SERVICE AND THE MERIT
      PROMOTION PLAN .....................................................................2

      A.    The MPP Score ...................................................................3

      B.    The Best Qualified List ......................................................4

      C.    Advisory Board Recommendations and Director Selections ...............4

II.   EXPERT EVIDENCE THAT THE MPP IS DISCRIMINATORY ..............4

III.  THE DISTRICT COURT'S CLASS CERTIFICATION RULING ..............6

REASONS FOR DENYING THE PETITION ...........................................8

I.    THE DISTRICT COURT'S CLASS CERTIFICATION
      DECISION DOES NOT SOUND THE "DEATH KNELL"
      OF THE LITIGATION ..................................................................8

II.   THIS CASE DOES NOT PRESENT ANY UNSETTLED
      OR FUNDAMENTAL ISSUES OF LAW ........................................9

III.  THE DISTRICT COURT DID NOT COMMIT
      "MANIFEST ERROR" IN CERTIFYING A CLASS ...........................12

      A.    Commonality .....................................................................12

            1.    Class Members All Allege Discrimination
                  Resulting from the Same Unitary, Structured,
                  Centralized Policy ...................................................12

i

2.    Extensive Statistical Evidence Demonstrates
that the MPP Operates in a Generally
Discriminatory Manner ............................................................15

B.    Adequacy of Representation ...............................................17

C.    Predominance ....................................................................19

CONCLUSION ................................................................................20

CERTIFICATE OF SERVICE ............................................................22

SUPPLEMENTAL APPENDIX

# TABLE OF AUTHORITIES

## Cases

*Adair v. England*, 209 F.R.D. 5 (D.D.C. 2002) ........................................18

*Aliotta v. Gruenberg*, 237 F.R.D. 4 (D.D.C. 2006) ..................................20

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)...........................20

*Chamberlan v. Ford Motor Co.*, 402 F.3d 952 (9th Cir. 2005)................9

*Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004) ...................................20

*Conn. v. Teal*, 457 U.S. 440 (1982) .......................................................15

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978)......................15, 16

*Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006) ................................11

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982) ............10, 11, 12

*Hartman v. Duffey*, 19 F.3d 1459 (D.C. Cir. 1994)...................10, 11, 19

*Hyman v. First Union Corp.*, 982 F. Supp. 1 (D.D.C. 1997) ..................18

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    289 F.3d 98 (D.C. Cir. 2002)...............................1, 2, 8, 9, 10, 18

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) .........8, 15, 16, 19, 20

*Int'l Woodworkers of Am., AFL-CIO, CLC v. Chesapeake Bay
    Plywood Corp.*, 659 F.2d 1259 (4th Cir. 1981)...........................17

*Johnson v. Meriter Health Servs. Emp. Ret. Plan*,
    702 F.3d 364 (7th Cir. 2012) .......................................................17

*Love v. Johanns*, 439 F.3d 723 (D.C. Cir. 2006) ...................................11

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  672 F.3d. 482 (7th Cir. 2012) ...............................................................14, 17

*McReynolds v. Sodexho Marriott Servs.*, 208 F.R.D. 428 (D.D.C. 2002)..............18

*Randall v. Rolls-Royce Corp.*, 637 F.3d 818 (7th Cir. 2011) ..................................18

*Segar v. Smith*, 738 F.2d 1249 (D.C. Cir. 1984)..........................................15, 16, 20

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ................................................18

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) .........................15, 16

*Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095 (10th Cir. 2001) .................20

*Twelve John Does v. District of Columbia*, 117 F.3d 571 (D.C. Cir. 1997) ...........17

*Wagner v. Taylor*, 836 F.2d 578 (D.C. Cir. 1987).......................................10, 18, 20

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011)...................................... 7, 9, 10, 11, 12, 13, 14, 17, 19

## Statutes and Rules

42 U.S.C. § 1981a .......................................................................................................9

Fed. R. Civ. P. 23 ....................................................... 1, 2, 6, 7, 8, 9, 11, 12, 19, 20

## Other

7A FED. PRAC. & PROC. § 1778 (2d ed. 1986).........................................................20

2013 DHS Budget Request, http://www.gpo.gov/fdsys/pkg/BUDGET-2012-
  BUD/pdf/BUDGET-2012-BUD-12.pdf .........................................................9

Fed. R. Civ. P. 23(f) Comm. Note (1998) ...............................................................8

This is a Title VII class action brought by African-American Special Agents of the United States Secret Service.  Plaintiffs allege that the Secret Service's Agency-wide promotions policy, the Merit Promotion Plan for GS/GM-1811 Promotions ("MPP"), operates to discriminate on the basis of race.  Eight Plaintiffs bring a pattern or practice intentional discrimination claim and a disparate impact claim on behalf of a class of approximately 120 African-American Special Agents.

Secretary Napolitano, the Petitioner, asks this Court to take the extraordinary step of granting interlocutory review of the District Court's order certifying a class.  Her petition does not satisfy any of this Court's requirements for review of a class certification ruling under Rule 23(f).  The District Court's ruling does not spell the "death knell" of the case for the government.  It presents no unsettled and fundamental issue of law.  And far from being "manifest error," it is manifestly correct.  The Secretary's request for interlocutory review should be denied.

## STANDARD OF REVIEW

Interlocutory appeals under Rule 23(f) are "generally disfavored as 'disruptive, timeconsuming, and expensive.'"  *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 105 (D.C. Cir. 2002) (internal citation omitted).  They may only be granted in exceptional circumstances:

(1)   when there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable, taking into account the district court's discretion over class certification;

1

(2) when the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review; and

(3) when the district court's class certification decision is manifestly erroneous. *Id.*

Review under Rule 23(f) of cases outside of these categories will only "rarely" be appropriate given "[t]he sheer number of class actions, the district court's authority to modify its class certification decision, *see* Fed. R. Civ. P. 23(c)(1), and the ease with which litigants can characterize legal issues as novel[.]" *Lorazepam*, 289 F.3d at 105-06.

## FACTUAL BACKGROUND

## I.     THE SECRET SERVICE AND THE MERIT PROMOTION PLAN

The Secret Service employs Special Agents ranging from GS-5 to the SES level. At issue in this case are promotions of African-American Special Agents to supervisor positions at the GS-14 and GS-15 levels.

Secret Service Special Agents are considered for promotion pursuant to a formal, Agency-wide policy called the Merit Promotion Plan ("MPP").[1] The MPP has three elements: the MPP score; the "best qualified list"; and the Advisory Board recommendations and Director selections.

---

[1] The MPP's provisions have remained substantively the same throughout the class period. *See* Mem. 28. The facts in this section are found in: SA 14-28, 34-44, 47-59; DE 679, Ex. 12 at 144, Ex. 14 (only 11 GS-13s and no GS-14s received a First Level score below 45 for 2003/2004), Ex. 15 (489 GS-13s received scores for 2003/2004), Ex. 21, Ex. 22; DE 712, Ex. 101 at 3-4, Ex. 105 at 36, 45-46, Ex. 110.

## A.    The MPP Score

Each eligible Agent receives an annual MPP score out of 100 points.  An MPP score for promotion to GS-14 has three components:  the First Level Evaluation (50%); the Peer Panel Evaluation (20%); and the Second Level Panel Evaluation (30%).  For promotion to GS-15, there is no Peer Panel; the First and Second Level Evaluations each make up 50% of the score.

The First Level Evaluation uses a standard form to evaluate the Agent on each of ten factors.  In practice, there is not significant variation in First Level Evaluation scores; they therefore do not play a significant role in score variations.

The Peer Panel is comprised of six raters at the GS-14 level or above selected by the Deputy Director of the Secret Service.  The Peer Panel evaluates candidates for promotion to GS-14 on factors listed in the MPP.  Agents submit a Qualifications Statement on a form included in the MPP that is provided to the raters.  The Peer Panel is conducted once a year, during which the panelists gather in the same room at headquarters, receive the same instructions and training, and evaluate the candidates at the same time.  Panelists must reach a consensus score within a certain number of points.  The MPP encourages continuity by requiring two of the panelists to serve the following year whenever possible.

A Second Level Panel then evaluates each candidate.  The seven-member Second Level Panel is comprised of representatives of each of the Assistant

Directors (all located at headquarters in Washington).  Second Level panelists are

each given the same materials on each candidate and evaluate the candidates on

competencies listed in the MPP.  Like the Peer Panel, the Second Level Panel is

conducted once a year; members sit in the same room at headquarters, receive the

same instructions and training, and evaluate the candidates at the same time.

### B.    The Best Qualified List

Agents use their MPP score to "bid" on positions.  The scores are used to

generate a "best qualified list," on which bidders are ranked exclusively by MPP

score.  A cut-off score for placement on the "best qualified list" is set by MPP

policy.  Only those Agents who make the "best qualified list" can be promoted.

### C.    Advisory Board Recommendations and Director Selections

The Advisory Board consists of the Assistant Directors, the Deputy Director,

the Chief Counsel, and the Chief of Personnel.  For each vacant position, the

Board's eight voting members reach consensus on one candidate to recommend to

the Director of the Secret Service.  As with the rating panels, the Advisory Board

meets in a room together in the Secret Service's Washington headquarters.

The Director of the Secret Service makes the final decision regarding which

candidate to select for every GS-14 and GS-15 position.

## II.    EXPERT EVIDENCE THAT THE MPP IS DISCRIMINATORY

Plaintiffs submitted the declaration of expert statistician Dr. Charles Mann in

4

support of class certification.  Dr. Mann concluded that the results of his analysis "support a finding of adverse impact against African Americans with regard [to] the promotion from GS-13 to GS-14 and GS-14 to GS-15."  SA 74 ¶ 78.

Dr. Mann presented four statistical tests demonstrating that the MPP has a statistically significant adverse impact on African Americans.  *See* Mem. 23-24.  His first test revealed that the MPP's use of scores to create a cut-off for the "best qualified list" had a statistically significant adverse impact for both GS-14 and GS-15 promotions, and for the entire class period and the class period plus a four-year background period.  *See id.* at 11-12; SA 67-68 ¶¶ 36-43.  The Secretary's expert agreed that "a higher percentage of African-American agents are disqualified at the best qualified step than white agents."  *See* DE 679, Ex. 26 at 154-55.

Dr. Mann's second and third tests demonstrated that even those African-American Agents who *made* the "best qualified list" were disproportionately disadvantaged by the MPP requirement that Agents are ranked exclusively by score.  *See* Mem. 12, 21-22; SA 69-74 ¶¶ 49-75.  Both tests showed statistically significant adverse impact for both GS-14 and GS-15 promotions, and for both the entire class period and the class period plus a four-year background period.  *See id.*

Dr. Mann's last statistical analysis showed that there is an independently statistically significant adverse impact on African-American Agents when it comes to selection from the "best qualified list."  *See* Mem. 12-13; SA 68-69 ¶¶ 45-48.

As the Secretary's own expert explained, identifying a statistically significant disparity in selection from the "best qualified list" is more difficult because African Americans are disproportionately disqualified for promotions at the best qualified stage of the MPP. *See* DE 679, Ex. 26 at 179-82. Yet this "double adverse impact" is statistically significant for the period 1998-2000 for GS-14 and 2002-2005 for GS-15 – consistent with the shift of the glass ceiling from GS-14 to GS-15 after the filing of this lawsuit. *See* Mem. 13; SA 68-69 ¶¶ 45-48.

## III.  THE DISTRICT COURT'S CLASS CERTIFICATION RULING

In 2010, the District Court denied without prejudice Plaintiffs' prior motion for class certification. *See* DE 659. It found that while Rule 23's numerosity and commonality requirements were satisfied, typicality and adequacy were not demonstrated because the class included Agents who did not bid for promotion and who were promoted on their first bid (typicality), and the record reflected direct accusations of discrimination within the class (adequacy). *See id.* at 26-30, 32, 34.

Addressing both concerns, Plaintiffs moved to certify a narrower class of:

[A]ll current and former African-American Special Agents who bid for promotion to a GS-14 position from 1995 to 2004 and were not promoted to GS-14 on the first bid list on which they bid; and all current and former African-American Special Agents who bid for promotion to a GS-15 position from 1995 to 2005 and were not promoted to GS-15 on the first bid list on which they bid; but excluding Special Agents who served as an Assistant Director, a Deputy Director, or the Director of the Secret Service during the class period.

Mem. 53. The Secretary again opposed certification and also filed a *Daubert*

6

motion to exclude the report of Plaintiffs' statistical expert, Dr. Mann.

In its opinion, the District Court devoted 23 pages to Dr. Mann's analysis, concluding it was "relevant" and "reliable" and satisfied *Daubert*.  Mem. 9-32. The Court then held that Rule 23(a) and 23(b)(3) were satisfied.  It found (and Petitioner does not dispute) that the class was sufficiently numerous and that Plaintiffs had resolved any concerns regarding typicality.  *Id.* at 35-36, 41-43.

In addressing commonality, the Court stated that the class members must demonstrate "'the same injury,'" meaning their "'claims must depend upon a common contention'" which is "'capable of classwide resolution,'" and that they could do so "by 'providing significant proof that [their] employer operated under a general policy of discrimination . . . if the discrimination manifested itself in . . . promotion practices in the same general fashion.'"  *Id.* at 37 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)).  The Court held Plaintiffs had established commonality through statistical and anecdotal evidence.  It found Dr. Mann's statistical analysis "sufficient to create an inference that the Secret Service had a common policy of discrimination." *Id*. at 40.  And it found that the anecdotal evidence – testimony from nearly 25% of class members – "brings 'the cold numbers' of Dr. Mann's statistical evidence 'convincingly to life.'" *Id.* at 41.

Turning to adequacy, the Court explained that any prior impediment to certification had been resolved; while some class members sat on MPP panels,

7

there were no "direct accusations of discrimination."  *Id.* at 46.

Addressing Rule 23(b)(3), the Court found that common issues predominate because under the *Teamsters* framework, the critical question of the class's ability to establish a pattern or practice of discrimination under the MPP will turn on common evidence alone, and the class action is superior to a multitude of individual lawsuits.  *See id.* at 48-51 & n.16 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977)).

The District Court therefore certified the proposed class.  *Id.* at 53.

## REASONS FOR DENYING THE PETITION

## I.     THE DISTRICT COURT'S CLASS CERTIFICATION DECISION DOES NOT SOUND THE "DEATH KNELL" OF THE LITIGATION

The first reason to grant interlocutory review of a class-certification ruling – indeed, a primary reason for Rule 23(f)'s creation, *see* Fed. R. Civ. P. 23(f) Comm. Note (1998) – is "when there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable, taking into account the district court's discretion over class certification."  *Lorazepam*, 289 F.3d at 105.  Granting class certification sounds a "death knell" for the defendant in the rare situation when it "may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability." Fed. R. Civ. P. 23(f) Comm. Note (1998); *see also Lorazepam*, 289 F.3d at 102.

The Secretary does not, and cannot, contend that certification of this 120-person class is a "death knell" for the government. The Department of Homeland Security commands an annual budget of over $40 billion. 2013 DHS Budget Request.[2] Compensatory damages in this case are capped at $300,000 per employee. 42 U.S.C. § 1981a(b)(3)(D). The Secret Service has litigated this case vigorously for nearly 13 years. There is no reason to think that it cannot appeal any adverse judgment in the normal course. *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 960 (9th Cir. 2005) (denying petition where defendant "made no showing that it lacks the resources to defend this case to a conclusion and appeal if necessary").

## II.    THIS CASE DOES NOT PRESENT ANY UNSETTLED OR FUNDAMENTAL ISSUES OF LAW

Rule 23(f) review may be warranted in the rare instance where the case presents an "unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review." *Lorazepam*, 289 F.3d at 105. Pointing to *Wal-Mart*, the Secretary claims this case raises "novel issues whose resolution would clarify the legal standards in this important area." Pet. 9-10. Yet nowhere does the Secretary identify a single unsettled, fundamental, or novel legal issue – much less one that is important "generally" that is "likely to evade end-of-the-case review." *Lorazepam*,

---

[2] http://www.gpo.gov/fdsys/pkg/BUDGET-2012-BUD/pdf/BUDGET-2012-BUD-12.pdf, at 4.

289 F.3d at 105.  That is because there are no such issues.

The Secretary points to *Wal-Mart*'s statements that there must be "some glue holding the alleged reasons for all th[e challenged employment] decisions together" to show commonality, *see* Pet. 10, and that it does not suffice to allege that all class members "suffered a violation of the same provision of law," Pet. 12-13.  But *Wal-Mart* did not rewrite the book on that issue, and the District Court did nothing but go by the book.  The Supreme Court has long rejected the proposition that the mere invocation of a common statute is sufficient for certification.  *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982); *see also Hartman v. Duffey*, 19 F.3d 1459, 1472 (D.C. Cir. 1994) ("[a]s *Falcon* made clear, there is more to a showing of commonality than a demonstration that class plaintiffs suffered discrimination on the basis of membership in a particular group"); *Wagner v. Taylor*, 836 F.2d 578, 591 (D.C. Cir. 1987) (commonality requires consideration of whether class members were injured "in the same manner" by "a specific discriminatory promotional practice").  The Secretary also points to *Wal-Mart*'s statement that a putative class must "demonstrate that the class members 'have suffered the same injury.'"  Pet. 12.  Yet as District Court recognized, *Wal-Mart* was quoting *Falcon*.  *Id.*; Mem. 37.

The Secretary repeats *Wal-Mart*'s statement that commonality may be established through "'significant proof that an employer operated under a general

10

policy of discrimination.'" Pet. 14; Mem. 37. That quote likewise comes from *Falcon*, as the District Court again recognized. *See id.*; *see also Hartman*, 19 F.3d at 1472 ("plaintiffs must make a significant showing to permit the court to infer that members of the class suffered from a common policy of discrimination that pervaded all of the employer's challenged employment decisions"); *Garcia v. Johanns*, 444 F.3d 625, 632 (D.C. Cir. 2006) (quoting *Hartman*).

Finally, the Secretary points to *Wal-Mart* for the proposition that it is not enough for class members to have general questions in common; they must have in common at least one question that will resolve an important issue in the case. *See* Pet. 12-13, 16. In 2006, in *Love v. Johanns*, 439 F.3d 723 (D.C. Cir. 2006), this Court quoted with approval the Sixth Circuit to the same effect: "'It is not every common question that will suffice [to show commonality], however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality. What we are looking for is a common issue the resolution of which will advance the litigation.'" *Id.* at 729-30 (internal citations omitted). The District Court properly applied this existing rule. Mem. 37-38.

The legal principles applicable to a Rule 23 commonality analysis in this Circuit have long been settled. The Secretary's vague suggestion that *Wal-Mart* gave rise to unsettled, fundamental, or novel legal questions in this area of the law

11

in the D.C. Circuit provides no basis for interlocutory review.[3]  Review of the court's decision is available after judgment, as it always is.

## III.   THE DISTRICT COURT DID NOT COMMIT "MANIFEST ERROR" IN CERTIFYING A CLASS

The District Court did not err, manifestly or otherwise, in finding the Rule 23 requirements satisfied based on settled law and the facts before it.

### A.    Commonality

The Secretary's assertion that the District Court's finding of commonality constitutes "manifest error" rests on a wholesale mischaracterization of the record – namely, her claim that the only thing class members have in common is "the broad allegation that they each suffered discrimination under Title VII."  Pet. 2.

### 1.    Class Members All Allege Discrimination Resulting from the Same Unitary, Structured, Centralized Policy

The Agency-wide promotions policy, the MPP, is the glue that holds the class members' claims together.  All "'have suffered the same injury,'" *Wal-Mart*, 131 S. Ct. at 2553 (quoting *Falcon*, 457 U.S. at 157), because they have been denied promotions pursuant to the same centralized policy.

The key decisions under the MPP are made by just a few people at headquarters – the Director of the Secret Service, who makes every final

---

[3]  Other aspects of *Wal-Mart* are not applicable here:  this is not a Rule 23(b)(2) class; the Court fully evaluated the expert evidence under *Daubert*; and the Court considered merits issues that overlapped with the commonality question.

promotion decision, and the handful of people on the Advisory Board, the Second

Level Panel, and the Peer Panel. Each committee meets together in Washington;

each follows practices required by the MPP. Scoring committees receive the same

briefing, instructions, and training at their annual meetings, and the same

information about the Agents being scored. The MPP requires applicants to be

ranked by score and governs which Agents are included on the "best qualified list."

The Advisory Board's recommendation to the Director, who makes every final

promotion decision, is a consensus choice. *See supra* at 3-4.

The Secretary ignores these facts. Instead she emphasizes features found in

most any promotions process. *See* Pet. 1, 11 (noting different Agents applied for

different positions at different times, committee members are not always identical,

and the process is multi-stage). These minor variations, inherent in every class, do

not defeat commonality.

Lest there be any lingering doubt, *Wal-Mart* is the polar opposite of this

case. *Wal-Mart* involved 1.5 million putative class members across 3,400 stores,

where "pay and promotions decisions" were left to "local managers' broad

discretion," and subject to store, regional, and district managers' "own subjective

criteria." *Wal-Mart*, 131 S. Ct. at 2547. This regime operated "to avoid evaluating

employees under a common standard," and was "just the opposite of a uniform

employment practice." *Id.* at 2553-54. By contrast, this case involves a 120-

13

member class and an Agency-wide policy that imposes centralized decision-making as well as a uniform process for all Agents in the class.

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d. 482 (7th Cir. 2012), decided after *Wal-Mart*, makes clear that commonality is present here. *McReynolds* certified a company-wide class of 700 African-American brokers challenging two national Merrill Lynch policies under Title VII. *See id.* at 488-89. Implementation of the policies depended on local decision-making by the supervisors of 600 branches. *See id.* Judge Posner explained that whether the two policies had a racially adverse impact, and whether they were justified by business necessity, were "issues common to the entire class and therefore appropriate for class-wide determination." *Id.* at 489. The Court recognized that "to the extent" discretion was exercised locally, "the case is indeed like *Wal-Mart*," but found that the similarity ended there because "the exercise of that discretion is influenced by the two company-wide policies at issue[.]" *Id.* Because the two challenged policies were "practices of Merrill Lynch, rather than practices that local managers can choose or not at their whim," *Wal-Mart* showed that commonality was satisfied. *Id.* at 490. As in *McReynolds,* the decisionmakers here were "implementing a uniform policy established by top management." *Id.* at 488. And the key decisions under the MPP are even more centralized.

The District Court rightly determined that commonality is satisfied.

14

### 2. Extensive Statistical Evidence Demonstrates that the MPP Operates in a Generally Discriminatory Manner

Plaintiffs' statistical evidence further establishes commonality because, as the District Court found, it constitutes "'significant proof that [the Secret Service] operated under a general policy of discrimination.'" Mem. 37, 40. The Secretary's contention that this finding was error rests on her complete disregard of the majority of statistical analyses reported by Dr. Mann and considered by the Court.

Petitioner contends that the District Court erred in relying on Dr. Mann's four statistical analyses demonstrating adverse impact under the MPP and instead should have considered only disparities in overall "promotion rate" measured by a single statistical test run by Petitioner. *See* Pet. 2, 7, 14-15; DE 703 at 19. Rejecting the same argument, the District Court correctly found that it ran afoul of Supreme Court precedent. *See* Mem. 17-22 (citing *Conn. v. Teal*, 457 U.S. 440 (1982) & *Furnco Const. Corp. v Waters*, 438 U.S. 567, 580 (1978)). Moreover, this Circuit has held that it is correct for a district court to consider a much broader range of disparities to support an inference of discrimination in promotions. *See Segar v. Smith*, 738 F.2d 1249, 1283-84 (D.C. Cir. 1983). Indeed, the Circuit instructed that the measure of sufficiency of plaintiffs' statistical evidence "must not be applied in a 'rigid, mechanistic, or ritualistic' way," and that "[t]he ultimate test of sufficiency must remain that of *Burdine*, *Teamsters*, and *Furnco*: did the plaintiffs offer evidence 'adequate to create an inference that . . . employment

15

decision[s] [were] based on a discriminatory criterion under the Act." *Id.* at 1274 (quoting *Furnco*, 438 U.S. at 577 & *Teamsters*, 431 U.S. at 358; citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981)) (modifications in original).  The district court properly determined that Dr. Mann's four statistical measures raised an inference of discrimination under this standard.

The statistical evidence likewise refutes Petitioner's assertion that the class covers an excessive time period.  *See* Pet. 7, 14-15.  Three of Dr. Mann's analyses demonstrate that for the entire class period and for promotion to both GS-14 and GS-15, the MPP had a statistically significant adverse impact on African-American Special Agents.[4]  Mem. 40; *see also id.* at 36.

Petitioner's contention that it was error to find commonality in a class that includes both Agents who made "best qualified lists" and those who did not, Pet. 15, reflects the same disregard for the statistical evidence.  Dr. Mann's analyses demonstrated that African-American Agents experience adverse impact in both disqualification for promotion at the best qualified stage *and* lower rank on the "best qualified list" than would be expected in the absence of discrimination.  *See supra* at 5.  Thus, class members who made and did not make the "best qualified

---

[4]  The Secretary claims that the observation of statistically significant adverse impact in one of Dr. Mann's statistical tests from 1998-2000 for GS-14 promotions, but not for GS-15 promotions, demonstrates "manifest error."  Pet. 16-17.  That argument is contrary both to the Secretary's expert's admissions and to Circuit precedent.  *See supra* at 6; *Segar*, 738 F.2d at 1283-84.

lists" share the common experience of being disadvantaged by the use of their MPP scores.[5]

### B.    Adequacy of Representation

The adequacy of representation requirement assures that there are no conflicts of interest between class representatives and other class members. *See, e.g.*, *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997). The District Court properly found adequacy satisfied because there was no evidence of "any direct accusations of discrimination" within the class "relevant to the plaintiffs' employment discrimination claim." Mem. 46.

The Secretary claims "manifest error" because a few class members sat on MPP panels that evaluated other class members. Pet. 17-18. The District Court addressed and resolved this issue as well. Mem. 45-47. And the Secretary cannot identify a single accusation of discrimination by one class member against another. Speculative, hypothetical, and unsupported assertions of intra-class conflict do not preclude class certification. *See, e.g.*, *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012); *Int'l Woodworkers of Am., AFL-CIO, CLC v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1269 (4th Cir. 1981).

---

[5] The District Court also properly relied on Plaintiffs' extensive anecdotal evidence to find commonality. Mem. 41. Plaintiffs offered testimony from almost one quarter of the class, whereas *Wal-Mart* involved testimony from only one of every 12,500 class members. *See Wal-Mart*, 131 S. Ct. at 2556. Whether the MPP's discriminatory impact is justified by business necessity is a further common and central question here. *See McReynolds*, 672 F.3d. at 489.

Indeed, absent direct accusations of discrimination, courts frequently have certified employment discrimination classes containing supervisors or those who applied the challenged policy. *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 958-59 (9th Cir. 2003); *McReynolds v. Sodexho Marriott Servs.*, 208 F.R.D. 428, 445-48 (D.D.C. 2002); *Adair v. England*, 209 F.R.D. 5, 11 (D.D.C. 2002); *Hyman v. First Union Corp.*, 982 F. Supp. 1, 5-6 (D.D.C. 1997). Should a conflict arise, district courts are authorized to modify certification orders. *See Lorazepam*, 289 F.3d at 105.

The Secretary's reliance on *Wagner v. Taylor* and *Randall v. Rolls-Royce Corp.*, is misplaced. *Wagner* merely found that, combined with unrelated adequacy concerns, the plaintiff's *direct* accusation of discrimination against another class member undermined his adequacy enough to preclude certification. *See Wagner*, 836 F.2d at 595. "*Wagner* did not, however, adopt any per se rule concerning adequacy of representation where the class includes employees at different levels of an employment hierarchy." *Staton*, 327 F.3d at 958. And in *Randall*, adequacy was lacking primarily because the class representatives' claims were "significantly weaker" than the claims of other class members. *See Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011). That the named plaintiffs set other class members' compensation was only a secondary consideration – to which there is no parallel here, since no class member could decide whether to promote another. *See id.*

18

Accepting the Secretary's interpretation of conflicts would enable any employer to deliberately insulate itself from employment class action liability by placing members of a protected class on an evaluation panel. The District Court's rejection of such a rule is correct, not manifestly erroneous.

## C.    Predominance[6]

The District Court properly found that because all class members will rely on the same evidence to establish a pattern or practice of discrimination, the Rule 23(b)(3) predominance requirement is satisfied. *See* Mem. 48. In asserting "manifest error," the Secretary fails to recognize the centrality of a pattern or practice finding under the *Teamsters* framework for Title VII litigation, which *Wal-Mart* itself reaffirmed as the controlling law and the District Court relied on. *See Wal-Mart*, 131 S. Ct. at 2561; Mem. 49 & n.16.

Under *Teamsters*, a pattern or practice finding gives rise to a fundamentally important "rebuttable inference that all class members were victims of the discriminatory practice[.]" *Wal-Mart*, 131 S. Ct. at 2552 n.7. If the inference is warranted, differences in class members' experiences that might overcome the presumption are addressed at subsequent individual *Teamsters* mini-hearings. *See Hartman*, 19 F.3d at 1462 n.2. The pattern or practice finding, without further proceedings, also justifies classwide injunctive relief. *See Teamsters*, 431 U.S. at

---

[6] Petitioner asserts error with respect to both predominance and superiority, *see* Pet. 3, 18, 20, but only proffers an argument with respect to predominance.

19

361.  A pattern or practice finding may be based on common statistical and anecdotal evidence alone, the type of evidence present here.  *See, e.g.*, *Wagner*, 836 F.2d at 592; *Segar*, 738 F.2d at 1277-79.

It is reversible error to disregard the *Teamsters* framework in considering predominance.  *See Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1107 (10th Cir. 2001).  That damages and any other issues specific to individuals may be addressed in *Teamsters* hearings does not undermine predominance.  "[T]he action will be considered proper under Rule 23(b)(3) even though important matters will have to be tried separately."  *Aliotta v. Gruenberg*, 237 F.R.D. 4, 12 (D.D.C. 2006) (quoting 7A FED. PRAC. & PROC. § 1778 (2d ed. 1986)); *see also Chiang v. Veneman*, 385 F.3d 256, 273 (3d Cir. 2004).  Moreover, much of the evidence in this case will be the same across the *Teamsters* hearings.

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), on which the Secretary principally relies, *see* Pet. 18, 20, is inapposite; it did not involve the *Teamsters* method of proof, and it implicated products manufactured by twenty defendant companies.  Here there is only a single defendant with a single discriminatory policy affecting all class members.  *Amchem* provides no basis for disturbing the District Court's predominance finding.

## CONCLUSION

For all of the reasons set forth above, the petition should be denied.

20

Respectfully Submitted,

| _____ /s/ _____ | _____ /s/ _____ |
|---|---|
| CATHERINE E. STETSON | JENNIFER I. KLAR |
| E. DESMOND HOGAN | JOHN P. RELMAN |
| ERICA KNIEVEL SONGER | MEGAN CACACE |
| HOGAN LOVELLS US LLP | RELMAN, DANE & COLFAX PLLC |
| 555 Thirteenth St., NW | 1225 Nineteenth St., N.W. |
| Washington, DC 20009 | Suite 600 |
| 202-637-5491 | Washington, D.C. 20036 |
| cate.stetson@hoganlovells.com | 202-728-1888, ext. 111 |
| | jklar@relmanlaw.com |

Dated:  March 25, 2013

21

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2013, a copy of the foregoing

was served on counsel for Defendant-Petitioners via hand delivery to:

STUART F. DELERY
CHARLES W. SCARBOROUGH
RONALD C. MACHEN JR.
R. CRAIG LAWRENCE
MARINA UTGOFF BRASWELL
BENTON G. PETERSON
Assistant United States Attorney
U.S. Attorney's Office
Judiciary Center – Civil Division
501 Third Street, N.W.
Washington, D.C. 20001

I hereby certify that on this 25th day of March, 2013, electronic copies of

this brief were also served through the Court's ECF system to:

CHARLES W. SCARBOROUGH
R. CRAIG LAWRENCE
MARINA UTGOFF BRASWELL
BENTON G. PETERSON

                                         /s/ Jennifer I. Klar
                                         JENNIFER I. KLAR

# SUPPLEMENTAL APPENDIX

# TABLE OF CONTENTS

Merit Promotion Plan for GS/GM-1811 Positions ...............................................SA 1

Fourth Supplemental Declaration of Charles R. Mann, Ph.D. .........................SA 60

United States Secret Service
Directives System

Manual : Administrative
RO : PER

Section : PER-08(02)
Date : 07/28/2000

# Merit Promotion Plan for GS/GM-1811 Positions

## Table of Contents

Page

REGULATIONS ............................................................................... 1

POLICY ....................................................................................... 1

COVERAGE ................................................................................... 1

EXCEPTIONS ................................................................................. 2

ENTRANCE LEVEL SELECTIONS ........................................................ 3

NON-COMPETITIVE PROMOTION PROCESS ......................................... 3

GS-7/12 CAREER PROMOTIONS ......................................................... 3

GS-13 CAREER PROMOTIONS ........................................................... 4

COMPETITIVE PROMOTION PROCESS .................................................. 5
    GS/GM-14 and GS-15 Promotions .................................................. 5

OVERVIEW OF COMPETITIVE PROMOTION PROCESS FOR GS-13 TO GS-14 ................. 6
    Forms to Submit ....................................................................... 6
    Eligibility Criteria ...................................................................... 6
    Promotion Evaluation ................................................................. 7

OVERVIEW OF COMPETITIVE PROMOTION PROCESS FOR GS/GM-14 to GS-15 ............. 7
    Forms to Submit ....................................................................... 7
    Eligibility Criteria ...................................................................... 7
    Promotion Evaluation ................................................................. 8

COMPETITIVE PROMOTION PROCESS .................................................. 8
    Forms to Submit ....................................................................... 8
    Election to Participate Forms ........................................................ 9
    Rating Official .......................................................................... 9
    Exceptions to Eligibility Criteria .................................................... 10
    Qualification Statements ............................................................. 10
    GS-13 to GS-14 ....................................................................... 10
    GS-14 to GS-15 ....................................................................... 10
    Rating Official .......................................................................... 11

OVERVIEW OF THE EVALUATION OF ELIGIBLES .................................... 11

i

DEF00230869

DEF00230869

Manual : Administrative
RO     : PER

Section : PER-08(02)
Date    : 07/28/2009

FIRST LEVEL EVALUATION ............................................................. 12
    Rating Official ................................................................. 12
    First Level Evaluation Forms .................................................... 12
    Nature of First Level Promotion Evaluation ...................................... 12
    Required Discussions and Signatures ............................................. 13
    GS-13 to GS-14 Competencies ..................................................... 13
    GS/GM-14 to GS-15 Competencies .................................................. 13
    Time of First Level Evaluation .................................................. 14

PEER PANELS ......................................................................... 14
    Peer Panel Composition .......................................................... 14
    Selection of Panel Members ...................................................... 14
    Training of Panel Members ....................................................... 15
    Panel Responsibilities .......................................................... 15
    Awarding Points ................................................................. 15
    Time of Peer Panel Evaluation ................................................... 16

SECOND LEVEL PANEL .................................................................. 16
    GS-13 to GS-14 Second Level Panel ............................................... 17
    GS/GM-14 to GS-15 Second Level Panel ............................................ 17
    Awarding Points ................................................................. 18
    Time of Evaluation .............................................................. 19

EVALUATION COMPONENTS ............................................................... 20
    GS-13 to GS-14 .................................................................. 20
    Scoring ......................................................................... 20
    Sample Rating for GS-13 to GS-14 ................................................ 20
    GS/GM-14 to GS-15 ............................................................... 21
    Scoring ......................................................................... 21
    Sample Rating for GS/GM-14 to GS-15 ............................................. 21
    Employee Information ............................................................ 21

BIDDING ON VACANCIES ................................................................ 22
    Unannounced Vacancies ........................................................... 22
    Announced Vacancies ............................................................. 22
    Employee Responsibility ......................................................... 23
    Office Manager Responsibility ................................................... 23
    Personnel Division Responsibility ............................................... 23
    Eligibility for Bidding on Vacancies ............................................ 23
    Bidding on Overseas Assignments ................................................. 24
    Referral of Eligibles ........................................................... 24
    Advisory Board Action ........................................................... 24
    Selection ....................................................................... 25
    Employee Information ............................................................ 25
    Effective Date of Promotions .................................................... 25
    Hardship Cases .................................................................. 25
    Probationary Period for New Supervisors and Managers ............................ 26
    Questions, Complaints, and Grievances ........................................... 26
    Promotion Records ............................................................... 26
    Plan Review ..................................................................... 26
    List of Offices Requiring a Language ............................................ 27

ii

DEF00230870

DEF00230870

Manual : Administrative                                Section : PER-08(02)
RO     : PER                                           Date    : 07/28/2000

Sample SSF 4015, Special Agent Full Performance Level (GS-13) Certification ................. 28

Sample SSF 4002, GS-13 to GS-14,
    Election for Participation in the Merit Promotion Process ............................... 29

Sample SSF 4004, Special Agent Qualification Statement,
    (GS-13 for Consideration for Promotion to GS-14) ...................................... 31

Sample SSF 3154, First Level Promotion Evaluation,
    (GS-13 for Consideration for Promotion to GM-14) ...................................... 37

Sample SSF 4003, GS/GM-14 to GS-15,
    Election for Participation in the Merit Promotion Process ................................ 42

Sample SSF 3152, Special Agent Qualification Statement,
    (GS-14 for Consideration for Promotion to GS-15) ...................................... 44

Sample SSF 3362, First Level Promotion Evaluation,
    (GM-14 for Consideration for Promotion to GM-15) ..................................... 52

iii

DEF00230871

United States Secret Service
Directives System

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date   : 07/28/2000

# MERIT PROMOTION PLAN FOR GS/GM-1811 POSITIONS

## Regulations

Regulatory requirements for merit promotion plans are cited in 5 CFR 335.103.

## Policy

This policy outlines the minimum requirements for promotion consideration. It is the policy of the Secret Service that each position will be filled by selection from among the best qualified candidates, whether by promotion, reassignment, transfer, reinstatement, or new appointment. Management will take into consideration the Career Track Program when making selections under this plan. Additional requirements established to be competitive for promotions in relation to career track options are outlined in Administrative Manual Section ADM-03(03).

All selections will be made without regard to political, religious or labor organization affiliation or non-affiliation, marital status, parental status, race, color, sex, sexual orientation, national origin, non-disqualifying physical handicap, or age, and selection will not be based on any criteria that are not job related.

Whatever the means of filling vacancies, management has the right to select or not select for any given position.

## Coverage

Unless exempted under "Exceptions", this plan applies to GS-1811 promotions through the GS-15 level, and to the following kinds of actions:

1

DEF00230872

DEF00230872

1. Reassignment or demotion to a position with more promotion potential than the position last held (except as required by reduction-in-force regulations);

2. Selection to be detailed for more than 120 days to a higher grade position or to a position with known promotion potential;

3. Promotion/reassignment to a higher grade position or position with higher promotion potential; and

4. Reinstatement to a position at a higher grade than the person last held, or to one having potential for advancement to a higher grade.

# Exceptions

The competitive procedures of this plan do not apply to the actions listed below.

1. A promotion resulting from an employee's position being upgraded because of additional duties and responsibilities, provided the employee continues to perform functions in the same line of work.

2. A position change within the Secret Service from a position having known promotion potential to a position having no higher potential. Reassignments between GS-1811 positions which involve no promotion in grade are generally not subject to merit promotion procedures, even though a change in title is involved, since employees would still compete under the same procedures and have the same opportunity for subsequent promotion.

   If, however, an employee was reassigned in grade to a position which definitely had more promotion potential (such as reassignment of a GS-13 to a GS-14 position which was temporarily reduced to a GS-13), merit promotion procedures would apply.

3. A temporary promotion of 120 days or less. It is the policy of the U.S. Secret Service not to temporarily promote GS-1811s for a period of 120 days or less. These actions are processed as a detailed action and therefore, no salary compensation is received. Refer to Administrative Manual section PER-04(11), Detail of Employees, for additional information.

4. An action taken as a remedy for failure to receive proper consideration in a competitive promotion action.

5. A promotion resulting from the upgrading of a position without significant change in duties and responsibilities due to issuance of a new classification standard or the correction of a classification error.

6. A position change permitted by reduction-in-force regulations.

7. Promotion back to the highest grade previously held on a permanent basis under career or career-conditional appointment, provided the employee was not demoted or separated from that grade because of deficiencies in performance or "for cause" (e.g., conduct) reasons. The full performance level of the position to be filled can be at no higher level than the full performance level of the employee's current position, or the highest actual grade the employee previously held.

2

DEF00230873

DEF00230873

Manual : Administrative
RO   : PER

Section : PER-08(02)
Date   : 07/28/2000

# Entrance Level Selections

Entry into GS-1811 positions is made in accordance with the Office of Personnel Management qualifications standard for GS-1811 positions, normally made at the GS-5, GS-7 and GS-9 levels, depending on qualifications.  Management may select for these positions from among qualified persons either outside or within the Service (subject to competitive procedures).

Secret Service employee selections for entry-level positions will be made under competitive procedures. Applications will be solicited by means of a vacancy announcement distributed Service-wide, and all qualified applicants will be considered as specified in the announcement.  Further discussion in this area may be found in Secret Service Administrative Manual section PER-04(04), Recruitment and Selection - Special Agents.

# Non-Competitive Promotion Process

The full performance level for GS/GM-1811 positions is GS-13.  Such career promotions may be made without competition with others, but such promotions are not automatic.

## GS-7 through GS-12 Career Promotions

All special agents, upon completion of one year in grades GS-5, 7, 9, and 11, are eligible to be considered for "career" promotion to the next higher grade until they reach the GS-12 level, as follows:

1. Time in Grade
   One year in grades GS-5, 7, 9, and 11

2. Performance Appraisal
   Most recent performance appraisal rating of record is "Acceptable"

Approximately ninety (90) days before a special agent completes one year in grade, his/her supervisor will receive documentation (SF 52, Request for Personnel Action) from the Personnel Division through the Mainframe System, informing him/her that the employee is eligible for consideration for promotion to the next higher grade level. The supervisor determines whether the employee is assuming responsibilities and performing duties commensurate with the next higher grade.  Before a career promotion may be made, the agent's supervisor must be sure that the agent has progressed to that level of performance.  It is the supervisor's responsibility to ensure that the proper documentation is then returned to the Personnel Division before the effective date of the promotion.  Refer to Administrative Manual section PER-22, Requests for Personnel Action - Use of Standard Form 52,  for  additional information.  Refer to Administrative Manual section PER-06(03), The Performance Appraisal Process, for more information pertaining to evaluating performance.

3

DEF00230874

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date   : 07/28/2000

# GS-13 Career Promotions

A special agent is eligible for consideration for promotion to GS-13 positions upon satisfactory completion of the following:

1. Time-in-Grade
   One year in grade as a GS-12 special agent with the Secret Service;

2. Performance Appraisal
   Most recent performance appraisal rating of record is "Acceptable";

3. Training
   Completion of the Conference on Employee Diversity issues or a substitute diversity course approved by the Office of Training on a case-by-case basis; and,

4. Certification (on SSF 4015)
   Certification by his/her SAIC (in consultation from his/her RAIC, where appropriate) that the candidate is capable of performing protective and/or investigative assignments at a level of complexity and responsibility characteristic of the GS-13 level as follows:

   Assignments involve the use of incomplete or inconclusive information, the need for variation in approaches, and the resolution of unacceptable, inconsistent, or unforeseen results. The incumbent is often confronted by large numbers of disparate operating situations which fit no common pattern and are not susceptible to solution by a single method or approach. Assignments typically require the incumbent to make unreviewed decisions and draw conclusions about matters of protective operations and criminal activities after evaluating and interpreting information from various sources.

   To be certified at the GS-13 level, the level of complexity for protective work requires that one serves as a sh"': or advance agent responsible for providing physical protection for principals. Assists in the preparation of work schedules, assigns post responsibilities, and coordinates the utilization of Secret Service assets. Establishes and maintains effective liaison with protectees and their staffs, as well as Federal, state, local and/or foreign officials, to coordinate security assignments related to protective movements.

   To be certified at the GS-13 level, the level of complexity for investigative work requires that one effectively plan, coordinate, and conduct difficult and sensitive investigative activities (e.g., financial crimes, counterfeit, intelligence investigations, etc.). Serves as a case agent responsible for directing other special agents in conducting complex investigations, to include coordinating undercover and surveillance assignments, developing and controlling informants, and participating in the decision making process regarding the progress of major investigations. Cases typically require the investigation of a large number of interrelated activities and frequently involve components of organized criminal groups.

   Approximately ninety (90) days before a special agent completes one year in grade as a GS-12, his/her supervisor will receive documentation (SF 52, Request for Personnel Action) from the Personnel Division informing him/her that the employee is eligible for consideration for promotion to the GS-13 grade level. The supervisor determines whether the employee has satisfactorily completed all of the eligibility criteria outlined above and is assuming responsibilities and performing duties commensurate with the GS-13 grade level. Before a career promotion may be made, the Agent's supervisor must be sure that the Agent has progressed to that level of performance.

4

DEF00230875

DEF00230875

Manual : Administrative
RO : PER

Section : PER-08(02)
Date : 07/28/2000

For the following situations listed below, it is the supervisor's responsibility to: (1) complete SSF 4015, Certification for GS-1811-13, (2) discuss the results with the employee and have the employee sign indicating there was a discussion, (3) file the SSF 4015 on the left side of the Employee Performance Folder:

If the SAIC determines that an employee satisfactorily completed all of the eligibility criteria, is assuming responsibilities, and performing duties commensurate with the GS-13 grade level, he/she should approve and sign the SF 52 and route through the appropriate AD to the Personnel Division before the effective date indicated on the SF 52 or the promotion will be processed the first pay period after the date received in the Personnel Division.

If the SAIC determines that an employee has not successfully completed all the eligibility criteria, is not assuming responsibilities, or is not performing at the GS-13 grade level, he/she should attach justification to the SSF 4015, sign the form and submit a copy to the Personnel Division, Special Agent and Office of Investigations Support Branch.

When the SAIC determines that an employee who initially failed to meet the eligibility criteria, but has now satisfactorily met all of the criteria, the SAIC must complete a new certification form (SSF 4015) and submit the SF 52 to the Personnel Division, to promote the employee to the GS-13 grade level.

Refer to Administrative Manual section PER-22, Requests for Personnel Action - Use of Standard Form 52, for additional information. Refer to Administrative Manual section PER-06(03), The Performance Appraisal Process, for more information pertaining to evaluating performance.

# Competitive Promotion Process

## GS/GM-14 and GS-15 Promotions

Special agents must compete for promotion to the GS-14 and GS-15 positions. All special agents must meet the eligibility criteria set forth in this plan at a minimum to be eligible to compete for promotion to positions at these levels. All qualified and available special agents of the Secret Service will be considered as described below.

5

DEF00230876

SA 8

Manual : Administrative                    Section : PER-08(02)
RO     : PER                               Date    : 07/28/2000

# Overview of Competitive Promotion Process for GS-13 to GS-14

## Forms to Submit

Due to the Personnel Division by **August 15:**

SSF 4002, GS-13 to GS-14, Election for Participation in the Merit Promotion Process
SSF 4004, Special Agent Qualification Statement, GS-13 for Consideration for Promotion to GS-14

Due to the Personnel Division by **August 30:**

SSF 3154, First Level Promotion Evaluation, GS-13 for Consideration for Promotion to GS-14

## Eligibility Criteria

1. Time in Grade
   Three years in grade as of 12/31 of the rating year

2. Performance Appraisal
   An "Acceptable" performance rating for the current performance rating period

3. Training
   Completion of one supervisory course as identified in TNG-05, The Secret Service's Management Training Program, or substitute supervisory course approved by the James J. Rowley Training Center on a case-by-case basis.

   In order to be eligible to compete, the training requirement must be met by December 31 of the rating year. If the required training is met by August 15, the Individual Training History (ITH) must be submitted with the SSF 4002, GS-13 to GS-14, Election for Participation in the Merit Promotion Process.

   If, however, an appropriate course is scheduled to be completed by December 31 of the rating year, the competing agent is required to submit a copy of the Individual Training Plan (Series SSF4014), Individual Training History, and as appropriate (for the out-of-agency course selections) an approved SF 182, Request, Authorization, Agreement and Certification of Training with the SSF 4002, GS-13 to GS-14, Election for Participation in the Merit Promotion Process. At the end of the year, before the final scores are distributed, Personnel Division will confer with the James J. Rowley Training Center to determine if the course was completed. If not, the agent will not receive final scores and will not be eligible for promotion during the promotion cycle.

4. Protection Experience
   A total of two years on a protective detail; or in ID, TSD, WHD

6

DEF00230877

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date   : 07/28/2000

## Promotion Evaluation

| | | |
|---|---|---|
| 1. First Level Evaluation | | 50% |
| 2. Peer Panel Evaluation | | 20% |
| Investigations | 10% | |
| Protection | 10% | |
| 3. Second Level Panel Evaluation<br>Two managerial competencies | | 30% |
| TOTAL | | 100% |

# Overview of Competitive Promotion Process for GS/GM-14 to GS-15

## Forms to Submit

Due by **August 15**: to the Personnel Division

SSF 4003, GS/GM-14 to GS-15, Election for Participation in the Merit Promotion Process
SSF 3152, Special Agent Qualification Statement, GS-14 for Consideration for Promotion to GS-15

Due by **August 30**: to the Personnel Division

SSF 3362, First Level Promotion Evaluation, GM-14 for Consideration for Promotion to GM-15

## Eligibility Criteria

1. Time in Grade
   One year in grade as of 12/31 of the rating year

2. Performance Appraisal
   An "Acceptable" performance rating for the current performance rating period

7

DEF00230878

**SA 10**

DEF00230878

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date   : 07/28/2000

3. Training
   Completion of one supervisory course as identified in TNG-05, Secret Service's Management Training Program or substitute supervisory course approved by the James J. Rowley Training Center on a case-by-case basis

   In order to be eligible to compete, the training requirement must be met by December 31 of the rating year. If the required training is met by August 15, the Individual Training History (ITH) must be submitted with the SSF 4003, GS/GM to GS-15, Election for Participation in the Merit Promotion Process.

   If, however, an appropriate course is scheduled to be completed by December 31 of the rating year, the competing agent is required to submit a copy of the Individual Training Plan (Series SSF4014), Individual Training History, and as appropriate (for the out-of-agency course selections) an approved SF 182, Request, Authorization, Agreement and Certification of Training, with the SSF 4003, GS/GM-14 to GS-15, Election for Participation in the Merit Promotion Process. At the end of the year, before the final scores are distributed, Personnel Division will confer with the James J. Rowley Training Center to determine if the course was completed. If not, the agent will not receive final scores and will not be eligible for promotion during the promotion cycle.

## Promotion Evaluation

| | | |
|---|---|---|
| 1. First Level Evaluation | 50% | |
| 2. Second Level Panel Evaluation Six Managerial Competencies | 50% | |
| TOTAL | 100% | |

# Competitive Promotion Process

## Forms to Submit

There are different forms to submit for each grade level. See samples of these forms at the end of this section.

8

DEF00230879

DEF00230879

Manual : Administrative
RO : PER

Section : PER-08(02)
Date : 07/28/2000

## Election to Participate Forms

## GS-13 to GS-14

**SSF 4002, GS-13 to GS-14 Election for Participation in the Merit Promotion Process**, must be completed and signed by all GS-13 special agents who meet the Time in Grade requirement of three years in grade as of December 31 of the rating year.

## GS-14 to GS-15

**SSF 4003, GS/GM-14 to GS-15 Election for Participation in the Merit Promotion Process**, must be completed and signed by all GS-14 special agents who meet the Time in Grade requirement of one year in grade as of December 31 of the rating year.

## Rating Official

The SAIC, RAIC, Chief Counsel or higher level official must sign the appropriate election to participate form and ensure that the forms are submitted to the Personnel Division by **August 15th** of each rating year. He/She must ensure that all employees who meet the required time in grade requirement as stated above, accurately complete and sign the form, including those employees electing not to participate for the current rating period and those who do not meet all eligibility criteria. Employees who are absent from work for an extended period of time are also required to submit an Election for Participation Form in the Merit Promotion Process indicating their election decision.

Declining to participate in a given year will in no way influence future consideration for promotion. In addition, it will not preclude the possibility of being laterally reassigned to a different post of duty.

A special agent who elects to "participate" in the merit promotion process is stating that he/she is aware that by participating in the process, the special agent may be promoted to fill a position for which he/she did not bid, and that promotion may require relocation.

NOTE: Employees eligible for promotion to more than one grade level (i.e., those who have previously held a higher grade level position) must submit the appropriate forms for each grade level they are applying for and must have the appropriate evaluations (first-level, peer panel and second-level panel) completed for each level applicable.

9

DEF00230880

SA 12

DEF00230880

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date    : 07/28/2000

## Exceptions to Eligibility Criteria

Waiver requests for exceptions to the eligibility criteria for training and protection experience must be requested on the Election for Participation in the Merit Promotion Process Form. Requests must fully document the specific reason(s) the required training or protection experience, where applicable, has not been obtained. The Assistant Director - Administration will make the final decision to approve or disapprove any waiver request. Only in rare and extreme circumstances will waivers be granted.

By law, no exceptions can be granted for time in grade or performance appraisal requirements.

## Qualification Statements

A new and complete qualification statement must be submitted each year. The qualification statement is used by the Peer Panel at the GS-13 to GS-14 grade level to rate employees on technical competencies. The qualification statement is used by the Second Level Panels at the GS-13 to GS-14 and the GS-14 to GS-15 levels to rate employees on managerial competencies.

## GS-13 to GS-14

**SSF 4004, Special Agent Qualification Statement (GS-13 for Consideration for Promotion to GS-14)** must be completed by all GS-13 special agents who are electing and are eligible to participate in the evaluation rating cycle.

## GS-14 to GS-15

**SSF 3152, Special Agent Qualification Statement (GS-14 for Consideration for Promotion to GS-15)** must be completed by all GS-14 special agents who are electing and are eligible to participate in the evaluation rating cycle.

The forms are due in the Personnel Division no later than **August 15**. The information **must not** exceed the space allowed. Additional sheets **will not** be evaluated by the Peer Panel or Second Level Panel.

It is the employees' responsibility, and in their best interest, to provide the panel with pertinent information (i.e., experience, training and awards) that fully demonstrates the proficiency in the experience and/or competencies to be addressed. Employees should provide **specific examples of accomplishments or achievements for each experience category or competency listed.**

10                    DEF00230881

**SA 13**

DEF00230881

Manual : Administrative
RO     : PER

Section : PER-08(02)
Date    : 07/28/2000

## Rating Official

The SAIC, RAIC, Chief Counsel or higher level official must sign the appropriate qualification statement and ensure that the forms are submitted to the Personnel Division by **August 15th of each** rating year. He/She must ensure that only those employees who are electing and are eligible to participate as outlined in the Eligibility Criteria on page 6 for GS-13 to GS-14 and page 7 for GS/GM-14 to GS-15 accurately complete and sign the form.

# Overview of the Evaluation of Eligibles

Employees will be evaluated on multiple components. Below are the weights assigned to each component for each grade level.

|  | GS-13 to 14 | GS/GM-14 to 15 |
| --- | --- | --- |
| First-Level Promotion Evaluations | 50% | 50% |
| Peer Panel Evaluations | 20% | N/A |
| Second-Level Panel Evaluations | 30% | 50% |
| Total | 100% | 100% |

# First Level Evaluation

## Rating Official

Each eligible employee will be evaluated for promotion by their SAIC, RAIC, Chief Counsel or next higher level official.

**Exceptions:**

The First Level Evaluations can only be signed by a lower level official when the lower level official has officially served as the Acting SAIC, RAIC, or Chief Counsel as announced by the appropriate Assistant Director or higher level official; or

If this official has been the employee's supervisor for less than 90 days as of August 1 (**no later than May 1**), the evaluation will be completed by the employee's previous supervisor; or

If the previous supervisor is unavailable (e.g., retired), the next higher level 1811, with appropriate input from other supervisor(s) familiar with the employee's work.

11

DEF00230882

DEF00230882

Manual : Administrative                                    Section : PER-08(02)
RO    : PER                                                Date   : 07/28/2000

The supervisor responsible for preparing the First Level Evaluation is required to consult with lower-level supervisors whenever he/she is not the immediate supervisor of the employee being evaluated, and the lower-level supervisor should sign the completed form to attest to his/her participation. Also, the rating official should consider the comments (written or oral) of any others who have supervised the employee for significant periods of time (I.e., 90 days or more) during the rating period (such as when the employee has been detailed to another office or has reassigned from another office during the rating year).

## First Level Evaluation Forms

The following forms are used for First Level Evaluations:

SSF 3154, First Level Promotion Evaluation, GS-13 for Consideration for Promotion to GM-14
SSF 3362, First Level Promotion Evaluation, GM-14 for Consideration for Promotion to GM-15

See samples of SSF 3154 and SSF 3362 at the end of this section.

## Nature of First Level Promotion Evaluation

The supervisory evaluation is based on current performance. As such, it provides the rater's best assessment of the employee's ability to perform successfully at the next grade level. Evaluations should be as objective as possible and in accordance with instructions on the form, including any required consultation with other supervisors. Comments are encouraged in all cases as an aid for Second Level Evaluations.

The supervisory evaluation will have a range of 10 - 50 points. The scoring of this evaluation will be done on a five point scale, as follows, for each element:

Level 1 - Marginal                        1 point
Level 2 - Acceptable                      2 points
Level 3 - Fully Competent                 3 points
Level 4 - Exceeds Fully Competent         4 points
Level 5 - Superior                        5 points

Ratings at Level 1 or Level 5 must be documented in writing in Section II of the applicable First Level Promotion Evaluation Form.

NOTE: The documentation is valuable to the employee and provides an excellent record of specific performance in each category. Documentation for Level 1 Ratings should provide specific information to the employee on the need for improvement in a specific area or areas in order to be considered successful at the next grade level. Documentation for Level 5 Ratings should provide the supervisor an opportunity to provide positive feedback to the employee for superior performance demonstrated in a specific area or areas.

Training in evaluating employees for promotion will be included in the supervisory training provided for new supervisors, and instruction will be provided periodically to other supervisors during appropriate supervisory training sessions or conferences. However, the Personnel Division, Employee Relations Branch is available to provide advice in evaluating at any time.

12

DEF00230883

Manual : Administrative
RO     : PER

Section : PER-08(02)
Date    : 07/28/2000

## Required Discussions and Signatures

First Level Evaluations **must be discussed** with all candidates rated for promotion. Each candidate is required to sign his or her evaluation form to acknowledge the discussion. If the candidate and rater are not located in the same office, the first level evaluation should be discussed telephonically and documented as such on the appropriate evaluation form. A signature from both the rater and the candidate is still required. In addition to formal promotion evaluation discussions, rating officials should discuss promotion prospects with employees at any time the employee desires or the circumstances warrant.

## GS-13 to GS-14 Competencies

Candidates will be rated on the following elements:

1. Ability to communicate orally
2. Ability to communicate in writing
3. Ability to work and deal effectively with individuals and/or groups
4. Ability to analyze problems and recommend solutions
5. Ability to fully subscribe to Equal Employment Opportunity concepts and to advance the Service's EEO Action Plan
6. Ability to negotiate and influence others
7. Knowledge of Secret Service administrative rules and regulations
8. Ability to plan and organize
9. Ability or aptitude to lead others
10. Ability to manage human resources

## GS/GM-14 to GS-15 Competencies

Candidates will be rated on the following elements:

1. Ability to communicate orally
2. Ability to communicate in writing
3. Ability to work and deal effectively with individuals and/or groups
4. Ability to analyze problems and recommend solutions
5. Ability to fully subscribe to Equal Employment Opportunity concepts and to advance the Service's EEO Action Plan
6. Ability to negotiate and influence others
7. Ability to plan and organize
8. Ability to lead and direct others
9. Knowledge of Secret Service administrative rules and regulations
10. Ability to manage human resources

13

DEF00230884

DEF00230884

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date   : 07/28/2000

## Time of First Level Evaluation

Except for foreign offices, it is required that First Level Evaluations be submitted to the Personnel Division using the U.S. Secret Service Performance Evaluation Program through E-mail. The First Level Evaluation scores must be entered into the program for employees who will be eligible for promotion as of December 31 of the rating year, and who elected to participate in the merit promotion process. In addition, First Level Evaluation scores must be discussed with the employee, and submitted to the Personnel Division by August 30. Instructions will be provided, in advance, for submission of the evaluation scores.

A printed copy of the First Level Evaluation, must also be submitted to the Personnel Division, Attention: Special Agent and Office of Investigations Support Branch, so as to arrive no later than August 30. It is the submitting office's responsibility to ensure that the printed copies of the form have the required original signatures and agree with the promotion evaluation.

# Peer Panels

## Peer Panel Composition

There is a panel for promotion from the GS-13 to GS-14 level. The panel consists of a total of eight members who are at least at the grade to which the promotion will be made. The panel is divided into two teams each comprised of three raters and one alternate. Three raters must be present to form a quorum for action.

One team rates each candidate in protection. The other team rates each candidate in investigations. Within each team, each panel member evaluates all candidates independently, and then individual panel member scores are averaged to provide one score for each experience category being rated. Panel members who were the First Level Evaluation rating or reviewing official or contributed to the first level rating of an employee may not rate that employee. This particular rating will be performed by the alternate member. A non-voting member of the Personnel Division will serve on each panel to provide any necessary technical assistance and oversight.

## Selection of Panel Members

The panel will represent a diverse cross section of the Service's special agent work force. To the extent possible, the panel will be comprised of special agents who represent minority groups, large field offices, small field offices, various geographic locations, headquarters, and protective divisions. In order to provide continuity from year to year, and when possible, each team will have a panel member from the previous year, selected by the Deputy Director.

In addition, the Personnel Division will solicit volunteers to represent the Service's diverse work force. Panel members representing various categories will be selected by lottery for the protection and investigations panels.

14

DEF00230885

**SA 17**

Manual  :  Administrative                                          Section  :  PER-08(02)
RO      :  PER                                                     Date     :  07/28/2000

Names of the members selected by lottery will be submitted to the Deputy Director who will make the final panel selections. If there are not enough volunteers to provide adequate representation of the Service's work force, nominations for members will be solicited from the Assistant Directors of Investigations, Protective Operations, and Protective Research. The Deputy Director will select a member(s) from these nominations. Should any member become unavailable to serve after the panel has started its work but before it is completed, a replacement will be designated by the Deputy Director.


## Training of Panel Members

The Personnel Division will provide specific instructions to the peer panel on the qualification review process prior to the rating of candidates.


## Panel Responsibilities

The peer panel teams will use evaluative criteria (i.e., benchmarks or examples of qualifying experience at each performance level) to rate each candidate's experience based on the Special Agent Qualification Statement submitted. The evaluative criteria was developed by a Merit Promotion Task Force based on a thorough job analysis considering the requirements at each grade level.

While most experience will fall easily within the categories provided, some will not. The evaluative criteria has been established to give consideration to special services provided that are important to the agency (e.g., assignment to the Information Resources Management Division, or James J. Rowley Training Center). Candidates should address special experiences/services under the category that is most closely related to their assignments and accomplishments. Experience as a course instructor for the Office of Training should be included under the appropriate category (e.g., providing training on the principles and techniques of protection should be addressed under the Protection category). It should be noted that protective intelligence experience should be addressed under the Protection category.

Candidates should also include special projects (e.g., coordinating an office move) in either the Protection or Investigations categories. Evaluations will be based on all information provided by a candidate, including records of training, awards, and special achievements.


## Awarding Points

Each peer panel member will assign a rating based on a scale of 1-7 for the experience being rated (Investigations or Protection) which will be averaged to determine the total score for each experience. The scale ranges from one "1" at the low end to seven "7" at the high end. Statements are provided for ratings of 1, 4, and 7 to show the level of experience associated with points on the 1-7 scale. Benchmarks or examples of different types of experience qualifying at each point level 1-7 is used by the panel evaluators to award points.

15

DEF00230886

SA 18

DEF00230886

The rating scale will be used as follows:

**Rating Scale**

1  **DEVELOPMENTAL: Points** will be awarded if the candidate provides information which demonstrates experience representative of a **DEVELOPMENTAL** level at the agent's current grade level.

2

3

4  **ACCEPTABLE: Points** will be awarded if the candidate provides information which demonstrates experience representative of an **ACCEPTABLE** level at the agent's current grade level.

5

6

7  **OUTSTANDING: Points** will be awarded if the candidate provides information which demonstrates experience representative of an **OUTSTANDING** level at the agent's current grade level.

Individual special agent promotion scores will be good for the life of the promotion cycle. Candidates will be reevaluated each new cycle based on the information provided on their Special Agent Qualification Statement. Failure to adequately address each competency or experience, providing pertinent examples where appropriate, could result in a lower promotion score.

## Time of Peer Panel Evaluation

Peer Panels will **generally** be conducted during the month of September.

# Second Level Panel

The Second Level Evaluation represents the panel's best assessment of an employee's ability to perform successfully at the next higher grade. Panel members rate each candidate on managerial competencies based on the information provided on the candidate's qualification statement. In addition, comments provided on the First Level Evaluation and Peer Panel results, where applicable, may be considered as they relate to the candidate's demonstration of the competencies being evaluated. Therefore, it is important for candidates to review the definitions of the competencies carefully, and provide the panel with pertinent information that demonstrates their proficiency in each competency.

16

DEF00230887

**SA 19**

Manual : Administrative                                           Section : PER-08(02)
RO    : PER                                                       Date   : 07/28/2000

## GS-13 to GS-14 Second Level Panel

The Second Level Panel will consist of a representative from each Assistant Director's office at the SAIC level or higher. A representative of the Office of Chief Counsel at the GS-15 level or higher will serve as the alternate.

The Second Level Panel will use the information provided on SSF 4004, Special Agent Qualification Statement (GS-13 for consideration for Promotion to GS-14), addressing the following two managerial competencies that were identified by the job analysis survey as the two most important competencies needed at the GS-14 level:

I. **Leadership and Influencing** - Ability to initiate action, to be proactive and to effectively establish appropriate courses of action to accomplish the USSS's goals and objectives. Ability to influence or persuade others, including persons over whom one does not have direct supervisory responsibilities to gain cooperation from others. This also includes the ability to be an effective negotiator and establish mutually agreeable solutions.

II. **Decision Making** - Ability to make necessary decisions and commitments without deferring actions when decisions can and should be made and functioning under very stressful conditions. Ability to demonstrate sound judgment by making decisions based on logical assumptions that reflect factual information and that demonstrate an understanding/knowledge of relevant technical and professional information. Ability to make decisions that are consistent from one situation to the next, and that reflect the goals and objectives of the USSS.

Special agents should briefly describe their major achievements demonstrating each of the competencies listed above on the SSF 4004, Special Agent Qualification Statement (GS-13 for consideration for promotion to GS-14), in the space provided. The achievements can either be a specific incident or examples of high performance activities over a period of time. Candidates should provide specific examples whenever possible, stating what they did, when they did it, the outcome, and who can verify the information presented.

## GS/GM-14 to GS-15 Second Level Panel

The Second Level Panel will consist of a representative from each Assistant Director's office at the DAD level or higher. Chief Counsel will serve as the alternate.

The Second Level Panel will use the information provided on SSF 3152, Special Agent Qualification Statement (GS-14 for consideration for promotion to GS-15), addressing six managerial competencies.

I. **Written Communication** - Ability to write in a clear, concise, and organized manner to ensure understanding of communication by others. This includes using appropriate grammar, spelling, and punctuation, and being accurate in what one writes. This also includes using the appropriate style/format to address one's audience. For example, being able to explain very technical terms, policies, legal issues, etc., to non-law enforcement persons, such as the general public.

17

**SA 20**

II. **Oral Communication** - Ability to convey an idea or express oneself clearly and accurately when communicating orally in individual or group situations. The ability to take appropriate steps, e.g., active listening, to ensure that information is adequately received by others. Ability to present facts and ideas in a persuasive manner with emphasis on key issues or points. This also includes the ability to effectively use verbal and nonverbal communications such as proper grammar, articulation and volume.

III. **Ability to Lead or Direct Others** - Ability to initiate action, to be proactive and to effectively establish appropriate courses of action to accomplish the USSS's goals and objectives. Ability to influence or persuade others, including persons over whom one does not have direct supervisory responsibilities to gain cooperation from others. This also includes the ability to be an effective negotiator and establish mutually agreeable situations.

IV. **Ability to Plan and Organize** - Ability to establish objectives and priorities for oneself and others in order to satisfactorily complete tasks and assignments in a timely manner. The ability to coordinate and execute large scale or complex efforts. The ability to develop and implement long term plans. The ability to develop budget and financial projections/plans and to conduct strategic planning.

V. **Ability to Analyze Problems and Recommend Solutions** - Ability to identify problems or issues, determine their likely causes, and obtain information needed to resolve the problems. Ability to gather relevant data, relate data from different sources, critically evaluate data, and correctly assess situations in order to arrive at practical solutions. Ability to anticipate problems and evaluate the consequences of various alternatives when solving problems.

VI. **Ability to Manage Financial Resources** - Ability to plan, administer and monitor expenditures to ensure cost-effective support of programs and policies. This includes the ability to apply sound practices as well as department policies and procedures when making decisions. This also includes an awareness and utilization of available resources within and outside of the USSS.

Special agents should briefly describe their major achievements demonstrating each of the competencies listed above on the SSF 3152, Special Agent Qualification Statement (GS-14 for consideration for promotion to GS-15), in the space provided. The achievements can either be a specific incident or examples of high performance activities over a period of time. Candidates should provide specific examples whenever possible, stating what they did, when they did it, the outcome, and who can verify the information presented.

## Awarding Points

Each second level panel member will assign a rating based on a scale of 1-7 for the competency being evaluated which will be averaged to determine the total score for each competency. The scale ranges from one "1" at the **low end** to seven "7" at the **high end**. Statements are provided for ratings of 1, 4, and 7 to show the level of experience associated with points on the 1-7 scale. Benchmarks or examples of different types of experience qualifying at each point level (1-7) will be used by the panel evaluators to award points.

18

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date   : 07/28/2000

The rating scale will be used as follows:

**Rating Scale**

1  **DEVELOPMENTAL: Points** will be awarded if the candidate provides information which demonstrates experience representative of a **DEVELOPMENTAL** level at the agent's current grade level.

2

3

4  **ACCEPTABLE: Points** will be awarded if the candidate provides information which demonstrates experience representative of an **ACCEPTABLE** level at the agent's current grade level.

5

6

7  **OUTSTANDING: Points** will be awarded if the candidate provides information which demonstrates experience representative of an **OUTSTANDING** level at the agent's current grade level.

Panel members who participated in the First Level or Peer Panel Evaluation of a candidate may not provide a second level panel rating for that special agent. This particular rating will be performed by the alternate member.

Individual special agent promotion scores will be good for the life of the promotion cycle. Candidates will be reevaluated each new cycle based on the information provided on their Special Agent Qualification Statement. Failure to adequately address each competency or experience, providing pertinent examples where appropriate, could result in a lower promotion score.

Once the second level panel has completed awarding points to each candidate, a final list of all candidates and their second level scores will be established. This list will be circulated to all the Assistant Directors for approval and signature.

## Time of Evaluation

Second Level Panel evaluations for GS-13 to GS-14 and GS/GM-14 to GS-15 will **generally** be conducted in October.

19

DEF00230890

**SA 22**

DEF00230890

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date   : 07/28/2000

# Evaluation Components

## GS-13 to GS-14

**First Level Evaluations**
A maximum of 50 points may be awarded which represents 50% of the combined total evaluation score.

**Peer Panel Evaluations**
A maximum of 14 points may be awarded which represents 20% of the combined total evaluation score.

| | |
|---|---|
| Investigations | 1 - 7 points for 10% of score |
| Protection | 1 - 7 points for 10% of score |

**Second Level Panel**
A maximum of 14 points may be awarded which represents 30% of the combined total evaluation score.

Two Competencies each to be rated on a 7-point scale (See **page 13** for an explanation of the competencies.)

## Scoring

Each components raw score (i.e. total points awarded) will be converted to a 100 point scale using the following formula:

**Points Awarded/Maximum Possible Points  X  Weight (percent) of the Component  X  100**

The final promotion score for each candidate will be the sum of each converted component score.

## Sample Rating for GS-13 to GS-14

| | |
|---|---|
| First Level | 48/50 x 50% x 100 = 48 |
| Peer Panel | |
|   Investigations | 5/ 7  x 10% x 100 = 7.14 |
|   Protection | 5/ 7  x 10% x 100 = 7.14 |
| Second Level Panel | 9/14 x 30% x 100 = <u>19.29</u> |
| | |
| Total Score | 81.57 |

**NOTE:** The total points at each level may be greater than the total possible points when converted to the 100-point scale.

20

DEF00230891

    DEF00230891

Manual : Administrative                    Section : PER-08(02)
RO     : PER                               Date    : 07/28/2000

## GS/GM-14 to GS-15

**First Level Evaluations**
A maximum of 50 points may be awarded which represents 50% of the combined total evaluation score.

**Second Level Panel**
A maximum of 42 points may be awarded which represents 50% of the combined total evaluation score.

Six Competencies each to be rated on a 7-point scale (See page 13 for an explanation of the competencies.)

## Scoring

Each components raw score (i.e. total points awarded) will be converted to a 100-point scale using the following formula:

Points Awarded/Maximum Possible Points   X   Weight (percent) of the Component   X   100

The final promotion score for each candidate will be the sum of each converted component score.

## Sample Rating for GS/GM-14 to GS-15

| | |
|---|---|
| First Level | 48/50 x 50% x 100 = 48 |
| Second Level Panel | 40/42 x 50% x 100 = 47.62 |
| Total Score | 95.62 |

**NOTE:** The total points at each level may be greater than the total possible points when converted to the 100-point scale.

## Employee Information

Rating officials will routinely discuss promotion evaluations with those evaluated as soon as possible after the evaluations are completed. Every reasonable effort will be made to hold this discussion promptly and in person, even if it requires limited travel such as to a resident agency.

Copies of completed first-level promotion evaluations may be obtained from the rating official.

21

DEF00230892

                                    DEF00230892

The Personnel Division will provide all candidates with the following information where applicable. Generally, initial scores are given in November and final scores are provided in December:

1. First Level Evaluation Score
2. Peer Panel Score
3. Second Level Panel Score
4. Total Score
5. Overall Ranking

The scores will remain in effect until a new list is approved. Generally, the new list will be prepared in January of the Promotion Cycle

# Bidding on Vacancies

## Unannounced Vacancies

Consideration for a vacancy is restricted to the highest-ranking thirty (30) eligibles (plus ties for the thirtieth position) or the top 25%, whichever is greater, on the promotion list. In such cases, no announcement is required.

This will be done in situations where the bidding system cannot meet the immediate needs of the Service. For example, this procedure will apply when there is a need to fill a specific vacancy without delay. The Advisory Board will act on the list of competing eligibles in the manner prescribed under GS-14/15 Promotions.

## Announced Vacancies

At the request of the Deputy Director, GS-14 and GS-15 positions will be announced on a bid list via teletype by the Assistant Director - Administration. Bid lists may be made at any time and will be held open for a minimum of fourteen (14) calendar days.

SAICs and other supervisors are responsible for notifying all of their eligible GS/GM-1811 employees about vacancies as soon as possible after the jobs are announced. Special agents are responsible for and must submit their bids using the Mainframe 1811 Bids Program. Office Managers have the capability to submit bids for special agents who are unable to submit their own bids. In the absence of an Office Manager, the Personnel Division, Special Agent and Office of Investigations Support Branch has the capability of entering bids upon request. The Personnel Division can see bids immediately after submission. All bids for special agent vacancies must be submitted on or before the closing date of the bid list.

DEF00230893

SA 25

DEF00230893

Manual : Administrative                                    Section : PER-08(02)
RO     : PER                                               Date    : 07/28/2000

## Employee Responsibility

It is the responsibility of the special agent to ensure that all positions he/she wishes to be considered for are properly entered in the Mainframe 1811 Bid Program. If an employee desires consideration for one or more positions/offices and believes that he/she may not see the bid list because of leave or any other absence from the office, the employee should advise his/her supervisor accordingly prior to the absence. In such cases the supervisor will assure that the employee's name is submitted in the event a bid list is open during the employee's absence. In those cases where an employee's bid is not submitted due to administrative error, a memorandum citing the circumstances should be submitted promptly through the SAIC, through the appropriate Assistant Director, to the Chief, Personnel Division, who will confer with the Deputy Director for a final decision prior to the Advisory Board Meeting.

## Office Manager Responsibility

The Office Manager or equivalent has the responsibility on behalf of the SAIC of confirming in the Mainframe 1811 Bid Program that all eligible employees were aware that a list of vacant positions were announced and that every eligible employee who planned to bid has submitted and confirmed his/her bid. The Office Manager confirms bids prior to or on the closing date listed in the announcement for job opportunities. This process serves to inform the Personnel Division the office has completed bidding. **It does not forward bids to Personnel.**

## Personnel Division Responsibility

The Personnel Division will contact any office where the Office Manager or equivalent did not confirm, to ensure the office was aware of announced vacancies and has submitted all bid submissions.

## Eligibility for Bidding on Vacancies

Bids will be accepted from all eligible candidates for promotion to the grade of the position to be filled. In addition, bids will be accepted from employees in the same grade or a higher grade than that on the bid list. There may be occasions when there are valid reasons for restricting applications to employees at or above the grade of the job to be filled, or to indicate unique requirements of the position based on the duties and responsibilities reflected in the applicable position description.

23

DEF00230894

Manual : Administrative                                    Section : PER-08(02)
RO     : PER                                               Date    : 07/28/2000

## Bidding on Overseas Assignments

Permanent assignments at most foreign posts of duty require a degree of proficiency in the native language. Refer to page 27 for the "List of Offices Requiring a Language". Any such requirements will be noted on the bid list. Candidates for permanent positions at those posts of duty must have demonstrated an aptitude for learning a foreign language **prior to submitting a bid for the position(s)**. Additionally, position(s) involving extensive work in a country different from the one in which the field office is located, may require an aptitude score for more than one language.

Aptitude testing is available to all qualified employees who are considering bidding for positions requiring a language proficiency. In order to arrange for such testing, employees should contact the Office of Training, James J. Rowley Training Center.

Employees must provide a written statement under the Special Qualifications section of the Mainframe 1811 Bids Program documenting their aptitude score. If the proficiency score is available, employees should include it. Failure to provide special qualifications information when requested will preclude consideration for that vacancy.

Prior to reassignment and/or promotion, selected employees at the grade GS/GM-14 and above must be prepared to demonstrate that they are capable of speaking at the "memorized proficiency" level (S-0 Plus) in the requisite language. All other employees, prior to reassignment/promotion, must demonstrate the speaking level (S-1) of "elementary proficiency".

If necessary, employees selected for these posts of duty will be provided with appropriate training for the requisite language skill.

## Referral of Eligibles

The Personnel Division will refer the following groups of eligibles to the Advisory Board:

All candidates at or above the grade level of the position, who bid on a particular vacancy;

The highest-ranking thirty candidates (plus any ties for the thirtieth position) or the top 25%, whichever is greater, who bid on a particular vacancy; or

The highest-ranking thirty candidates (plus any ties for the thirtieth position) or the top 25%, whichever is greater, on the promotion register for the appropriate grade level.

## Advisory Board Action

The Advisory Board consists of the Deputy Director, the Assistant Directors, and Chief Counsel, with the Chief, Personnel Division, serving as advisor and recorder of Board proceedings. At least five members or their designated alternates must be present to form a quorum for action.

24

DEF00230895

DEF00230895

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date   : 07/28/2000

## Selection

The Advisory Board will provide the Director with recommendations from the referred list of eligibles or will provide a recommendation from employees at or above the grade of the position to be filled. Upon request, the Director will be provided the lists of best qualified promotion candidates (comprised of candidates' names, in descending order of score) or reassignment eligibles, as applicable.

The Director may concur with recommendations from the Advisory Board or select candidates from one of the lists of best qualified promotion candidates or reassignment eligibles.

## Employee Information

Following the selection for each announced vacancy, the Personnel Division will advise all offices of the name of the selectee, the effective date of the action, the cut-off score, if applicable, and the number of applications received for each vacancy.

## Effective Date of Promotions

Promotions not requiring a permanent change of duty station will be effective as soon as possible, but no later than the beginning of the second full pay period after selection (or after the date the position becomes vacant if the position was occupied at the time the selection was made). Promotions to positions requiring a permanent change of duty station will normally be effective the first full pay period which begins 120 days after the selection was made. Exceptions to this policy (e.g., delays necessitated by a change of duty station) will be documented in writing by the Personnel Division. Requests for changes to the established effective date for actions requiring a permanent change of duty station should be approved in writing by the gaining Assistant Director, through the appropriate losing SAIC and Assistant Director and forwarded to the Personnel Division.

## Hardship Cases

If a special agent electing to participate encounters a hardship during the promotion cycle that would prohibit the special agent from relocating, the special agent must submit a memorandum to the appropriate Assistant Director through the SAIC stating that he/she no longer wishes to participate in the current cycle.

The Hardship Review Committee will review the reasons stated and inform in writing of its decision.

25

DEF00230896

DEF00230896

Manual : Administrative                                          Section : PER-08(02)
RO    : PER                                                      Date   : 07/28/2000

# Probationary Period For New Supervisors and Managers

As detailed in the Administrative Manual section, PER-04(08), Periods of Probation, persons appointed to supervisory or managerial positions for the first time are required to serve a one-year probationary period. This provides the Service with an opportunity to assess a new supervisor's or manager's development on the job and to return an employee to a non-supervisory or non-managerial position without undue formality should his/her performance as a supervisor or manager be inadequate.

## Questions, Complaints, and Grievances

Employees should refer questions or complaints about the promotion plan or about specific promotion actions to their supervisors or to the Personnel Division.

Any employee complaint which cannot be resolved informally shall be processed under applicable grievance procedures as indicated in PER-12 of the Administrative Manual. Matters not a basis for a formal complaint are: (1) failure to be selected for promotion when proper promotion procedures are used (i.e., non-selection from a group of properly ranked and certified candidates); and (2) an action required to be taken by the Service under provisions of statute or instructions of the Office of Personnel Management (OPM).

There is no appeal to the Office of Personnel Management on promotion actions.

## Promotion Records

The Personnel Division shall maintain records of promotion actions for at least two years. Such records will contain all documentation necessary to show that each promotion action was made in accordance with appropriate regulations.

## Plan Review

The merit promotion plan for GS/GM-1811 positions will be reviewed regularly and changes will be made in accordance with the Code of Federal Regulations, Part 335. Employees may offer suggestions for improvement at any time via **memorandum or by EMAIL to MPP1811@usss.treas.gov.**

DEF00230897

DEF00230897

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date    : 07/28/2000

# List of Offices Requiring a Language

The following is a list of the current posts of duty that require a language(s) proficiency:

| POD | REQUIRED LANGUAGE |
|---|---|
| Berlin | German |
| Bonn Resident Agency | German |
| Bogota Resident Office | Spanish |
| Milan Resident Office | Italian |
| Montreal Resident Office | French |
| Paris Field Office | French |
| Rome Field Office | Italian |
| San Juan Field Office | Spanish |
| Interpol (Lyons, France) | French |
| Russia | Russian |

27

**SA 30**

DEF00230898

Manual : Administrative
RO : PER

Section : PER-08(02)
Date : 07/28/2000

## Sample SSF 4015, Special Agent Full Performance Level (GS-13) Certification

---

**UNITED STATES SECRET SERVICE**
**SPECIAL AGENT FULL PERFORMANCE LEVEL**
**(GS-13) CERTIFICATION**

| NAME OF EMPLOYEE (PRINT) | SOCIAL SECURITY NUMBER |
|---|---|
| OFFICE | DATE OF PROMOTION TO USSS GS-1811-12 |
| DATE OF MOST RECENT PERFORMANCE APPRAISAL: | RESULT OF RATING:  ☐ ACCEPTABLE  ☐ UNACCEPTABLE |

**PERFORMANCE LEVEL WORK**

PROTECTIVE AND INVESTIGATIVE assignments at the GS-13 level are characterized by the following level of complexity:

Assignments involve the use of incomplete or inconclusive information, the need for variation in approaches, and the resolution of unacceptable, inconsistent, or inconsistent results. The incumbent is often confronted by large numbers of disparate operating situations which fit no common pattern and are not susceptible to solution by a single method or approach. Assignments typically require the incumbent to make unreviewed decisions and draw conclusions about matters of protective operations and criminal activities after evaluating and interpreting information from various sources.

**PROTECTION**

Serves as a shift or advance agent responsible for providing physical protection for principals. Assists in the preparation of work schedules, assigns post responsibilities, and coordinates the utilization of Secret Service assets. Establishes and maintains effective liaison with protectees and their staffs, as well as Federal, state, local and/or foreign officials, to coordinate security assignments related to protective movements.

**INVESTIGATIONS**

Effectively plans, coordinates, and conducts difficult and sensitive investigative activities (e.g., financial crimes, counterfeit, intelligence investigations, etc.). Serves as a case agent responsible for directing other special agents in conducting complex investigations, to include coordinating undercover and surveillance assignments, developing and controlling informants, and participating in the decision making process regarding the progress of major investigations. Cases typically require the investigation of a large number of interrelated activities and frequently involve components of organized criminal groups.

**CERTIFICATION OF SUPERVISOR**

*(CHECK ONE)*

☐ I certify that the above named employee has satisfactorily completed all of the eligibility criteria for promotion and is performing duties commensurate with the GS-13 level. *(Signify approval on the SF 52, Request For Action)*

☐ I certify that the above named employee has not satisfactorily completed the following eligibility criteria for promotion and is not performing duties commensurate with the GS-13 level. *(Provide written supporting justification to the employee and attach a copy to this form.)*

___ Most recent performance appraisal rating of record is "Unacceptable"

___ Has not achieved the full performance level work (attach supporting justification)

| NAME OF SPECIAL AGENT IN CHARGE (Print) | SIGNATURE OF SPECIAL AGENT IN CHARGE | DATE |
|---|---|---|

**CERTIFICATION OF EMPLOYEE**

I certify that I have seen the full performance level certification and that I have discussed it with my supervisor.

| *Employee Signature* | *Date* |
|---|---|

UNITED STATES SECRET SERVICE
This form was electronically produced by OmniForm by USSS/ADMPR/MIS/PARS

SSF 4015 (07/2000)

28

DEF00230899

| | |
|---|---|
| Manual : Administrative | Section : PER-08(02) |
| RO : PER | Date : 07/28/2000 |

## Sample SSF 4002, GS-13 to GS-14
## Election For Participation in the Merit Promotion Process (Page 1)

---

**GS-13 to GS-14**
**ELECTION FOR PARTICIPATION IN THE MERIT PROMOTION PROCESS**

| NAME: | SOCIAL SECURITY NUMBER: |
|---|---|

| CURRENT GRADE: | CURRENT OFFICE: |
|---|---|

(CHECK ONE) ☐ NO — I elect NOT to participate in the Merit Promotion Process this rating period. I understand that this decision will in no way influence future consideration for promotion or preclude the possibility of being laterally reassigned to a different post of duty.

☐ YES — I elect TO participate in the Merit Promotion Process this rating period. I realize that by participating I may be promoted to fill a position for which I did not bid and which may require relocation.

| DATE OF PROMOTION TO GS-13: | PERFORMANCE APPRAISAL: ☐ I received an Acceptable performance rating for the current rating cycle. |
|---|---|

TRAINING REQUIREMENT - ONE SUPERVISORY COURSE (Refer to TN0-8 for recommended courses):

☐ I HAVE COMPLETED THE FOLLOWING TRAINING COURSE: (A copy of your Individual Training History MUST be attached)

NAME OF COURSE          DATES OF COURSE

☐ BY DECEMBER 31, OF RATING YEAR, I WILL COMPLETE THE FOLLOWING TRAINING COURSE: (A copy of your Individual Training Plan (Series SSF 4014), Individual Training History, and as appropriate, an approved SF 182, Request for Training MUST be attached)

NAME OF COURSE          DATES OF COURSE

**Waiver Request:**

☐ I request a waiver of the training requirement. YOU MUST FILL OUT THE REVERSE SIDE OF THIS or your waiver will not be considered.

PROTECTION EXPERIENCE: TWO YEARS ON A PROTECTIVE DETAIL, ID, TSD, WHO, OR MED

Assignment(s): _____ Date(s): from: _____ to: _____
_____ from: _____ to: _____
_____ from: _____ to: _____
_____ from: _____ to: _____

**Waiver Request:**

☐ I request a waiver of the protection requirement. YOU MUST FILL OUT THE REVERSE SIDE OF THIS FORM or your waiver will not be considered.

CERTIFICATION:

I certify that the information contained on this form is true, complete, and correct to the best of my knowledge and belief.

Employee's Signature          Date

Name of SAIC (Print)          SAIC's Signature          Date

PRIVACY ACT STATEMENT: Executive Order 9397 authorizes use of the Social Security number to identify and separate individuals with similar or identical names or initials. Disclosure of the Social Security number is voluntary. Refusal to disclose the Social Security number will not be cause for denial of any right, benefit, or privilege by law.

UNITED STATES SECRET SERVICE
This form was electronically produced via OmniForm by USSSA/DMabel/OFP4RB

SSF 4002 (07/2000)

29

DEF00230900

Manual : Administrative
RO : PER

Section : PER-08(02)
Date : 07/28/2000

## Sample SSF 4002, GS-13 to GS-14
## Election For Participation in the Merit Promotion Process (Page 2)

*Waiver Request* [THIS SECTION MUST BE COMPLETED FOR A WAIVER REQUEST TO BE CONSIDERED.]

I AM REQUESTING A WAIVER OF TRAINING/PROTECTION REQUIREMENT BECAUSE [ATTACH ADDITIONAL SHEETS IF NECESSARY]:

*Waiver History:*

☐ I have previously submitted a waiver for training.    Date(s): _____

☐ I have previously submitted a waiver for protection.    Date(s): _____

TO BE COMPLETED BY DECIDING OFFICIAL:

☐ Approved        ☐ Not Approved

Comments:

AO-ADMINISTRATION (SIGNATURE):        DATE:

UNITED STATES SECRET SERVICE        SSF 4002 (07/2000)

30

DEF00230901

DEF00230901

Manual : Administrative  
RO : PER

Section : PER-08(02)  
Date : 07/28/2000

## Sample SSF 4004, Special Agent Qualification Statement
## (GS-13 for consideration for promotion to GS-14) (Page 1)

**Special Agent Qualification Statement**
**(GS-13 for consideration for promotion to GS-14)**

### I. General Identifying Information

| Title and Name (Last, First, Initial) | | | Current Grade |
|---|---|---|---|
| Office of Permanent Assignment | Date Entered Secret Service | Date Began Career as USSS Agent | Date of Last Promotion |

INSTRUCTIONS: This form must be submitted each time you are being evaluated for promotion. DO NOT exceed the space allowed. It is in your best interest to ensure that this form contains accurate and detailed information regarding your experience.

### II. List Permanent Assignments as Special Agent (USSS)

| Name of Office or Division (First Position to Present) | Approximate Time Served | |
|---|---|---|
| | Years | Months |
| | | |

### III. Secret Service Experience by Category

Briefly describe your experience, training and achievements in Secret Service assignments in each of the categories on the next two pages, noting any supervisory experience. Achievements may be either a specific incident or examples of high performance over a period of time. BE SPECIFIC - include actual work situations stating what you did, when you did it, the outcome and who can verify the information you are presenting for this evaluation process. Include, in the appropriate category, any performance award(s) (Quality Step Increase, Cash Award, etc.), you have received in the past. DO NOT exceed the space provided. Additional sheets WILL NOT be evaluated.

### IV. Managerial Competencies

Briefly describe your major achievements demonstrating that you have the competencies listed below. The achievements may be either a specific incident or examples of high performance activities over a period of time. BE SPECIFIC - include actual work situations stating what you did, when you did it, the outcome, and who can verify the information you are presenting. DO NOT exceed the space provided. Additional sheets WILL NOT be evaluated.

I. LEADERSHIP AND INFLUENCING - Ability to initiate action, to be proactive and to effectively establish appropriate courses of action to accomplish the USSS's goals and objectives. Ability to influence or persuade others, including persons over whom one does not have direct supervisory responsibilities to gain cooperation from others. This also includes the ability to be an effective negotiator and establish mutually agreeable solutions.

II. DECISION MAKING - Ability to make necessary decisions and commitments without deferring actions when decisions can and should be made and functioning under very stressful conditions. Ability to demonstrate sound judgment by making decisions based on logical assumptions that reflect factual information and that demonstrate an understanding/knowledge of relevant technical and professional information. Ability to make decisions that are consistent from one situation to the next, and that reflect the goals and objectives of the USSS.

UNITED STATES SECRET SERVICE     This form was electronically produced on OmniForm by USSM-DMMMD-PARS     SSF 4004 (09/97)

31

DEF00230902

**SA 34**

DEF00230902

Manual : Administrative           Section : PER-08(02)
RO      : PER                         Date     : 07/28/2000

## Sample SSF 4004, Special Agent Qualification Statement
## (GS-13 for consideration for promotion to GS-14) (Page 2)



32

DEF00230903

DEF00230903

Manual : Administrative
RO    : PER

Section : PER-06(02)
Date    : 07/28/2000

## Sample SSF 4004, Special Agent Qualification Statement
## (GS-13 for consideration for promotion to GS-14)  (Page 3)



33

DEF00230904

DEF00230904

Manual : Administrative
RO : PER

Section : PER-08(02)
Date : 07/28/2000

## Sample SSF 4004, Special Agent Qualification Statement (GS-13 for consideration for promotion to GS-14)  (Page 4)



34

DEF00230905

DEF00230905

Manual : Administrative
RO     : PER

Section : PER-08(02)
Date    : 07/28/2000

## Sample SSF 4004, Special Agent Qualification Statement
## (GS-13 for consideration for promotion to GS-14)  (Page 5)



35

DEF00230906

SA 38

DEF00230906

Manual : Administrative                                  Section : PER-08(02)
RO    : PER                                              Date   : 07/28/2000

## Sample SSF 4004, Special Agent Qualification Statement
## (GS-13 for consideration for promotion to GS-14)  (Page 6)

**V Employee Certification**

I certify that the information contained on this form is true, complete, and correct to the best of my knowledge and belief.

_____        _____
Employee Signature                          Date

_____        _____
Supervisor Signature and Title              Date

UNITED STATES SECRET SERVICE                                    SSF 4004 (08/97)

36

DEF00230907

**SA 39**

DEF00230907

Manual : Administrative
RO : PER

Section : PER-08(02)
Date : 07/28/2000

## Sample SSF 3154, First Level Promotion Evaluation
## (GS-13 for consideration for promotion to GM-14)  (Page 1)

### FIRST LEVEL PROMOTION EVALUATION
#### GS-13 for consideration for promotion to GM-14

| NAME OF EMPLOYEE RATED | CURRENT GRADE: GM |
|---|---|
| EMPLOYEE'S OFFICE OF PERMANENT ASSIGNMENT | |
| NAME OF RATING OFFICIAL | OFFICE OF RATING OFFICIAL |

**INSTRUCTIONS**

This evaluation is to be completed by the first level official. This official is required to consult with lower level supervisors whenever the rater is not the immediate supervisor of the employee being evaluated, and the lower-level supervisors must sign the complete form to attest to their participation. Also, the rating official should consider the comments (written or oral) of any other who have supervised the employee for significant period of time during the rating period (such as when an employee has been detailed to another office).

Section I contains ten elements (knowledge, skills, or abilities) important in GM-14 Special Agent positions. Benchmarks and performance examples are provided for the following elements: Marginal, Fully Competent, and Superior. Levels 2 and 4 (Acceptable and Exceeds Fully Competent) may also be selected if applicable. The performance examples are not all inclusive, they are only examples of work at the particular level. Consider each element separately and independently of all others. Don't allow one recent atypical incident to unduly influence the complete picture and don't let your rating on one element influence on others. For each element, circle the number on the scale of 1-5 which most nearly represents your judgement of the candidate where:

**Level 1 - Marginal**
Based on the candidate's current job performance, the element in question is Marginal.

**Level 2 - Acceptable**
Based on the candidate's current job performance, the element in question is Acceptable.

**Level 3 - Fully Competent**
Based on the candidate's current job performance, the element in question is Fully Competent.

**Level 4 - Exceeds Fully Competent**
Based on the candidate's current job performance, the element in question is Exceeds Fully Competent.

**Level 5 - Superior**
Based on the candidate's current job performance, the element in question is Superior.

Evaluations should be as objective as possible and in accordance with instructions on this form, including any required consultation with other supervisors. Comments are encouraged in all cases as an aid in subsequent evaluations in the promotion process. The supervisory evaluation of the candidate's abilities will have a total range of 1-5 points. For each element the rater will choose among the following:

        Level 1  1 point
        Level 2  2 points
        Level 3  3 points
        Level 4  4 points
        Level 5  5 points

You must provide written comments supporting a rating in Level 1 or Level 5.

Indicate the appropriate level in Section I. Use Section II as needed for mandatory narrative comments. Forms must be signed and dated by the first-level rating official and by any lower-level supervisors who participated in the rating. This rating will be discussed with and signed by the employee.

UNITED STATES SECRET SERVICE                                                                 SSF 3154 (09/92)

DEF00230908

DEF00230908

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date  : 07/28/2000

## Sample SSF 3154, First Level Promotion Evaluation
## (GS-13 for consideration for promotion to GM-14)  (Page 2)

**SECTION I - RATING ELEMENTS, con't (GS-1811-13 to GM-1811-14)**   (circle one)

| FACTOR ONE | Ability to communicate orally. Candidate is clear, concise, and organized when speaking; discusses issues and responds to questions articulately in stressful and non-stressful situations; and makes effective oral presentations. | LEVEL/POINTS |
|---|---|---|
| | Level 1 - MARGINAL: Occasionally has difficulty presenting the facts of a case to others. Sometimes he/she does not speak clearly and is unable to articulate his/her thoughts. When speaking in public, this agent may not be able to keep the audience's attention due to poor presentation, lack of enthusiasm, or monotonous tone. | 1 2 |
| | Level 3 - FULLY COMPETENT: While testifying in court, this agent clearly articulates the facts of the case and does not waiver under pressure from the defense attorney. When speaking in public, this agent maintains good eye contact, presents material in a clear organized manner, maintains the audience's attention, and encourages responses from the audience. | 3 4 5 |
| | Level 5 - SUPERIOR: Present material to large audiences clearly and concisely, maintains audience interest, and persuades them to accept his/her point of view. This agent persuades reluctant suspects and/or defendants to divulge information concerning a case or investigation. | |

| FACTOR TWO | Ability to communicate in writing. Candidate writes clear, concise, well-organized memos and reports; expresses thoughts logically and level of writing is appropriate to the reader. | LEVEL/POINTS |
|---|---|---|
| | Level 1 - MARGINAL: Occasionally writes reports and memos that are poorly organized, difficult to understand, lack vital information, and may contain incorrect grammar and punctuation. | 1 |
| | Level 3 - FULLY COMPETENT: Reports and memos are clear, concise, well-organized, accurate and grammatically correct. | 2 3 |
| | Level 5 - SUPERIOR: Reports and memos are clear, concise, well-organized, and articulate. These writings are for the most complex investigations and are used as examples for other special agents to follow. | 4 5 |

| FACTOR THREE | Ability to work and deal effectively with individuals and/or groups. Candidate works well with others; shows tact and diplomacy; responds appropriately to the needs, feelings and capabilities of others; and manages conflict and confrontation. | LEVEL/POINTS |
|---|---|---|
| | Level 1 - MARGINAL: At times, has difficulty working with others. He/she may lack tact and diplomacy and may be unable to gain cooperation from others. In times of conflict, may be unwilling to compromise, and may alienate others and escalate problems. | 1 2 |
| | Level 3 - FULLY COMPETENT: Shows tact and diplomacy when dealing with all levels of employees. Exhibits good listening skills and is considerate of the feeling of others. | 3 4 |
| | Level 5 - SUPERIOR: Manages conflict and confrontation extremely well and resolves problems to everyone's satisfaction. Subordinates feel they have been treated fairly. Adjusts approach to suit different personalities and situations. | 5 |

| FACTOR FOUR | Ability to analyze problems and recommend solutions. Candidate reasons clearly and objectively, defines the issues, weighs alternative, and makes logical judgements. | LEVEL/POINTS |
|---|---|---|
| | Level 1 - MARGINAL: Sometimes is unable to grasp all aspects of a problem. Solutions may be ineffective or result in a deterioration of the situation. At times, ignored problems with the hope that they will go away or that someone else will handle them. | 1 2 |
| | Level 3 - FULLY COMPETENT: Defines the major issues of a problem, carefully weighs the alternatives, and chooses a workable solution. | 3 |
| | Level 5 - SUPERIOR: Analyzes very complex problems and develops creative and ingenious solutions. Other consult this person regularly because of their ability to recognize major issues or elements of a problem and develop solutions. | 4 5 |

UNITED STATES SECRET SERVICE                                                SSF 3154 (8/92)

38

DEF00230909

DEF00230909

Manual : Administrative
RO : PER

Section : PER-08(02)
Date : 07/28/2000

## Sample SSF 3154, First Level Promotion Evaluation
## (GS-13 for consideration for promotion to GM-14) (Page 3)

| SECTION I - RATING ELEMENTS, con't (GS-1811-13 to GM-1811-14) | | (circle one) |
|---|---|---|
| **FACTOR FIVE** | Ability to fully subscribe to Equal Employment Opportunity concepts and to advance the Service's EEO Action Plan. Candidate is sensitive to cultural diversity, race, gender and other individual differences in the workforce; manages workforce diversity. | **LEVEL/POINTS** |
| | Level 1 – MARGINAL: Is not always sensitive to cultural diversity, race, gender, and other individual differences in the workforce. He/she occasionally tolerates ethnic and racial jokes or sexual harassment in the workplace. | 1 |
| | | 2 |
| | Level 3 – FULLY COMPETENT: Is sensitive to cultural diversity, race, gender, and other individual differences in the workforce and does not tolerate ethnic and racial jokes or sexual harassment in the workplace. | 3 |
| | | 4 |
| | Level 5 – SUPERIOR: Is sensitive to cultural diversity, race, gender, and other individual differences in the workforce, does not tolerate ethnic or racial jokes and adheres to the Service's EEO Action Plan in recruitment, promotion and other areas. | 5 |
| **FACTOR SIX** | Ability to negotiate and influence others. Candidate persuades others, gains cooperation from others, and negotiates to find mutually acceptable solutions. | **LEVEL/POINTS** |
| | Level 1 – MARGINAL: Is not always able to gain cooperation from others, may be inflexible in negotiations and with others. May be unable to find mutually acceptable solutions, occasionally maintains poor relations. | 1 |
| | Level 3 – FULLY COMPETENT: Persuades and gains cooperation from others and negotiates to find mutually acceptable solutions. Meeting with outside officials usually run smoothly and differences are resolved satisfactorily in order to meet Secret Service goals. | 2 |
| | | 3 |
| | Level 5 – SUPERIOR: Persuades and gains cooperation from others, negotiates to find mutually acceptable solutions, develops networks and coalitions, and builds consensus through give and take. | 4 |
| | | 5 |
| **FACTOR SEVEN** | Knowledge of Secret Service administrative rules and regulations. Candidate follows correct administrative procedures and is familiar with official files and indices. | **LEVEL/POINTS** |
| | Level 1 – MARGINAL: Is unfamiliar with the content and organization of administrative, investigative, and protective manuals. Occasionally he/she must be reminded of routine administrative procedures and may not be timely in meeting reporting requirements. | 1 |
| | Level 3 – FULLY COMPETENT: Demonstrates a good knowledge of the content and organization of administrative, investigative, and protective manuals. Must research some questions. He/she prepares timely reports, follows correct administrative procedures, and understands the correct organization of official files. | 2 |
| | | 3 |
| | Level 5 – SUPERIOR: Is very familiar with the content and organization of administrative, investigative, and protective manuals; provides correct information concerning USSS policies or procedures; and rarely has to research administrative questions. | 4 |
| | | 5 |
| **FACTOR EIGHT** | Ability to plan and organize. Candidate determines strategy to complete task, complete tasks, coordinates with others, and anticipates problems or opportunities. | **LEVEL/POINTS** |
| | Level 1 – MARGINAL: Does not always determine a strategy to complete tasks or anticipate problems. Sometimes fails to anticipate consequences of his/her actions. Many projects require last minute activity due to procrastination. | 1 |
| | Level 3 – FULLY COMPETENT: Plans and coordinates work in advance and anticipates problems or opportunities. Projects run smoothly due to adequate preparation. | 2 |
| | | 3 |
| | Level 5 – SUPERIOR: Plans and coordinates large scale projects, monitors the progress and makes any needed adjustments, and anticipates problems or opportunities. Prepares contingency plans for emergencies. | 4 |
| | | 5 |

UNITED STATES SECRET SERVICE

SSF 3154 (06/92)

DEF00230910

DEF00230910

Manual : Administrative
RO : PER

Section : PER-08(02)
Date : 07/28/2000

## Sample SSF 3154, First Level Promotion Evaluation
## (GS-13 for consideration for promotion to GM-14)  (Page 4)

SECTION I - RATING ELEMENTS, con't (GS-1811-13 to GM-1811-14)

(circle one)

| FACTOR NINE | Ability or aptitude to lead others. Candidate sets objectives, assigns responsibility, schedules and assigns work, monitors activities and makes adjustments if necessary. | LEVEL/POINTS |
|---|---|---|
| | Level 1 - MARGINAL: Delegates very little, may give inadequate instructions, and sometimes provides no feedback to subordinates. Sometimes fails to recognize to give credit to others causing resentment. | 1 |
| | Level 3 - FULLY COMPETENT: Delegates tasks, schedules and prioritizes work, gives clear instructions, provides feedback, and motivates subordinates. Adjusts leadership styles to a variety of situations. Recognizes accomplishments of others. | 2 / 3 |
| | Level 6 - SUPERIOR: Delegates tasks commensurate to subordinates' abilities, schedules and prioritizes work, gives clear instructions, provides feedback, and motivates subordinates. Adjusts leadership styles to a variety of situations. Recognizes accomplishments of others. | 4 / 5 |

| FACTOR TEN | Ability to manage human resources. Candidate ensures that staff are appropriately utilized, appraised, and developed, and that they are treated in a fair and equitable manner. | LEVEL/POINTS |
|---|---|---|
| | Level 1 - MARGINAL: Often assigns subordinates inappropriately, may fail to share rewards for achievement, and may not treat subordinates in a fair and equitable manner. Does not always develop subordinates. | 1 |
| | Level 3 - FULLY COMPETENT: Assigns subordinates appropriately, shares rewards for achievement, and appropriately appraises, develops, and treats subordinates in a fair and equitable manner. | 2 / 3 |
| | Level 6 - SUPERIOR: Empowers people by sharing power and authority, assigns subordinates appropriately, shares rewards for achievement, appraises, develops, and treats subordinates in a fair and equitable manner. | 4 / 5 |

TOTAL POINTS

UNITED STATES SECRET SERVICE

SSF 3154 (06/92)

40

DEF00230911

DEF00230911

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date   : 07/28/2000

## Sample SSF 3154, First Level Promotion Evaluation
## (GS-13 for consideration for promotion to GM-14)  (Page 5)

**SECTION II - MANDATORY NARRATIVE COMMENTS**                     *(Comments are mandatory for Levels 1 and 5)*

| FACTOR NUMBER | COMMENTS |
|---|---|
|  |  |

**SIGNATURE OF FIRST-LEVEL RATING OFFICIAL**

SIGNATURE                                                        DATE

TITLE

**SIGNATURE OF CONTRIBUTING RATERS**

SIGNATURE                          TITLE                        DATE

SIGNATURE                          TITLE                        DATE

SIGNATURE                          TITLE                        DATE

**CERTIFICATION OF EMPLOYEE**

I certify that I have seen the first-level evaluation and that I have discussed it with my supervisor. However, this certification does not indicate that I necessarily agree or disagree with this rating.

SIGNATURE OF EMPLOYEE BEING EVALUATED                            DATE

UNITED STATES SECRET SERVICE                                     SSF 3154 (10/92)

41

DEF00230912

DEF00230912

Manual : Administrative
RO : PER

Section : PER-08(02)
Date : 07/28/2000

## Sample SSF 4003, GS/GM 14 to GS-15
## Election For Participation in the Merit Promotion Process  (Page 1)

### GS/GM 14 to GS-15
### ELECTION FOR PARTICIPATION IN THE MERIT PROMOTION PROCESS

| NAME | SOCIAL SECURITY NUMBER: |
|---|---|

| CURRENT GRADE: | CURRENT OFFICE: |
|---|---|

(CHECK ONE) ☐ NO  I elect NOT to participate in the Merit Promotion Process this rating period. I understand that this decision will in no way influence future consideration for promotion or preclude the possibility of being laterally reassigned to a different post of duty.

☐ YES  I elect TO participate in the Merit Promotion Process this rating period. I realize that by participating I may be promoted to fill a position for which I did not bid and which may require relocation.

| DATE OF PROMOTION TO GS/GM-14: | PERFORMANCE APPRAISAL: |
|---|---|
| | ☐ I received an Acceptable performance rating for the current rating cycle. |

TRAINING REQUIREMENT - ONE SUPERVISORY COURSE (Refer to TNG-8 for recommended courses):

☐ I HAVE COMPLETED THE FOLLOWING TRAINING COURSE: *(A copy of your Individual Training History MUST be attached)*

| NAME OF COURSE | DATES OF COURSE |
|---|---|

☐ BY DECEMBER 31, OF RATING YEAR, I WILL COMPLETE THE FOLLOWING TRAINING COURSE: *(A copy of your Individual Training Plan (Series SSF 4010, Individual Training History, and as appropriate, an approved SF 182, Request for Training MUST be attached)*

| NAME OF COURSE | DATES OF COURSE |
|---|---|

*Waiver Request:*

☐ I request a waiver of the training requirement. YOU MUST FILL OUT THE REVERSE SIDE OF THIS FORM or your waiver will not be considered.

CERTIFICATION:

I certify that the information contained on this form is true, complete, and correct to the best of my knowledge and belief.

| Employee's Signature | Date |
|---|---|

| Name of SAIC (Print) | SAIC's Signature | Date |
|---|---|---|

PRIVACY ACT STATEMENT: Executive Order 9397 authorizes use of the Social Security number to identify and separate individuals with similar or identical names or initials. Disclosure of the Social Security number is voluntary. Refusal to disclose the Social Security number will not be cause for denial of any right, benefit, or privilege by law.

UNITED STATES SECRET SERVICE

SSF 4003 (07/2000)

This form was electronically produced via OmniForm by USSS/MD/MSD/MOP/ARS

42

DEF00230913

DEF00230913

Manual : Administrative
RO     : PER

Section : PER-08(02)
Date    : 07/28/2000

## Sample SSF 4003, GS/GM 14 to GS-15
## Election For Participation in the Merit Promotion Process  (Page 2)

*Waiver Request:*  (THIS SECTION MUST BE COMPLETED FOR A WAIVER REQUEST TO BE CONSIDERED.)

I AM REQUESTING A WAIVER OF TRAINING/PROTECTION REQUIREMENT BECAUSE (ATTACH ADDITIONAL SHEETS IF NECESSARY):

*Waiver History:*

☐ I have previously submitted a waiver for training.              Date(s): _____

☐ I have previously submitted a waiver for protection.           Date(s): _____

TO BE COMPLETED BY DECIDING OFFICIAL:

☐ Approved              ☐ Not Approved

Comments:

AD-ADMINISTRATION (SIGNATURE):                                  DATE:

UNITED STATES SECRET SERVICE                                    SSF 4003 (07/2000)

43

DEF00230914

SA 46

DEF00230914

Manual : Administrative           Section : PER-08(02)
RO      : PER                          Date     : 07/28/2000

## Sample SSF 3152, Special Agent Qualification Statement (GS-14 for consideration for promotion to GS-15) (Page 1)

**Special Agent Qualification Statement**
**(GS-14 for consideration for promotion to GS-15)**

### I. General Identifying Information

| Title and Name (Last, First, Initial) | | Current Grade | |
|---|---|---|---|
| Office of Permanent Assignment | Date Entered Secret Service | Date Began Career as USSS Agent | Date of Last Promotion |

INSTRUCTIONS: This form must be submitted each time you are being evaluated for promotion. DO NOT exceed the space allowed. It is in your best interest to ensure that this form contains accurate and detailed information regarding your experience.

### II. List Permanent Assignments as Special Agent (USSS)

| Name of Office or Division (First Position to Present) | Approximate Time Served | |
|---|---|---|
| | Years | Months |
| | | |
| | | |
| | | |
| | | |

### III. Managerial Competencies

In this Qualification Statement, you are requested to describe what you consider to be your major achievements demonstrating that you have the knowledge, skills, or abilities described. The achievements may be either a specific incident or examples of high performance activities over a period of time. Include in the appropriate category any performance award(s) (Quality Step Increase, Cash Award, etc.) you have received in the past. BE SPECIFIC - include actual work situations stating what you did, when you did it, outcome and who can verify the information you are presenting for this evaluation process. DO NOT EXCEED the space provided. Additional sheets WILL NOT be evaluated.

    I.   **Written Communication** - Writes clear, concise, well-organized memos, reports, etc. Describe your past achievements which demonstrate your writing ability. In doing so, describe the kinds of documents you have been responsible for writing, the types of review they have been subject to, and the target audience addressed.

    II.   **Oral Communication** - Orally expresses ideas and facts to individuals or groups effectively and responds to questions articulately in stressful and non-stressful situations. Describe your past achievements which demonstrate your ability to communicate effectively in such situations. In doing so, describe types of presentations conducted, the information provided and the target audience addressed.

    III.   **Ability to Lead or Direct Others** - Assigns and schedules work, provides follow-up and feedback, and inspires and motivates others toward goal accomplishments. Give examples of your past achievements which demonstrate this ability.

    IV.   **Ability to Plan and Organize** - Determines strategy to complete tasks, coordinates with others, and anticipates problems or opportunities. Describe the types of activities you have organized, strategies you have planned, and any problems or opportunities you have anticipated.

    V.   **Ability to Analyze Problems and Recommend Solutions** - Reasons clearly and objectively, defines the issues, weighs alternatives, and makes logical judgements. Describe the types of problems you have handled, and how you have dealt with them, and the outcome of such situations.

    VI.   **Ability to Manage Financial Resources** - Plans, administers and monitors expenditures to ensure cost-effective support of programs and policies. Give examples of your past achievements which demonstrate this ability.

UNITED STATES SECRET SERVICE      This form was electronically produced via OmniForm by USABenONNIMIND/PARIS      SSF 3152 (09/97)

44

DEF00230915

Manual : Administrative
RO : PER

Section : PER-08(02)
Date : 07/28/2000

## Sample SSF 3152, Special Agent Qualification Statement (GS-14 for consideration for promotion to GS-15)  (Page 2)



L WRITTEN COMMUNICATION

UNITED STATES SECRET SERVICE

SSF 3152 (06/97)

45

DEF00230916

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date   : 07/28/2000

## Sample SSF 3152, Special Agent Qualification Statement
## (GS-14 for consideration for promotion to GS-15)  (Page 3)



46

DEF00230917

**SA 49**

DEF00230917

## Sample SSF 3152, Special Agent Qualification Statement
## (GS-14 for consideration for promotion to GS-15) (Page 4)



DEF00230918

DEF00230918

## Sample SSF 3152, Special Agent Qualification Statement
## (GS-14 for consideration for promotion to GS-15)  (Page 5)

IV. ABILITY TO PLAN AND ORGANIZE

UNITED STATES SECRET SERVICE                    SSF 3152 (06/97)

48

DEF00230919

DEF00230919

Manual : **Administrative**
RO    : **PER**

Section : PER-08(02)
Date   : 07/28/2000

## Sample SSF 3152, Special Agent Qualification Statement
## (GS-14 for consideration for promotion to GS-15)  (Page 6)



49

DEF00230920

DEF00230920

Manual : Administrative
RO    : PER

Section : PER-06(02)
Date   : 07/28/2000

## Sample SSF 3152, Special Agent Qualification Statement
## (GS-14 for consideration for promotion to GS-15)  (Page 7)

VI. ABILITY TO MANAGE FINANCIAL RESOURCES

UNITED STATES SECRET SERVICE

SSF 3152 (08/97)

50

DEF00230921

DEF00230921

Manual : Administrative
RO : PER

Section : PER-06(02)
Date : 07/28/2000

## Sample SSF 3152, Special Agent Qualification Statement (GS-14 for consideration for promotion to GS-15)  (Page 8)

**IV Employee Certification**

I certify that the information contained on this form is true, complete, and correct to the best of my knowledge and belief.

Signature of Employee                                    Date

To the best of my knowledge, the information provided by the employee is correct as shown.

Signature and Title of Supervisor                        Date

UNITED STATES SECRET SERVICE                             SSF 3152 (08/97)

51

DEF00230922

DEF00230922

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date   : 07/28/2000

## Sample SSF 3362, First Level Promotion Evaluation
## GM-14 for consideration for promotion to GM-15   (Page 1)

---

**FIRST LEVEL PROMOTION EVALUATION**
GM-14 for consideration for promotion to GM-15

| NAME OF EMPLOYEE RATED | CURRENT GRADE, GM |
|---|---|
| | |

EMPLOYEE'S OFFICE OF PERMANENT ASSIGNMENT

| NAME OF RATING OFFICIAL | OFFICE OF RATING OFFICIAL |
|---|---|
| | |

**INSTRUCTIONS**

This evaluation is to be completed by the first level official. This official is required to consult with lower level supervisors whenever the rater is not the immediate supervisor of the employee being evaluated, and the lower-level supervisors must sign the completed form to attest to their participation. Also, the rating official should consider the comments (written or oral) of any others who have supervised the employee for significant periods of time during the rating period (such as when an employee has been detailed to another office).

Section I contains ten elements (knowledge, skills, or abilities) important in GM-15 Special Agent positions. Benchmarks and performance examples are provided for the following elements: Marginal, Fully Competent, and Superior. Levels 2 and 4 (Acceptable and Exceeds Fully Competent) may also be selected if applicable. The performance examples are not all inclusive, they are only examples of work at the particular level. Consider each element separately and independently of all others. Don't allow one recent atypical incident to unduly influence the complete picture and don't let your rating on one element influence your rating on others. For each element, circle the number on the scale of 1-5 which most nearly represents your judgement of the candidate where:

**Level 1 - Marginal**
Based on the candidate's current job performance, the element in question is Marginal.

**Level 2 - Acceptable**
Based on the candidate's current job performance, the element in question is Acceptable.

**Level 3 - Fully Competent**
Based on the candidate's current job performance, the element in question is Fully Competent.

**Level 4 - Exceeds Fully Competent**
Based on the candidate's current job performance, the element in question is Exceeds Fully Competent.

**Level 5 - Superior**
Based on the candidate's current job performance, the element in question is Superior.

Evaluations should be as objective as possible and in accordance with instructions on this form, including any required consultation with other supervisors. Comments are encouraged in all cases as an aid in subsequent evaluations in the promotion process. This supervisory evaluation of the candidate's abilities will have a total range of 1-5 points. For each element the rater will choose among the following:

> Level 1   1 point
> Level 2   2 points
> Level 3   3 points
> Level 4   4 points
> Level 5   5 points

You must provide written comments supporting a rating in Level 1 or Level 5.

Indicate the appropriate level in Section I. Use Section II as needed for mandatory narrative comments. Forms must be signed and dated by the first-level rating official and by any lower-level supervisors who participated in the rating. This rating will be discussed with and signed by the employee.

UNITED STATES SECRET SERVICE                                          SSF 3362 (REV02)

---

52                    DEF00230923

**SA 55**

DEF00230923

Manual : Administrative
R0 : PER

Section : PER-08(02)
Date : 07/28/2000

## Sample SSF 3362, First Level Promotion Evaluation
## GM-14 for consideration for promotion to GM-15   (Page 2)

SECTION I - RATING ELEMENTS, con't (GM-1811-14 to GM-1811-15)          (circle one)

| | | LEVEL/POINTS |
|---|---|---|
| **FACTOR ONE** | Ability to communicate orally. Candidate is clear, concise, and organized when speaking; discusses issues and responds to questions articulately in stressful and non-stressful situations; and makes effective oral presentations. | |
| | Level 1 - MARGINAL: Presents information in one-on-one situations or participates in discussions. | 1 |
| | | 2 |
| | Level 3 - FULLY COMPETENT: Acts as spokesperson and presents information during meetings within one's own organizational area. | 3 |
| | | 4 |
| | Level 5 - SUPERIOR: Conducts formal oral presentations before groups of management officials or other internal agency groups. | 5 |
| **FACTOR TWO** | Ability to communicate in writing. Candidate writes clear, concise, well-organized memos and reports; expresses thoughts logically and level of writing is appropriate to the reader. | LEVEL/POINTS |
| | Level 1 - MARGINAL: Prepares written material for internal office communication. | 1 |
| | Level 3 - FULLY COMPETENT: Prepares material of a routine nature for internal use. Little research or fact finding is necessary. Prepares drafts for the immediate supervisor. The content is reviewed for correctness and completeness of information. | 2 |
| | | 3 |
| | Level 5 - SUPERIOR: Writer is provided with general description of the material, the scope to be covered and deadlines to be met. The content of the material provides information and facts to higher level management that may influence major policy decisions. | 4 |
| | | 5 |
| **FACTOR THREE** | Ability to work and deal effectively with individuals and/or groups. Candidate works well with others; shows tact and diplomacy; responds appropriately to the needs, feelings and capabilities of others; and manages conflict and confrontation. | LEVEL/POINTS |
| | Level 1 - MARGINAL: Sometimes lacks tact and diplomacy when dealing with peers and subordinates. Is not always sensitive to the needs and feelings of others. Fails to listen to others' thoughts and/or feelings. | 1 |
| | | 2 |
| | Level 3 - FULLY COMPETENT: Works with diverse groups that have the same goals. Is a team player who works well with others. Is receptive to the ideas of others and is sensitive to the feelings of others. Is flexible in dealing with others and maintains group cohesion. | 3 |
| | | 4 |
| | Level 5 - SUPERIOR: Works with diverse groups that have conflicting goals. Arbitrates personality conflicts and disagreements in a positive and constructive manner. Solutions are mutually acceptable to all parties. Minimizes negative personal impact of unpopular decisions. | 5 |
| **FACTOR FOUR** | Ability to analyze problems and recommend solutions. Candidate reasons clearly and objectively; defines the issues, weighs alternatives, and makes logical judgments. | LEVEL/POINTS |
| | Level 1 - MARGINAL: Assimilates data and facts; works with others in fact finding efforts; uses one source to draw conclusions and make recommendations. Avoids dealing with controversial issues. | 1 |
| | | 2 |
| | Level 3 - FULLY COMPETENT: Deals with administrative problems of a recurring nature requiring traditional methods of problem solving. | 3 |
| | | 4 |
| | Level 5 - SUPERIOR: Deals with organizational problems. Official response to the problem is determined at a higher level but he/she conducts necessary fact finding and reporting to recommend action or support management decision. | 5 |

UNITED STATES SECRET SERVICE                                    SSF 3362 (05-00)

53

DEF00230924

Manual : Administrative
RO : PER

Section : PER-08(02)
Date : 07/28/2000

## Sample SSF 3362, First Level Promotion Evaluation
## GM-14 for consideration for promotion to GM-15   (Page 3)

SECTION I - RATING ELEMENTS, con't (GM-1811-14 to GM-1811-15)                    (circle one)

| FACTOR FIVE | Ability to fully subscribe to Equal Employment Opportunity concepts and to advance the Service's EEO action plan. Candidate is sensitive to cultural diversity, race, gender, and other individual differences in the work force. | LEVEL/POINTS |
|---|---|---|
| | Level 1 - MARGINAL: Does not always recognize individual differences and work force diversity. | 1<br>2 |
| | Level 3 - FULLY COMPETENT: Ensures that all employees are utilized effectively and provides every employee an opportunity to reach his/her full potential. | 3<br>4 |
| | Level 5 - SUPERIOR: Plans strategy and actively recruits for minorities and women. Promotes according to the Service's EEO plan. | 5 |
| FACTOR SIX | Ability to negotiate and influence others. Candidate persuades others, gains cooperation from others, and negotiates to find mutually acceptable solutions. | LEVEL/POINTS |
| | Level 1 - MARGINAL: Meets with small groups; group members are committed to the same goals. | 1 |
| | Level 3 - FULLY COMPETENT: Meets with diverse groups; group members have different goals. | 2<br>3 |
| | Level 5 - SUPERIOR: Meets with large diverse groups; group members have conflicting goals. Persuades people external to the organization to work toward Secret Service goals. | 4<br>5 |
| FACTOR SEVEN | Ability to plan and organize. Candidate determines strategy to complete tasks, coordinates with others, and anticipates problems or opportunities. | LEVEL/POINTS |
| | Level 1 - MARGINAL: Under supervision, assists in the development of components of projects and program; plans primarily for one-self. | 1 |
| | Level 3 - FULLY COMPETENT: Develops plans in response to specifically established goals, advance time frames and dedicated resources, all of which are outside the control of the work unit and there is little opportunity for innovation or error. | 2<br>3<br>4 |
| | Level 5 - SUPERIOR: Prepares plans that consider external constraints or directional changes, and can be adjusted to meet changing resources and demands on short notice, often with inadequate information. | 5 |
| FACTOR EIGHT | Ability to lead or direct others. Candidate assigns responsibility, schedules and assigns work, and monitors activities and makes adjustments if necessary. | LEVEL/POINTS |
| | Level 1 - MARGINAL: Program accomplishments are task-oriented with focus on completion of the immediate task; provides input and limited direction concerning subject matter area. | 1<br>2 |
| | Level 3 - FULLY COMPETENT: Directs staff in the development of solutions and program accomplishment; leads staff through effective communication; considers and uses all available resources toward accomplishment of program area. | 3<br>4 |
| | Level 5 - SUPERIOR: Recognizes problems in advance; encourages, involves and supports subordinates in the search for solutions; introduces new ideas and develops concepts to sell the ideas to supervisors. | 5 |

UNITED STATES SECRET SERVICE                                                        SSF 3362 (4/99)

DEF00230925

DEF00230925

Manual : Administrative
RO : PER

Section : PER-08(02)
Date : 07/28/2000

## Sample SSF 3362, First Level Promotion Evaluation
## GM-14 for consideration for promotion to GM-15   (Page 4)

| SECTION I - RATING ELEMENTS, con't (GM-1811-14 to GM-1811-15) | | (circle one) |
|---|---|---|
| **FACTOR NINE** | Knowledge of Secret Service administrative rules and regulations. Candidate follows correct administrative procedures and is familiar with official files and indices. | **LEVEL/POINTS** |
| | Level 1 - MARGINAL: Work involves little need to refer to administrative, investigative, or protective manuals. Has little knowledge of administrative files. | 1 |
| | Level 3 - FULLY COMPETENT: Familiar with the content and organization of administrative, investigative, or protective manuals. Researches proper administrative procedures. Prepares timely reports and follows correct administrative procedures. | 2 3 4 |
| | Level 5 - SUPERIOR: Very familiar with the content and organization of administrative, investigative, and protective manuals; provides correct information concerning USSS policies or procedures; and rarely has to research administrative questions. | 5 |
| **FACTOR TEN** | Ability to manage human resources. Candidate ensures that staff are appropriately utilized, appraised, and developed, and that they are treated in a fair and equitable manner. | **LEVEL/POINTS** |
| | Level 1 - MARGINAL: Supervision of a small staff which performs projects that are small in scope. Usually develops/motivates staff to accomplish most assignments on time. Staff is homogeneous in nature. | 1 |
| | Level 3 - FULLY COMPETENT: Supervision of a medium size staff who perform projects covering many program areas. Staff is culturally diverse and supervisor actively supports EEO goals and objectives. Evaluations are completed on time and accurately appraises the employee's performance. All necessary/required training is provided to staff. | 2 3 4 |
| | Level 5 - SUPERIOR: Supervision of a large size staff which performs large scale projects covering many program areas. Projects are completed before deadlines and are recognized as authoritative and complete. Supervisor has developed a culturally diverse staff which might be distributed over a large geographical area. | 5 |

**TOTAL POINTS** [          ]

UNITED STATES SECRET SERVICE

SSF 3362 (R8/85)

55

DEF00230926

DEF00230926

Manual : Administrative
RO    : PER

Section : PER-08(02)
Date   : 07/28/2000

## Sample SSF 3362, First Level Promotion Evaluation
## GM-14 for consideration for promotion to GM-15   (Page 5)

| SECTION II - MANDATORY NARRATIVE COMMENTS | (Comments are mandatory for Levels 1 and 5) |
|---|---|
| FACTOR NUMBER | COMMENTS |
| | |

**SIGNATURE OF FIRST-LEVEL RATING OFFICIAL**

SIGNATURE _____  DATE _____

TITLE _____

**SIGNATURE OF CONTRIBUTING RATERS**

SIGNATURE _____ TITLE _____ DATE _____

SIGNATURE _____ TITLE _____ DATE _____

SIGNATURE _____ TITLE _____ DATE _____

**CERTIFICATION OF EMPLOYEE**

I certify that I have seen the first-level evaluation and that I have discussed it with my supervisor. However, this certification does not indicate that I necessarily agree or disagree with this rating.

SIGNATURE OF EMPLOYEE BEING EVALUATED _____  DATE _____

UNITED STATES SECRET SERVICE                                    SSF 3362 (04/92)

56

DEF00230927

**SA 59**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA


REGINALD G. MOORE, *et al.*

        Plaintiffs,

v.                                               Civ. No. 000-953 (RWR/DAR)

MICHAEL CHERTOFF,
SECRETARY, U.S.
DEPARTMENT OF HOMELAND
SECURITY,


        Defendant.


## FOURTH SUPPLEMENTAL DECLARATION OF CHARLES R. MANN, PH.D.

    I, Charles R. Mann, Ph.D. do hereby declare:

**Introduction**

    This report differs from my Third Supplemental Declaration for three reasons: (1) it uses additional data provided by the Defendant to Plaintiffs' Counsel after my third report was submitted; (2) at the request of Counsel, promotion from GS-14 to GS-15 is considered; and (3) the previous consideration of Applicant to Selection has been replaced by an analysis of Best Qualified to Selected in order to separate the steps of the selection process and to align this presentation with my understanding of *Connecticut v. Teal*.[1]  This document may be used without reference to my earlier declarations.


    1.    I have previously submitted a Declaration, a Supplemental Declaration, a Revised Supplemental Declaration, a Second Supplemental Declaration, and a Third Supplemental Declaration in connection with this matter.  My résumé and testimony list are attached hereto. See Attachment A.


    2.    My Second Supplemental Declaration was submitted because I had been provided with additional data, identified by Counsel as having been used in the report prepared by Dr. Paul White.  These data include what Dr. White refers to as "In Addition To" (IAT) promotions and Counsel had requested that they be incorporated into my promotion analysis.

---

[1] *Connecticut v. Teal*, U.S. 440, 120 S.Ct 2525 (1982)

3.    My Third Supplemental Declaration differs in that it incorporates additional "bid promotions" data that were not included in the CD identified by the Secret Service as the "bid database." Counsel and I learned of this additional data from Dr. White's programs.

4.    This Fourth Supplemental Declaration incorporates three additional sets of data identified in the next three paragraphs[2]. It is my understanding that all of these were obtained by Counsel after submission of my Third Supplemental Declaration. All of them were provided to me after submission of my Third Supplemental Declaration.

5.    I have now been provided with additional bid promotion data for the years 1991 through 1997.

6.    I have now been provided with Merit Promotion Plan (MPP) Scores for the years 1992 through 2004.

7.    I have now been provided with additional promotion data extracted by Plaintiffs' Counsel from hard copy files provided to them by the Defendant.

8.    Counsel has defined the "Background Data Period" to be from 1991 through 1994 for promotions from GS-13 to GS-14 and promotions from GS-14 to GS-15.

9.    Counsel has defined the "Plaintiffs' Current Class Period" to be from 1995 through 2004 for promotions from GS-13 to GS-14, and to be from 1995 through 2005 for promotions GS-14 to GS-15.

10.    Counsel has defined "First Plaintiff Best-Qualified Period" to be from 1998 through 2000 for promotions from GS-13 to GS-14, and to be from 2002 through 2005 for promotions from GS-14 to GS-15[3].

11.    Counsel has defined the "Combined Background Data Period with Selection Indicator and the Plaintiffs' Current Class Period" to be from 1994 through 2004 for promotions from GS-13 to GS-14, and to be from 1994 through 2005 for promotions from GS-14 to GS-15.

12.    I have been asked by Plaintiffs' Counsel to consider whether the data they have provided supports an assertion of adverse impact of the employment policies of the United States Secret Service ("Secret Service") against African-American Special Agents ("SA"s) of the

---

[2] Counsel also provided to me a fourth additional dataset, the National Finance Center (NFC) database for 1991 through 1993. I did not use this because Counsel did not find any of the named Plaintiffs on a Best-Qualified list during that period and, therefore, considered an analysis of promotions from the Best-Qualified list for that period to not be of interest. (It is noted for completeness that the NFC database did not identify promotion types. As a result, appropriate pools for these selections could not have been determined.)

[3] The First Plaintiff Best-Qualified Period ends at the end of the pre-litigation period for promotions from GS-13 to GS-14. The First Plaintiff Best-Qualified Period ends with end of the plaintiffs' current class period for promotions from GS-14 and GS-15.

2

**SA 61**

Secret Service as compared with non-African-American SAs. In particular, I have been asked by Counsel to discuss Series 1811 promotions from GS-13 to GS-14 and promotions from GS-14 to GS-15 for the Combined Background Data Period and the Plaintiffs' Current Class Period, the Plaintiffs' Current Class Period, the Combined Background Data Period with Selection Indicator and the Plaintiffs' Current Class Period, and the First Plaintiff Best-Qualified Period.

13.     Three types of promotions were considered for this report: "Bidder" Promotions awarded to vacancy announcement bidders; "Vacancy filled non-bidder" (VFNB) Promotions corresponding to vacancy announcements, but awarded to SAs who did not bid on the announcement considered; and IAT Promotions awarded without a vacancy announcement.

14.     At Counsel's request, I defined pools for the IAT promotions and the VFNB promotions identified by Counsel after their review of paper records provided to them by the Defendant in accordance with Dr. White's analysis. Counsel informed me that they based their identifications on promotion date and Secret Service MPP scores, which they provided to me[4].

15.     To reflect what Counsel has identified as the Secret Service's policy for constructing a Best-Qualified list[5] and the actual construction of those lists, I have had Best-Qualified lists constructed for each policy and practice for each promotion type.

16.     The Agency defines a bid list as all SAs who bid on any vacancy announcement during a fixed time period defined by the Agency. I have considered an eligible bidder for a Bidder vacancy announcement to be a SA on the bid database who has bid on that vacancy announcement, for whom selection would be a promotion (increase in grade) and who has not already been selected for another promotion from the bid list.

17.     I have considered an eligible for an IAT or a VFNB promotion to be a SA who has an MPP score received during the year prior to that of the promotion announcement (for a VFNB), or the promotion (for an IAT), and who has not previously been selected for another promotion of any type within the same calendar year.

18.     Counsel has advised us that at a minimum the Best-Qualified lists for Bidder vacancy announcements include the top 15 MPP scores on a vacancy announcement for the years 1991 through 1997, and the greater of the top 30 ranked MPP scores by vacancy announcement and the top 25% of the MPP scores on that vacancy announcement for the years 1998 through 2005.

19.     Counsel has advised us that for the years 1991 through 1997, Bidder promotions

---

[4] Two GS-14 to GS-15 IAT promotions are omitted from analyses because their MPP scores are not known to me.

[5] The term "Best-Qualified" list refers to the list provided to the decision-makers from which to make their selections. It is not the computer-generated, initial Best-Qualified list which there is reason to believe is subject to change as will be discussed below.

3

**SA 62**

are made from Best-Qualified lists of size 14+the number of selections[6]. The SAs on the list are the top eligible bidders based on Merit Promotion Plan (MPP) scores of eligible bidders for that vacancy announcement. Also based on those memoranda, it is my understanding that IAT and VFNB promotions are made from Best-Qualified lists of size 14+the number of selections. The SAs on the list are the top eligibles based on MPP scores of all eligibles for that year.

20.    In considering selection policy for Best-Qualified lists for the years 1991 through 1997, I also include those vacancy announcements from which no promotion was made or for which we could not identify the SAs promoted from the data available (in particular, this includes all of 1991 through 1993), by using the minimum Best-Qualified list size as described in footnote 6, *i.e.* the Best-Qualified list is considered to be the 15 eligible bidders on the Bidder list for that vacancy with the highest MPP scores.

21.    Counsel has informed me that for the period 1998 through 2005, the Best-Qualified list is considered to be the larger of the list of eligible bidders on that vacancy announcement with the top 30 ranked MPP scores among them and the list of eligible bidders on that vacancy announcement with MPP scores among the top 25% of MPP scores of the SAs who bid on that vacancy announcement.

22.    In considering selection policy for Best-Qualified lists for the years 1998 through 2005, I also include those vacancies from which no promotion was made or for which we could not identify the SAs promoted from the data available, by using the minimum Best-Qualified list size as described in footnote 6, *i.e.* the greater of the top 30 SAs ranked by MPP scores by

---

[6] I have concluded that a file variable, NO OF VACANCIES, should not be used to identify the size of the Best-Qualified lists as they were considered based on the following. During our early efforts in connection with this matter, I requested of Counsel at that time a definition of the variable NO OF VACANCIES. Counsel's response was that the variable was unreliable and should be disregarded. I have since examined this variable for the period 1991 through 2005. I had the file entry numbers compared with the numbers of selections identified in the data by vacancy announcement for GS-13 to GS-14 promotions and found that they differed approximately 6% of the time when both values were known. I took this to mean that the file entry was not intended to match the actual number of selections and that if the file data was the data on the vacancy announcement it had not been modified to reflect supplementation of the Best-Qualified list for multiple selections, as discussed above. In particular, there were 45 instances out of 1290 vacancy announcements where the file number was less than the observed number of selections.

As a result, I performed analyses by estimating the number of vacancies for each vacancy announcement as the observed number of selections (promotions and laterals) where that information was available, and as the minimum Best-Qualified list sizes (in particular for the years 1991 through 1993) for vacancy announcements for which the number of selections were not available.

I note that after examining the results presented in this declaration, it is, in my opinion, unlikely that alternative approaches based on variations of the assumptions concerning the factors identified will have a meaningful impact on the statistical results or the conclusions on them. This opinion is based on the small numbers of affected vacancy announcements, the small numbers of vacancies with multiple selections, the inability to determine the impact or even the direction of the impact of relatively rare small increases and decreases in the sizes of the Best-Qualified lists, and the levels of statistical significance observed. Because of this, I have not considered it necessary to perform any such alternative analyses.

4

vacancy announcement and the top 25% of the SAs ranked by MPP scores on that vacancy announcement.

23.     Similarly, for 1998 through 2005, agency policy was to consider as Best-Qualified for IAT and VFNB promotions the larger of those eligibles with the top 30 ranked MPP scores among eligibles and those with the top 25% of MPP scores among eligibles.

24.     Counsel has informed me that policy and practice were the same with regard to multiple selections from a Best-Qualified list for the years 1991 through 1997.

25.     Counsel told me to assume that for the years 1998 through 2005, the Secret Service's practice for Bidder selections was that the Best-Qualified list was the larger of the top (29+number of selections) ranked MPP scores on the vacancy announcement and the top (25%+number of selections-1) ranked MPP scores on the vacancy announcement in accordance with Dr. White's report. In considering selection practice for Best-Qualified lists for the years 1998 through 2005, I also include those vacancies from which no promotion was made or for which we could not identify the SAs promoted from the data available, by using the minimum Best-Qualified list size as described in footnote 6, *i.e.* the greater of the top 30 ranked MPP scores by vacancy announcement and the top 25% of the MPP scores on that vacancy announcement.

26.     Similarly, and again in accordance with Dr. White's report, Counsel told me to assume that for 1998 through 2005, the Best-Qualified lists for IAT and VFNB promotions in practice consisted of the greater of: the (top 29+number of selections) ranked MPP scores among eligibles and the (top 25%+number of selections-1) ranked MPP scores among eligibles.

27.     The bid database for the years 1991 to 1993 was used to determine who attained Best-Qualified status during that period[7].

28.     The bid database contains a field "Selection Indicator" that may take on the value "P" to indicate that the SA received a promotion from another vacancy announcement and is not being considered for promotion on the announcement with the value P.   In such a case that SA is not included in our analysis of becoming Best-Qualified.  Furthermore, if that SA would have been on the Best-Qualified list, the SA with the next highest MPP score to those on the Best-Qualified list[8] is included.  I disagree with Dr. White's assertion that a SA with a Selection

---

[7] It is noted that the NFC database provided to Counsel identified all individuals selected for promotions during this period, but did not specify the type of promotion and did not identify the vacancy announcement from which each bid selection was made.

[8] Counsel has provided excerpts from the testimonies of three Secret Service supervisors that appear to support this action. See Attachment B, Bauer Deposition, Lawson Deposition, and Samway Deposition. I have asked Counsel if they know of any documentation that the Agency does not support augmentation of the Best-Qualified list to replace selections ("P" selections).  Counsel responded that, with the possible exception of Dr. White's report, they are aware of none. In reviewing Dr. White's report, I have found no such documentation but only a mention of conversations (not subject to cross-examination by Plaintiffs' Counsel) he had with Agency employees. The attached testimony excerpts were obtained in deposition and were subject to cross-examination by Agency Counsel.

Indicator "P" should not be removed from the Best-Qualified list. This is not because that SA was not Best Qualified, but rather, because it is not known whether that SA would have received the alternative promotion had the promotion of the SA not been awarded. In other words, while we agree that candidate could have been considered, we do not know that he was considered. Furthermore, if he was considered, we do not know whether he would have been selected or not absent his promotion to another position, *i.e.* whether the "P" replaced a "Y" or "N."

29.    In his Supplemental Report in this matter, Dr. Paul White correctly noted that I did not include SAs whose MPP scores were the same as the lowest ranked SA included on that list. I agree that they should have been included and this is now done.

30.    Dr. White asserts that my use of one tail tests is inappropriate and that two tail tests should be used. He provides no authority for this. In actuality, he is presenting an opinion, with which I disagree.[9]   In the following paragraphs, I will explain why I believe that he is wrong and describe what I believe to be a proper statistical application of the standards described in the *Hazelwood* decision.

31.    Dr. White concluded that my analyses are incorrect in form. He is wrong because statistical hypothesis tests reject a (null) hypothesis properly only when the observed difference is in the direction of the alternative hypothesis. If one wants to know whether it can be asserted that the mean value of a characteristic (*e.g.* test score, rank, salary, or percentage correct) is different for African Americans than it is for non-African Americans, then a two tail test is appropriate. In this circumstance, however, it is only correct to conclude that there is reason to believe there is difference. It is not appropriate to conclude that the actual difference agrees in direction with the observed difference. The actual difference could be in either direction. If one takes that extra step of declaring the direction of the difference, then one is no longer using a two tail test. Instead, a one tail test is being used with its level of significance being half that of the level of significance used for the two tail test. This is consistent with the lengthy description of hypothesis testing provided by Dr. White. In my opinion, the issue at hand is not whether there is a difference between African Americans and non-African Americans, but rather whether there is a difference adverse to (or in some cases, favorable to) African Americans versus non-African Americans. If I were not correct, then an observed difference favorable to African Americans could be used to assert that there is a real difference adverse to African Americans.

32.    If one wants to know whether the data supports a conclusion that is directional, *e.g.* the mean value of African Americans on the characteristic of interest is higher (or, alternatively, lower) than the mean value of that characteristic for non-African Americans, then a

---

[9] I consider it relevant that Dr. White's presentation indicates that his understanding of statistical hypothesis testing is flawed. To demonstrate this, on page 2 of his report he states that "…statistical tests ... calculate a probability that the observed occurrences could be attributed to random chance." This is a common misunderstanding among non statisticians, but should not be an assertion of someone claiming expertise in the field. In fact, what is calculated is the probability of the observed data (or more unusual data given the hypotheses used to define the test) given that there is no difference between the groups being compared. It is <u>not</u> the probability that the observed results are due to chance. This is equivalent to confusing the probability of a woman being at least six feet tall with the probability that a six foot tall person is a woman.

6

**SA 65**

one tail test must be used. In my opinion, statistical analysis of the issues of interest as I see and state them here requires a one tail test be used. Despite his criticism of my work, I believe Dr. White ultimately acts in agreement with this position.

33.    It remains to specify the level of significance that is appropriate for my one tail tests. It is important to note, however, that my results are presented in such a way that any specific level of significance can be used to form conclusions. Thus, Dr. White has taken the position that my conclusions are incorrect because I used one tail tests. He could also conclude that had two tail tests been used (at the .05 level which I agree is an appropriate level) every result for which I found statistical significance would still have been statistically significant. The difference between our conclusions would properly be that I find differences that are directional while he finds difference with unspecified direction (even though the direction of the difference in the data is observable.) He would conclude my conclusions are of the form there is a difference adverse to African Americans. His conclusions would be of the form there is a difference between African Americans and non-African Americans, but I cannot say in whose favor (unless he changes the level of significance, or equivalently, asserts that the actual difference is in the direction of the observed difference.

34.    The reason that there is a difference between our presentations is that the *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736 (1977 ) (*Hazelwood*) decision is commonly presented in terms of standard deviations. This was possible in that case because the statistical technique used was a Normal approximation to a binomial distribution. An important characteristic of Normal probability distributions is that there is an exact relationship between the numbers of standard deviations from the mean and the probability associated with that difference. This is why questions with regard to Normal distributions with any mean and any size standard deviation can be answered by consulting any other Normal distribution with a possibly different mean and/or standard deviation. One needs only the probability distribution of any Normal distribution. This permits statistics texts to provide one table to be used for all Normal distribution. Almost universally, that table is the Normal distribution with mean zero and standard deviation one.

30.    This leaves open the question of what to do when a distribution other than a Normal distribution is being used since the equivalence relationship between probability and numbers of standard deviations is not valid except for Normal distributions.   The answer to this question is based on the fact that while standard deviations are not universally appropriate measures of likelihood, probability is such a universal measure. Instead of citing the *Hazelwood* criterion in terms of standard deviations (the common critical level being asserted as 1.96 or approximately two standard deviations) it can be stated as observing an event that has probability less than .05 of being observed given the hypothesis being tested. Thus, **the appropriate universal criterion, based on *Hazelwood*, is that the probability of an event at least as unusual as the observed event is less than .05** under the hypothesis being tested. Note that is does not require a two tail test when such is not statistically valid.

35.    In the following paragraphs I summarize the results of my analyses obtained under the assumptions discussed above. Analysis of attainment of applicant to Best-Qualified

7

**SA 66**

status considered all three types of promotions.

36.    Assuming Secret Service policy to have been followed with respect to GS-13 SAs attaining Best-Qualified status for GS-14 positions and using a multivariate hypergeometric test[10], I found fewer African Americans on the BQ lists than were expected based on the composition of the pools for the Combined Background Data Period and the Plaintiffs' Current Class Period.  This difference is statistically significant at the .0072 one-tail level, corresponding to less than 1 chance in 138 or more than 2.6 standard deviations in the sense of *Hazelwood*.  See Attachment C.

37.    Assuming Secret Service policy to have been followed with respect to GS-13 SAs attaining Best-Qualified status for GS-14 positions from among applicants and using a multivariate hypergeometric test, I found there to be fewer African Americans on the BQ lists than were expected based on the composition of the pools for the Plaintiffs' Current Class Period.  This difference is statistically significant at the .0044 one-tail level, corresponding to less than 1 chance in 227 or more than 2.8 standard deviations in the sense of *Hazelwood*.  See Attachment C.

38.    Considering GS-13 to GS-14 attainment of Best-Qualified status from among applicants under Secret Service practices and using a multivariate hypergeometric test, I found there to be fewer African Americans on the BQ list than were expected based on the composition of the pools for the Combined Background Data Period and the Plaintiffs' Current Class Period.  This difference is statistically significant at the .0132 one-tail level, corresponding to less than 1 chance in 75 or more than 2.4 standard deviations in the sense of *Hazelwood*.  See Attachment C.

39.    Considering GS-13 to GS-14 attainment of Best-Qualified status from among applicants under Secret Service practices and using a multivariate hypergeometric test, I found there to be fewer African Americans on the BQ list than were expected based on the composition of the pools for the Plaintiffs' Current Class Period.  This difference is statistically significant at the .0086 one-tail level, corresponding to less than 1 chance in 116 or more than 2.6 standard deviations in the sense of *Hazelwood*.  See Attachment C.

40.    Considering GS-14 to GS-15 attainment of Best-Qualified status according to policy from among applicants, I found there to be fewer African Americans on the BQ list than were expected based on the composition of the pools for the Combined Background Data Period and the Plaintiffs' Current Class Period.  This difference is statistically significant at the .0000[11] one-tail level, corresponding to less than 1 chance in 20,000 or more than 4.0 standard deviations

---

[10]  The multivariate hypergeometric distribution procedure respects the individuality of the vacancy announcements while combining the information in the totality of the vacancies considered.  The analysis used finds the probability of as many or fewer African Americans being selected as were observed, given the composition of the individual pools and the numbers of selections made from each individual pool.

[11]  The software used prints probabilities with four decimal places.  Thus, the value .0000 means .00005 or less.  Similarly, other software used for this report prints probabilities with three decimal places.  In that case, the value .000 means .0005 or less.

8

in the sense of *Hazelwood*. See Attachment C.

41.     Considering GS-14 to GS-15 attainment of Best-Qualified status according to policy from among applicants, I found there to be fewer African Americans on the BQ list than were expected based on the composition of the pools for the Plaintiffs' Current Class Period. This difference is statistically significant at the .0000 one-tail level, corresponding to less than 1 chance in 20,000 or more than 4.0 standard deviations in the sense of *Hazelwood*. See Attachment C.

42.     Considering GS-14 to GS-15 attainment of Best-Qualified status according to practice from among applicants, I found there to be fewer African Americans on the BQ list than were expected based on the composition of the pools for the Combined Background Data Period and the Plaintiffs' Current Class Period. This difference is statistically significant at the .0000 one-tail level, corresponding to less than 1 chance in 20,000 or more than 4.0 standard deviations in the sense of *Hazelwood*. See Attachment C.

43.     Considering GS-14 to GS-15 attainment of Best-Qualified status according to practice from among applicants, I found there to be fewer African Americans on the BQ list than were expected based on the composition of the pools for the Plaintiffs' Current Class Period. This difference is statistically significant at the .0000 one-tail level, corresponding to less than 1 chance in 20,000 or more than 4.0 standard deviations in the sense of *Hazelwood*. See Attachment C.

44.     Analysis of promotion from the Best-Qualified list considered all three promotion types. The Bidder promotions of non-Best-Qualified applicants were omitted. One GS-13 to GS-14 promotion was removed. For GS-14 to GS-15 promotions, all selectees in those years were Best Qualified.

45.     Considering GS-13 to GS-14 promotions from among Best Qualified according to policy, I found there to be fewer African-American promotions than were expected based on the composition of the pools for First Plaintiff Best-Qualified Period. This difference is statistically significant at the .0045 one-tail level, corresponding to less than 1 chance in 222 or more than 2.8 standard deviations in the sense of *Hazelwood*. See Attachment D.

46.     Considering GS-13 to GS-14 promotions from among Best Qualified according to practice, I found there to be fewer African-American promotions than were expected based on the composition of the pools for First Plaintiff Best-Qualified Period. This difference is statistically significant at the .0041 one-tail level, corresponding to less than 1 chance in 243 or more than 2.8 standard deviations in the sense of *Hazelwood*. See Attachment D.

47.     Considering GS-14 to GS-15 promotions from among Best Qualified according to policy, I found there to be fewer African-American promotions than were expected based on the composition of the pools for First Plaintiff Best-Qualified Period. This difference is statistically significant at the .0195 one-tail level, corresponding to less than 1 chance in 51 or more than 2.3 standard deviations in the sense of *Hazelwood*. See Attachment D.

9

**SA 68**

48.    Considering GS-14 to GS-15 promotions from among Best Qualified according to practice, I found there to be fewer African-American promotions than were expected based on the composition of the pools for First Plaintiff Best-Qualified Period. This difference is statistically significant at the .0181 one-tail level, corresponding to less than 1 chance in 55 or more than 2.3 standard deviations in the sense of *Hazelwood.* See Attachment D.

49.    Counsel requested that I identify for each year and for each of GS-13 to GS-14 and GS-14 to GS-15 promotions, the minimum MPP score among Best-Qualified applicants who were promoted during the year. They then asked me to analyze the racial composition (African American v. non-African American) achieving that score among Best-Qualified applicants to determine whether African Americans achieved that score at a lower rate than non-African Americans. As stated above in paragraph 22, IAT promotions for the years 1991 through 1993 were not considered in this analysis. The Bidder promotions of non Best-Qualified applicants were also omitted.[12]

50.    Considering GS-13 to GS-14 attainment of annual minimum selected MPP Score among Best-Qualified applicants according to policy, I found there to be fewer African Americans making higher than the minimum selected MPP score than were expected based on the composition of the pools for the Combined Background Data Period with Selection Indicator and the Plaintiffs' Current Class Period. This difference is statistically significant at the .0000 one-tail level, corresponding to less than 1 chance in 20,000 or more than 4.0 standard deviations in the sense of *Hazelwood.* See Attachment E.

51.    Considering GS-13 to GS-14 attainment of annual minimum selected MPP Score among Best-Qualified applicants according to policy, I found there to be fewer African Americans making higher than the minimum selected MPP score than were expected based on the composition of the composition of the pools for the Plaintiffs' Current Class Period. This difference is statistically significant at the .0000 one-tail level, corresponding to less than 1 chance in 20,000 or more than 4.0 standard deviations in the sense of *Hazelwood.* See Attachment E.

52.    Considering GS-13 to GS-14 attainment of annual minimum selected MPP Score among Best-Qualified applicants according to practice, I found there to be fewer African Americans making higher than the minimum selected MPP score than were expected based on the composition of the pools for the Combined Background Data Period with Selection Indicator and the Plaintiffs' Current Class Period. This difference is statistically significant at the .0000 one-tail level, corresponding to less than 1 chance in 20,000 or more than 4.0 standard deviations in the sense of *Hazelwood.* See Attachment E.

53.    Considering GS-13 to GS-14 attainment of annual minimum selected MPP Score

---

[12]  There were four non–Best-Qualified SAs promoted from GS-13 to GS-14. There were seven non-Best-Qualified SAs promoted from GS-14 to GS-15.

10

**SA 69**

among Best-Qualified applicants according to practice, I found there to be fewer African Americans making higher than the minimum selected MPP score than were expected based on the composition of the composition of the pools for the Plaintiffs' Current Class Period. This difference is statistically significant at the .0000 one-tail level, corresponding to less than 1 chance in 20,000 or more than 4.0 standard deviations in the sense of *Hazelwood*. See Attachment E.

54.     Considering GS-14 to GS-15 attainment of annual minimum selected MPP Score among Best-Qualified applicants according to policy, I found there to be fewer African Americans making higher than the minimum selected MPP score than were expected based on the composition of the pools for the Combined Background Data Period with Selection Indicator and the Plaintiffs' Current Class Period. This difference is statistically significant at the .0000 one-tail level, corresponding to less than 1 chance in 20,000 or more than 4.0 standard deviations in the sense of *Hazelwood*. See Attachment E.

55.     Considering GS-14 to GS-15 attainment of annual minimum selected MPP Score among Best-Qualified applicants according to policy, I found there to be fewer African Americans making higher than the minimum selected MPP score than were expected based on the composition of the composition of the pools for the Plaintiffs' Current Class Period. This difference is statistically significant at the .0000 one-tail level, corresponding to less than 1 chance in 20,000 or more than 4.0 standard deviations in the sense of *Hazelwood*. See Attachment E.

56.     Considering GS-14 to GS-15 attainment of annual minimum selected MPP Score among Best-Qualified applicants according to practice, I found there to be fewer African Americans making higher than the minimum selected MPP score than were expected based on the composition of the pools for the Combined Background Data Period with Selection Indicator and the Plaintiffs' Current Class Period. This difference is statistically significant at the .0000 one-tail level, corresponding to less than 1 chance in 20,000 or more than 4.0 standard deviations in the sense of *Hazelwood*. See Attachment E.

57.     Considering GS-14 to GS-15 attainment of annual minimum selected MPP Score among Best-Qualified applicants according to practice, I found there to be fewer African Americans making higher than the minimum selected MPP score than were expected based on the composition of the composition of the pools for the Plaintiffs' Current Class Period. This difference is statistically significant at the .0000 one-tail level, corresponding to less than 1 chance in 20,000 or more than 4.0 standard deviations in the sense of *Hazelwood*. See Attachment E.

58.     In performing the Applicant to Best Qualified, Best Qualified to Selected, and attainment of annual minimum selected MPP Score among Best-Qualified applicants analyses, the multivariate hypergeometric statistical procedure used is a standard statistical procedure. A commercial software program, StatExact[©], was used to perform the analyses.

11

**SA 70**

59.    Counsel requested that I consider MPP score ranks as opposed to values.  The highest MPP score is considered to have rank 1 and the lowest MPP score among k SAs is assigned rank k.  Thus, rank and MPP score are inversely related.  High scores correspond to low ranks and low scores correspond to high ranks.  I was asked to determine whether African Americans were adversely impacted with regard to MPP score ranks.  To do this, I had the mean ranks for African Americans and non-African Americans on the Best-Qualified lists found.  For each list I then considered whether the mean rank of the African Americans was lower than that of non-African Americans on the same list and counted the numbers of lists for which a comparison could be made and the number of lists for which African Americans had a lower mean rank than that of non-African Americans.   If there is no difference between MPP ranks for African Americans and non-African Americans then African Americans are expected to have a higher mean rank half the time, ignoring ties.  I had these analyses performed in two ways, distinguished by their treatment of ties.  One approach excludes ties.  The second approach assumes that all ties correspond to African American ranks being lower than non-African-American ranks.  This is a conservative assumption for the plaintiffs because it breaks all ties as adverse to their receiving lower MPP scores.  The procedure used here is a binomial test (sign test).  I implemented this procedure using our proprietary software STATUA©, which has been used for decades and is known to be accurate.  As stated in footnote 2, IAT promotions for the years 1991 through 1993 were not considered in this analysis.

60.    Considering GS-13 to GS-14 proportions of African-American lower mean rank on Best-Qualified list under the Secret Service policy assumptions, with ties considered as mean African-American rank lower than mean non-African American rank, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Combined Background Data Period and the Plaintiffs' Current Class Period.  This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*.  See Attachment F.

61.    Considering GS-13 to GS-14 proportion of mean rank on Best-Qualified list according to policy with ties excluded, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Combined Background Data Period and the Plaintiffs' Current Class Period.  This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*.  See Attachment F.

62.    Considering GS-13 to GS-14 proportion of mean rank on Best-Qualified list according to policy with ties considered as mean African-American rank lower than mean non-African-American rank, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Plaintiffs' Current Class Period.  This difference is statistically significant at the .001 one-tail level, corresponding to less than 1 chance in 1,000 or more than 3.2 standard deviations in the sense of *Hazelwood*.  See Attachment F.

63.    Considering GS-13 to GS-14 proportion of mean rank on Best-Qualified list

12

according to policy with ties excluded, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Plaintiffs' Current Class Period. This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*. See Attachment F.

64.     Considering GS-13 to GS-14 proportion of mean rank on Best-Qualified list according to practice with ties considered as mean African-American rank lower than mean non-African-American rank, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Combined Background Data Period and the Plaintiffs' Current Class Period. This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*. See Attachment F.

65.     Considering GS-13 to GS-14 proportion of mean rank on Best-Qualified list according to practice with ties excluded, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Combined Background Data Period and the Plaintiffs' Current Class Period. This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*. See Attachment F.

66.     Considering GS-13 to GS-14 proportion of mean rank on Best-Qualified list according to practice with ties considered as mean African-American rank lower than mean non-African-American rank, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Plaintiffs' Current Class Period. This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*. See Attachment F.

67.     Considering GS-13 to GS-14 proportion of mean rank on Best-Qualified list according to practice with ties excluded, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Plaintiffs' Current Class Period. This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*. See Attachment F.

68.     Considering GS-14 to GS-15 proportion of mean rank on Best-Qualified list according to policy with ties considered as mean African-American rank lower than mean non-African-American rank, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Combined Background Data Period and the Plaintiffs' Current Class Period. This difference is statistically significant at the .001 one-tail level, corresponding to less than 1 chance in 100 or more than 3.2 standard deviations in the sense of *Hazelwood*. See Attachment F.

69.     Considering GS-14 to GS-15 proportion of mean rank on Best-Qualified list

13

**SA 72**

according to policy with ties excluded, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Combined Background Data Period and the Plaintiffs' Current Class Period. This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*. See Attachment F.

70.    Considering GS-14 to GS-15 proportion of mean rank on Best-Qualified list according to policy with ties considered as mean African-American rank lower than mean non-African-American rank, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Plaintiffs' Current Class Period. This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*. See Attachment F.

71.    Considering GS-14 to GS-15 proportion of mean rank on Best-Qualified list according to policy with ties excluded, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Plaintiffs' Current Class Period. This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*. See Attachment F.

72.    Considering GS-14 to GS-15 proportion of mean rank on Best-Qualified list according to practice with ties considered as mean African-American rank lower than mean non-African-American rank, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Combined Background Data Period and the Plaintiffs' Current Class Period. This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*. See Attachment F.

73.    Considering GS-14 to GS-15 proportion of mean rank on Best-Qualified list according to practice with ties excluded, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Combined Background Data Period and the Plaintiffs' Current Class Period. This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*. See Attachment F.

74.    Considering GS-14 to GS-15 proportion of mean rank on Best-Qualified list according to practice with ties considered as mean African-American rank lower than mean non-African-American rank, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Plaintiffs' Current Class Period. This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*. See Attachment F.

75.    Considering GS-14 to GS-15 proportion of mean rank on Best-Qualified list

14

according to practice with ties excluded, I found there to be fewer instances in which African-American mean rank was lower than were expected based on the composition of the pools for the Plaintiffs' Current Class Period. This difference is statistically significant at the .000 one-tail level, corresponding to less than 1 chance in 2,000 or more than 3.4 standard deviations in the sense of *Hazelwood*. See Attachment F.

76.    In performing these analyses, as before, applicants for lateral transfers were omitted from the data. They are not counted as either applicants or selectees.

77.    In performing these analyses, as before, only "informative" pools affect results. These are the pools that have at least one African-American eligible and at least one non-African-American eligible, and also have at least one successful eligible and at least one not successful eligible. The omitted pools are not informative because they do not contain either both racial groups or both outcomes.

78.    The results above support a finding of adverse impact against African Americans with regard the promotion from GS-13 to GS-14 and GS-14 to GS-15. In particular, statistically significant differences adverse to African Americans were found with regard to attainment among all applicants of Best-Qualified status, promotion from among all Best-Qualified SAs, attainment of annual minimum selected MPP Score among Best-Qualified applicants, and comparison of proportion of Best-Qualified lists on which the mean non-African-American rank exceeds mean African-American rank.

The opinions expressed herein relate to my review of the data and information produced to me to date. To the extent that additional information or data are provided to me, I may supplement my analyses and modify my opinions. Additionally, it is my understanding that I may also be called upon to analyze and express opinions in rebuttal to future testimony, analyses, or opinions provided by Defendant's expert or experts in this action.

Charles R. Mann Associates, Inc. Charges $440 per hour for my services, and $220 per hour for those of my staff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 28th day of September, 2007 at Washington, D.C.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Charles R. Mann, Ph.D.

15

SA 74